**KIRBY NOONAN LANCE & HOGE, LLP**
Michael L. Kirby (50895)
 mkirby@knlh.com
Ryan S Kirby (252674)
 rkirby@knlh.com
350 Tenth Avenue, Suite 1300
San Diego, California 92101-8700
Telephone (619) 231-8666
Facsimile (619) 231-9593

**FREEBORN & PETERS, LLP**
Joseph L. Fogel (*pro hac vice pending*)
 jfogel@freebornpeters.com
Suzanne M. Rose (*pro hac vice pending*)
 srose@freebornpeters.com
311 S. Wacker Drive, Suite 3000
Chicago, Illinois  60606
Telephone (312) 360-6568
Facsimile (312) 360-6594

Attorneys for Plaintiff PINNACLE FITNESS AND
RECREATION MANAGEMENT, LLC

FILED
2008 JUL 29 PM 2: 58
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

'08 CV 1368 W POR

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PINNACLE FITNESS AND RECREATION MANAGEMENT, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> THE JERRY AND VICKIE MOYES FAMILY TRUST, an Arizona trust, DEER VALLEY CAPITAL, LLC, an Alaska limited liability company, and CAREFREE CAPITAL INVESTMENTS, LLC, a Nevada limited liability company, <br><br> Defendants. | CIVIL CASE NO. <br><br><br> **COMPLAINT** <br><br> **JURY DEMAND** |

Plaintiff Pinnacle Fitness and Recreation Management, LLC ("Plaintiff" or "Pinnacle"), for its Complaint against Defendants, The Jerry and Vickie Moyes Family Trust ("Moyes Trust"), Deer Valley Capital, LLC ("Deer Valley"), and Carefree Capital Investments, LLC ("Carefree") (sometimes referred to herein collectively as "Defendants"), alleges as follows:

## THE PARTIES

1.     Plaintiff Pinnacle is a Delaware limited liability company ("LLC") with its principal place of business in Wheeling, Illinois. Pinnacle's sole member is Marsha Forsythe-Fournier ("Ms. Fournier"), who is a citizen of the State of Illinois. Pinnacle is affiliated with a group of companies owned by the Forsythe family located in the Chicago, Illinois area which are involved in, among other things, the energy and power generation businesses.

2.     Defendant Moyes Trust which is, on information and belief, a citizen of the State of Arizona whose trustees are also citizens of the State of Arizona. The Moyes Trust is owned by the Jerry and Vickie Moyes family, an Arizona family which owns various businesses in the transportation, entertainment and real estate development industries and that collection of businesses is sometimes collectively referred to as the "Moyes Group."

3.     Defendant Deer Valley is a part of the Moyes Group, and is, on information and belief, an Alaska LLC with its principal place of business in Arizona. Deer Valley is Defendant Moyes Trust's designated Manager under the LLC Operating Agreement for a non-party, MFC Investments, LLC ("MFC"), an entity which is central to this dispute. Deer Valley's members are Jerry Moyes and his wife, Vicky Moyes, who are both citizens of the State of Arizona.

4.     Defendant Carefree, a member of the Moyes Group, is, on information and belief, a Nevada LLC whose sole member is the Moyes Trust.

5.     Non-party MFC is a Nevada LLC jointly formed by Pinnacle and the Moyes Trust as a 50-50 joint venture for the purpose of loaning money to, and

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  managing the health club operations of, a separate non-party Xeptor, LLC ("Xeptor"),

2  an entity which owns and operates health clubs in Arizona.

## NATURE OF THE ACTION

4     6.    In this action, Pinnacle seeks:  (i) a judicial declaration that Pinnacle and

5  the Moyes Trust entered into a valid and enforceable Buy-Out agreement whereby

6  the Moyes Trust agreed to purchase Pinnacle's entire 50% interest in MFC (the "Buy-

7  Out"); (ii) judicial enforcement of the Buy-Out agreement which the Moyes Trust has

8  unambiguously admitted in writing exists; (iii) immediate payment to Pinnacle of all of

9  the consideration due to Pinnacle under the Buy-Out; and (iv) compensatory and

10  punitive damages for the Moyes Trust's breaches of fiduciary duties and breaches of

11  contract in connection with various joint ventures and the Buy-Out.

12     7.    After agreeing to the Buy-Out, the Moyes Trust and entities under its

13  control, including Defendant Deer Valley, immediately seized control of MFC and its

14  assets in a manner wholly at odds with the interests of a 50% partner (Pinnacle) to

15  whom the Moyes Trust owed fiduciary and contractual duties.  The Moyes Trust has

16  now wrongfully repudiated the Buy-Out and taken over and converted the assets of

17  MFC.  Therefore, in the alternative to its declaratory relief and contract enforcement

18  claims relating to the Buy-Out, Pinnacle also seeks equitable and monetary relief for,

19  among other things, Defendants' breaches of fiduciary duties and contractual duties

20  owed to Pinnacle.

21     8.    After repudiating the binding Buy-Out in bad faith, the Moyes Trust

22  unlawfully conspired with its co-defendants to breach its fiduciary duties and commit

23  other unlawful acts, including:  (i) usurp for themselves the assets of MFC by, among

24  other things, unilaterally executing leases belonging to MFC in the name of Deer

25  Valley, the entity which the Moyes Trust designated to be its Manager under the MFC

26  Operating Agreement, when the right to enter into such leases belonged solely to

27  MFC; (ii) use Defendant Carefree as a guarantor to give the landlord on such leases

28  comfort to do business with Deer Valley; and (iii) usurp and take the health clubs'

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  name, customer bases, proprietary information and certain of the equipment in one or

2  more of the clubs which are owned by MFC and use them for the sole benefit of the

3  Moyes Trust or entities under Defendants' control.  The Moyes Trust and its co-

4  conspirators have, through their wrongful and duplicitous acts, secured for

5  themselves the very benefit of the Buy-Out which they bargained for, but without

6  paying Pinnacle the agreed-upon consideration of approximately $3.5 million due

7  under the Buy-Out.

8  **JURISDICTION AND VENUE**

9      9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332

10  because the matter in controversy exceeds the sum of $75,000, exclusive of interest

11  and costs, and the parties are citizens of different States.

12      10.    This Court has personal jurisdiction over the Moyes Trust and venue is

13  proper in this District because the parties expressly agreed in the MFC Operating

14  Agreement that any litigation arising out of, or related to, the interpretation or

15  enforceability of the Operating Agreement shall be brought in this District, which the

16  parties had selected as a neutral forum for any dispute resolution.

17      11.    This Court has personal jurisdiction over Defendant Deer Valley and

18  venue is proper in this District because Deer Valley is the Moyes Trust's co-

19  conspirator and agent, and is the Moyes Trust's designated manager of MFC under

20  the MFC Operating Agreement and, as stated above, the parties agreed that any

21  litigation arising out of, or relating to, the MFC Operating Agreement shall be brought

22  in this District.

23      12.    This Court has personal jurisdiction over Defendant Carefree and venue

24  is proper in this District because Carefree is the co-conspirator and agent of the

25  Moyes Trust in certain of the wrongdoing alleged herein, including the diversion of

26  assets of MFC to the Moyes Trust in violation of the MFC Operating Agreement and

27  the Moyes Trust agreed to litigate all matters related to the MFC Operating

28  Agreement in this District.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1

## FACTUAL ALLEGATIONS

2

**A.    MFC Is Formed By The Two Partners To Assist Xeptor**

3      13.    Xeptor has owned and operated fitness and health club facilities in

4  Arizona.  During the summer of 2007, Xeptor was in such dire financial condition that

5  it was on the brink of losing its leases on at least two of its fitness clubs because

6  monetary judgments had been entered against Xeptor for failing to make rent

7  payments to its landlord.  To help Xeptor stay afloat and to explore whether Xeptor's

8  assets might be worth acquiring, representatives of the Moyes Trust and Pinnacle

9  jointly organized MFC for the purpose of infusing desperately needed capital into

10  Xeptor's fledgling health club operations, managing and operating the health clubs,

11  and potentially acquiring Xeptor's assets.  Pinnacle and the Moyes Trust initially

12  operated under a "handshake" arrangement whereby they were to equally share

13  funding and management of Xeptor on a 50-50 basis until the business of MFC could

14  be formalized in an LLC Operating Agreement pursuant to which each party would be

15  equal (50/50) members, *i.e.*, equal partners.  The activities by Pinnacle and the

16  Moyes Trust with respect to MFC were joint venture activities giving rise to fiduciary

17  duties owed by the joint venturers to each other.

18      14.    To document their prior existing agreement to be 50-50 partners, in

19  October 2007, Pinnacle and the Moyes Trust formalized their relationship by

20  executing the MFC Operating Agreement (the "Operating Agreement") which was

21  made effective as of August 6, 2007.  (A true copy of the Operating Agreement is

22  attached hereto as Exhibit 1.)  Under the Operating Agreement, the Moyes Trust and

23  Pinnacle each owned 50% of MFC, and each partner agreed to make an initial capital

24  contribution up to a total of $2.2 million. (Exhibit 1, § 1.4, Exhibit A thereto).  Further,

25  pursuant to the Operating Agreement, MFC was to, among other things:

26          a.    manage Xeptor's business and the business of its affiliates
              including certain athletic and fitness club facilities in the Phoenix,
27          Arizona area;

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

   b.    loan and advance funds to and for the benefit of Xeptor for the operation of Xeptor and for pursuit of litigation claims of Xeptor;

   c.    conduct investigation regarding possible acquisition of the assets of Xeptor and/or its affiliates; and

   d.    engage in the business of management, ownership, operation and investment in membership athletic and fitness clubs and facilities.

(Ex. 1 at § 4.1.)

15.    Pinnacle and the Moyes Trust also agreed in their Operating Agreement, among other things, that:

   a.    management of MFC "shall be vested in a Board of Managers" which "shall be comprised of Two (2) Managers[.]" (*Id.* at § 6.1);

   b.    Deer Valley would serve as the Moyes Trust's Manager and Ms. Fournier would serve as Pinnacle's Manager. Deer Valley and Ms. Fournier are sometimes referred to herein as the "Managers". (*Id.* at Exhibit B);

   c.    the Managers "shall have complete and exclusive right and authority to direct and manage the business and affairs of [MFC]" but "[w]ithout the vote or written consent of at least a Majority-in-Interest of the Members, no Manager shall directly or indirectly. . .[d]o any act in contravention of this Agreement[.]" (*Id.* at § 6.8);

   d.    "[a]ny act required to be taken by the Board of Managers under this Agreement and any decision or determination required to be made by the Board of Managers under this Agreement shall require the unanimous approval of the Moyes Managers Group and the Pinnacle Managers Group during such time as Moyes and Pinnacle are the sole Members and have equal Percentage Interests." (*Id.* at § 6.10(b));

   e.    if "[a]ny action required or permitted to be taken by the Managers may be taken by the Managers without a meeting, but upon consent in writing to such action by the unanimous approval of the Managers[.]" (*Id.* at § 6.10(c)); and

   f.    after entering into the Operating Agreement, no member of MFC "shall engage in the operation or ownership of membership fitness or membership athletic clubs." (*Id.* at § 8.5.)

16.    In October 2007, MFC and Xeptor entered into a Second Amended and Restated Management, Loan and Standstill Agreement (the "MSA") effective as of August 6, 2007, pursuant to which MFC was to, among other things, advance funds to and manage the business of Xeptor. Under the MSA, MFC advanced funds to Xeptor to run the fitness clubs with the potential for MFC to acquire the assets of

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Xeptor.  Thereafter, Xeptor and its members executed promissory notes evidencing

2  the MFC advances pursuant to which Xeptor and its members promised to repay

3  MFC all funds advanced.

4      17.     As part of an early attempt to help Xeptor, MFC posted the bond needed

5  in connection with the appeal of a judgment of default entered against Xeptor under

6  its leases on two of its fitness clubs.  The Moyes Trust put up the initial bond prior to

7  the execution of the Operating Agreement, but Pinnacle, as an equal partner, then

8  reimbursed the Moyes Trust fifty percent (50%) of the bond's cost shortly thereafter.

9  Thus, Pinnacle and the Moyes Trust each have a 50% interest in the bond.

10  Pinnacle's 50% interest in that bond is $330,077.14.  In addition, the Moyes Trust

11  also posted cash security for a second appeal of other Xeptor-related litigation for

12  $349,000, for which Pinnacle thereafter also funded 50% of that amount.  Pinnacle's

13  50% interest in that security is $174,500.  These good faith acts by Pinnacle further

14  confirmed the 50/50 joint venture/partnership relationship which Pinnacle had entered

15  into with the Moyes Trust.  In fact, Pinnacle has invested approximately $3.5 million

16  into the MFC joint venture.

17  **B.      The Moyes Trust Refuses To Treat Pinnacle As A True Partner**

18      18.     Despite the fact that an equal partnership was the foundation of the

19  parties' relationship, the Moyes Trust had no real intent or interest in honoring a true

20  partnership with Pinnacle.  For example, in January 2008, without disclosure to

21  Pinnacle, the Moyes Trust unilaterally changed the names of the Xeptor fitness clubs

22  to "Coyote Athletic Clubs", presumably because the Moyes family owns the Phoenix

23  Coyotes hockey team in the National Hockey League ("NHL").  When Pinnacle

24  learned of the unilateral name change and confronted the Moyes Trust about it, the

25  Moyes Trust initially denied that the names had been changed and instead told

26  Pinnacle that the Phoenix Coyotes had simply sponsored a Super Bowl event at the

27  Xeptor fitness clubs that coincided with the 2008 Super Bowl held in Phoenix,

28

1  Arizona.  That story was a fabrication, and was designed to conceal Defendants'
2  wrongful activities.

3      19.    When Pinnacle later discovered that the Moyes Trust had charged
4  almost $40,000 to MFC for the alleged Coyote "sponsorship event", Pinnacle rejected
5  the charges and advised accounting personnel that the charges should be absorbed
6  by the Moyes family-owned Coyotes and not charged to MFC or Xeptor.  The
7  accounting personnel advised Pinnacle that there was no "sponsorship" by the
8  Coyotes and that the charges were strictly for the "grand opening" of the health clubs
9  that coincided with name change to "Coyote Athletic Clubs".  When Pinnacle learned
10 that there had indeed been a name change, it confronted the Moyes Trust again,
11 which only then conceded that the Moyes Trust had, in fact, unilaterally changed the
12 names of the fitness clubs.

13     20.    The Moyes Trust's machinations over the name change not only misled
14 Pinnacle, but it also undermined MFC's settlement discussions in pending litigation
15 between Xeptor and one of its members, Mr. Art Kinberg ("Kinberg"), because the
16 MFC representatives who were sent to try to negotiate a settlement of that litigation
17 were unaware of the name change and Xeptor's adversary blindsided them at the
18 settlement conference with the fact that the names had been changed.  As further
19 evidence of the Moyes Trust's improper machinations and self-dealing, the Moyes
20 Trust later claimed, without any prior notice to or approval by Pinnacle, that the fitness
21 clubs would have to pay a "licensing fee" to the Coyotes for use of the Coyotes'
22 name.  In spite of repeated requests by Pinnacle, the Moyes Trust has never
23 explained the basis for these purported "fees".

24     21.    Despite the Moyes Trust's refusal to act as a true partner and its
25 improper attempt to use Xeptor's assets for its sole benefit, Pinnacle continued to try
26 to work to protect Xeptor, MFC and Pinnacle's substantial investment in MFC.  For
27 example, to address Xeptor's continuing financial troubles, on or about March 3,
28 2008, Pinnacle, the Moyes Trust, Deer Valley and Ms. Fournier adopted certain

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   Consent Resolutions of All of the Members and the Board of Managers of MFC (the

2   "Consent"), pursuant to which MFC resolved to provide Xeptor with additional

3   financial assistance.  Pinnacle, the Moyes Trust, Deer Valley and Ms. Fournier also

4   agreed to consider the purchase of some or all of the assets of Xeptor and agreed

5   that it was in the best interests of Xeptor and MFC to permit MFC to enter into new

6   lease agreements directly with Xeptor's current landlord, Greenstreet Properties

7   ("Greenstreet"), and to obtain a release of Xeptor of any future liability under the

8   leases.  In addition, on or about March 3, 2008, Xeptor entered into a Settlement

9   Agreement and Mutual Release (the "Settlement Agreement") with the landlords of its

10  fitness clubs.  Under the Settlement Agreement, the new leases were to be executed

11  with MFC at or before midnight Pacific time on April 7, 2008.  The Moyes Trust

12  insisted that it be the MFC contact and spokesperson for dealing with Greenstreet

13  because of its relationship with one of Greenstreet investors.

14      22.     Despite knowing of the April 7 deadline, the Moyes Trust delayed in

15  addressing the lease execution issue for several weeks.  Further, the Moyes Trust

16  refused to contribute its 50% share of an MFC capital call until Pinnacle made its

17  capital contribution.  The purpose of the capital call was to provide funds for Xeptor's

18  operations.  Then, when Pinnacle made its contribution, the Moyes Trust continued to

19  refuse to timely fund its share of the capital call.

20      23.     Meanwhile, the relationship between Pinnacle and the Moyes Trust

21  continued to deteriorate because the Moyes Trust refused to treat Pinnacle as an

22  equal partner and, instead, wanted to run MFC unilaterally for Defendants' benefit and

23  without Pinnacle's input and in disregard of Pinnacle's status as an equal partner.

24  Ultimately, in early March 2008, the Moyes Trust made clear to Pinnacle that it would

25  no longer be Pinnacle's partner and that it desired to purchase Pinnacle's interest in

26  MFC.

27  ///

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

**C.    The Moyes Trust Agrees To Buy Pinnacle's 50% Interest In MFC**

24.    Extensive negotiations thereafter ensued via email which culminated in an email from Pinnacle, received by the Moyes Trust late on April 7, 2008, summarizing a list of detailed material terms pursuant to which it had agreed to sell its entire 50% interest in MFC to the Moyes Trust and to which the Moyes Trust had agreed as well.  Pinnacle's email reads, in substantial part:

> I vote "yes" on MFC signing the leases on the condition that Mr. Moyes has agreed in Principle to purchase my 50% interest in MFC on the following terms:
>
> 1.    The [$]375,000 with interest will be paid with profits on a cash basis excluding any related party transactions with audit right reserved.  Interest will paid at the rate of Libor +2% and will be adjusted semi-annually.  The [$]375,000 with interest will be repaid in full prior to any splits on profits with Xeptor.
>
> 2.    The [$]1,352,500.00 will be paid with the earlier of Incentive Payments received or profits on a cash basis excluding any related party transactions with audit rights reserved.  Interest will be paid at the rate of Libor +2% and will be adjusted semi-annually.  The [$]1,352,500 with interest will be repaid in full prior to any splits on profits with Xeptor.
>
> 3.    The approximately [$]1,228,418.72 (with interest at Libor +2%) will be paid in 4 equal semi-annual installments of [$]307,104.68 plus interest with first payment made 6 months after transfer of [Pinnacle's] interests in MFC contingent on closing with Xeptor but not contingent with any agreement or settlement with Art.  The [$]1,228,418.72 with interest will be paid in full prior to any splits on profit with Xeptor.
>
> 4.    50% of Court Deposit of roughly [$]504,077.00 will be split 50/50 as soon as received.
>
> 5.    Complete indemnity from any 3rd party claims against [Pinnacle] arising from or related to any participation in and ownership of MFC and management of Xeptor.

(emphasis added).  The sums reflected in items 1-4 above were based on the amounts Pinnacle had invested in its partnership with the Moyes Trust, a sum of approximately $3.5 million.  Pinnacle also advised the Moyes Trust that Pinnacle would work with "your attorney of choice to formalize this transaction."  (A true copy of

1  the email exchange including Pinnacle's email received on April 7, 2008 is attached

2  hereto as Exhibit 2.)  The "Incentive Payments" referenced in item 2 above were

3  separate contracts executed in connection with each fitness center lease that called

4  for certain payments upon the sale of the strip centers in which the health clubs were

5  located.  The $1,352,500 referenced in item 2 above represented 50% of the

6  incentive money that would be due Pinnacle under the Incentive Payment

7  agreements.

8       25.    In two subsequent emails sent a few minutes later (and each received

9  well before midnight Arizona time on April 7), Pinnacle clarified two of its terms which

10  had already been agreed to by the Moyes Trust:  (i) that the "court deposit"

11  referenced in item 4 of the earlier email [Exhibit 2 hereto] meant that Pinnacle's "50%

12  interest in the court deposit is [$]504,077" and (ii) that the payments in item 3 had

13  been guaranteed personally by Jerry Moyes.  In fact, Jerry Moyes had previously

14  agreed to this guarantee on April 4 and April 6, 2008.  (A true copy of the email

15  exchanges in which Jerry Moyes' guarantee was confirmed is attached as Exhibit 3.)

16  **D.    The Moyes Trust Confirms The Buy-Out Agreement With Pinnacle**

17       26.    After receipt of Pinnacle's emails setting forth the material terms of the

18  Buy-Out, on April 8, 2008, the same Moyes Trust authorized representative who had

19  negotiated the Buy-Out confirmed to counsel for Xeptor that the Moyes Trust had

20  reached an agreement with Pinnacle to buy Pinnacle's interest in MFC.  Specifically,

21  on April 8, 2008 at 7:41 a.m., he told Xeptor's counsel in an email that:  **"I have**

22  **reached an agreement for jerry [Moyes] to buy out marsha [Pinnacle's sole**

23  **member]."**  (emphasis added).  (A true copy of this April 8 email is attached as

24  Exhibit 4.)  The Moyes Trust did not send a copy of this email to Pinnacle or its

25  counsel.

26       27.    At 8:04 a.m. on April 8, 2008, the same Moyes Trust authorized

27  representative replied to Pinnacle's emails of the prior evening [Exhibit 2 and 3],

28  stating: "Marsha-I will summarize **our agreement** and make sure we are agreed on

*Kirby Noonan Lance & Hoge LLP*
*350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700*

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  all issues." (emphasis added). A true copy of that email reply, and the emails from

2  Pinnacle to which the Moyes Trust was responding, is attached hereto as Exhibit 5.

3       28.    The Moyes Trust thus acknowledged in writing that the Buy-Out was a

4  binding and enforceable deal. Indeed, as further evidence of the existence and

5  enforceability of the Buy-Out, the Moyes Trust directed the same Xeptor outside

6  counsel to prepare leases for the health clubs to be executed by Deer Valley rather

7  than MFC. Deer Valley later executed such leases. Further, the Moyes Trust and/or

8  Deer Valley used Carefree as its guarantor on the leases to give comfort to the

9  landlord.

10      29.    On April 9, 2008, Pinnacle again sent an email to the Moyes Trust

11 stating:

> 12    I haven't heard from you. As I didn't hear from you I called
> Bob Shely [Xeptor's counsel] and he said you were trying to
> 13    modify leases and trying to put another entity on the leases
> vs. MFC. As I understand there is a deadline at 5:00 pm
> 14    today on the leases, it would behoove us to finish our
> binding agreement now so you could legally change the
> 15    name on the leases.
>
> 16    Until we have a binding agreement the leases need to stay
> in MFC's name [pursuant to the Consent] and in the future,
> 17    you could assign them to any Moyes entity[.]"

18      30.    In response to Pinnacle's April 9 email, the Moyes Trust did not dispute

19 or object to Pinnacle's statement that there was a "binding agreement" and did not

20 object to keeping the leases in the name of MFC. To the contrary, the Moyes Trust

21 stated: "That is not a problem. I was expecting to get a draft agreement from Alan."

22      31.    On April 9, 2008, at approximately 3:08 p.m., the Moyes Trust explicitly

23 confirmed to Pinnacle that it had agreed to the Buy-Out on the material terms stated

24 in Pinnacle's April 7, 2008 emails. Specifically, the Moyes Trust stated in writing to

25 Pinnacle that while it intended to summarize the emails, the Moyes Trust then

26 admitted the parties had reached an agreement: "But it is my understanding that **we

27 have a deal**" (emphasis added). Further, the Moyes Trust promised that until the

28 formal Buy-Out agreement was executed, it had "no issue" with having the Xeptor

1   leases signed in the name of MFC rather than a Moyes Group entity.  However, the

2   Defendants had already done just the opposite.  That string of April 9, 2008 emails is

3   attached collectively hereto as Exhibit 6.

4          32.    Based on Pinnacle's understanding that the parties had reached an

5   agreement on the material terms of the Buy-Out, Pinnacle drafted a formal Buy-Out

6   agreement memorializing the agreed-upon terms of the Buy-Out.  On April 14, 2008,

7   Pinnacle presented the Moyes Trust with a Acquisition Agreement which incorporated

8   the terms to which the parties had previously agreed.

9          33.    During this same time period, Pinnacle repeatedly asked the Moyes

10  Trust to attend an MFC Board meeting to discuss the business of Xeptor and the

11  parties' prior differences so that they could be resolved in a manner intended to

12  protect the parties' joint investment in MFC and Xeptor while the Buy-Out was being

13  completed.  The Moyes Trust ignored such requests for a Board meeting and, in the

14  process, allowed the business and value of MFC and Xeptor to deteriorate.

15  **E.     The Moyes Trust Repudiates The Buy-Out And Seizes MFC's Assets**

16         34.    On April 10, 2008, the Moyes Trust dropped two bombshells on

17  Pinnacle.  First, the Moyes Trust repudiated the Buy-Out by stating, without any

18  basis, that "even if there had been a deal it is now void."  Second, it informed

19  Pinnacle that the new lease agreements had been executed "on behalf of a moyes

20  entity" and not MFC as the Moyes Trust had previously promised.  The Moyes Trust

21  later admitted that it used Defendant Deer Valley (its controlled entity) to execute the

22  leases.  The Moyes Trust thus breached and repudiated the Buy-Out and breached

23  its contractual and fiduciary duties to Pinnacle.  Further, Deer Valley, the Moyes

24  Trust's designated Manager of MFC under the Operating Agreement, breached its

25  fiduciary duties to Pinnacle.  The Moyes Trust ratified all of these breaches.

26         35.    In spite of the Defendants' egregious conduct, Pinnacle continued to try

27  to work with the Moyes Trust to consummate the Buy-Out.  Based on explicit

28  representations made by the Moyes Trust's representative after April 10, 2008,

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

COMPLAINT

1  Pinnacle in good faith believed that the Moyes Trust was finally going to comply with

2  its obligations and duties under the Buy-Out by, among other things, paying Pinnacle

3  its portion of the bond money for the appeals.  Indeed, on June 4, 2008, the Moyes

4  Trust affirmatively stated that it would send Pinnacle's portion "when we have the

5  money."  (*See* Email from Jeff Shumway to Ms. Fournier, a true copy of which is

6  attached hereto as Exhibit 7.)  On June 18, 2008, the Moyes Trust re-confirmed that it

7  would pay Pinnacle its portion of such funds.  (*See* Email from Elly Penrod to Steve

8  Page, a true copy of which is attached hereto as Exhibit 8.)

9      36.    Despite these repeated affirmations of the Buy-Out, the Moyes Trust

10  continued to repudiate its obligations and breach its duties to Pinnacle.  As recently

11  as June 27, 2008, the Moyes Trust promised to address this issue by no later than

12  June 30, 2008.  Instead, however, on July 3, 2008, the Moyes Trust expressly

13  repudiated its multiple promises to pay Pinnacle its share of the bond money.

14      37.    To compound the Moyes Trust's willful breaches of the Buy-Out, without

15  disclosure to Pinnacle, on information and belief, the Moyes Trust has attempted to

16  force Xeptor to give up its rights in its health clubs so that some or all of them could

17  be transferred to an entity called "Coyote Athletic Clubs" ("CAC"), a name developed

18  by MFC because of the name change referenced in paragraphs 18 and 19 above.

19  The Moyes Trust has used a Xeptor employee to implement this scheme and that

20  person has, on information and belief, acted at the direction of the Defendants, and

21  has threatened to use the Moyes Group's financial power to put Xeptor and certain of

22  its members into financial ruin if they do not agree to release their interests in the

23  health clubs.

24      38.    Further, in breach of its duties to Pinnacle, Xeptor and MFC, on

25  information and belief, the Moyes Trust has also been negotiating a settlement of

26  litigation between Xeptor and Kinberg in litigation related to the health clubs.  On

27  information and belief, the Moyes Trust and Kinberg have also conspired to prevent

28  Xeptor from maximizing the value of certain of the health clubs by agreeing that

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Kinberg would withhold his consent as a Xeptor member to any sale by Xeptor of
2  certain of the health clubs so that they could be taken over by the Moyes Trust or
3  entities under its control and so that Kinberg, who owns the equipment in the clubs,
4  could lease or sell his equipment to the new tenants of the clubs.

5      39.    Thus while Pinnacle has worked diligently to close the agreed-upon Buy-
6  Out, the Moyes Trust and its co-conspirators have attempted to secure for
7  themselves, and to deny Pinnacle, the very benefits of the Buy-Out without paying
8  Pinnacle the agreed-upon consideration of approximately $3.5 million.

9      40.    In their Operating Agreement, Pinnacle and the Moyes Trust agreed that
10  "[i]n any controversy, claim or dispute arising out of, or relating to, [the Operating
11  Agreement]. . .the prevailing party shall be entitled to and awarded, in addition to any
12  other relief, a reasonable sum as litigation/arbitration expenses [including attorneys'
13  fees]." (Ex. 1 at § 20.17.)  Due to the breaches by the Moyes Trust described herein,
14  Pinnacle has been required to obtain counsel and incur legal expenses to protect its
15  rights and to file and pursue this action.

### FIRST CAUSE OF ACTION
#### (Declaratory Judgment - Against Defendant
#### The Moyes Trust Only)

19      41.    Pinnacle repeats and realleges each and every allegation contained in
20  paragraphs 1 - 40 with the same force and effect as if here set forth in full.

21      42.    There are actual, substantial and immediate controversies between
22  Pinnacle and the Moyes Trust concerning the Buy-Out, the Operating Agreement and
23  the other matters described above.

24      43.    The Moyes Trust has repeatedly evidenced its agreement to the material
25  terms of the Buy-Out in emails and admissions to Xeptor's counsel and to Pinnacle as
26  alleged above.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

44.    Despite the Moyes Trust's clear and definite agreement to be bound by the Buy-Out terms, the Moyes Trust now wrongfully claims that it is not bound by the Buy-Out, or that the Buy-Out, if it existed, purportedly "is now void."

45.    The parties are thus presently in dispute over whether the Moyes Trust agreed to the Buy-Out and is therefore the owner of 100% of MFC.

46.    The ownership interests of Pinnacle and the Moyes Trust in MFC must be determined immediately as this dispute impacts not only Pinnacle and its obligations under the Operating Agreement, the Consent and the MSA, but this dispute also directly impacts MFC and the management and operation of Xeptor.

47.    This claim for declaratory relief arises out of or relates to the Operating Agreement because, among other things: (i) it involves to the ownership of MFC which necessarily relates to the Operating Agreement for that entity; (ii) the Moyes Trust's repudiation of the Buy-Out has caused a breach in the Operating Agreement because, after agreeing to and then repudiating the Buy-Out, the Moyes Trust acted as though it was the sole owner of MFC and its business opportunities and engaged in multiple unilateral acts to the detriment of Pinnacle, and breached the covenant of good faith and fair dealing implied in the Operating Agreement, as alleged herein; and (iii) the Buy-Out would require an amendment to the Operating Agreement to, among other things, properly identify the fact that Pinnacle was no longer a member of MFC, and that its entire 50% interest has been purchased by the Moyes Trust.

48.    Further, until such time as Pinnacle's damages can be quantified, the Court should impose an immediate constructive trust on all of MFC's assets, including, but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities under its control, the Incentive Payments described above, the health clubs' names and customer bases and related membership dues, the equipment in one or more of the health clubs and any and all other assets, business opportunities and proprietary information of MFC, whether in possession of the Moyes Trust or in the possession of any of its transferees.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

**SECOND CAUSE OF ACTION**
(Breach of Buy-Out Agreement - Against Defendant
The Moyes Trust Only)

49.    Pinnacle repeats and realleges each and every allegation contained in paragraphs 1 - 40 with the same force and effect as if here set forth in full.

50.    As described above, Pinnacle and the Moyes Trust entered into a valid, binding and enforceable Buy-Out agreement when the Moyes Trust agreed to purchase Pinnacle's entire interest in MFC.

51.    The material terms to which the parties agreed in the Buy-Out agreement were clear and definite, and the object of that agreement was lawful.

52.    The email communications detailed above make it clear that there was a meeting of the minds between Pinnacle and the Moyes Trust and that both parties agreed to the material terms of the Buy-Out.

53.    The Moyes Trust has materially breached the Buy-Out agreement by, among other things, doing the following:

     a.    Repudiating the Buy-Out contract by declaring that there was not an agreement, or that even if there had been an agreement it is now void, and making clear and definitive representations that it was not going to proceed with the contract; and

     b.    Failing to pay Pinnacle the agreed upon consideration under the Buy-Out.

54.    Each one of the above-alleged breaches, by itself, constitutes a breach of contract for which Pinnacle is entitled to damages.

55.    Pinnacle has substantially complied with and performed all of its material obligations under the Buy-Out agreement to the extent it reasonably could, given the Moyes Trust's breaches of duties and repudiation of the Buy-Out.

56.    The Moyes Trust has (and had) no valid legal ground or excuse to justify its breaches of contract as alleged above.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\535644.1

-16-

COMPLAINT

57.    As a direct and proximate cause of the Moyes Trust's breaches of its contractual obligations, Pinnacle has incurred damages in amounts to be proven at trial including, but not limited to, the amounts owed to Pinnacle under the Buy-Out, and any other actual and consequential damages caused by the Moyes Trust's breaches of contract, none of which is limited by contract or governing law.

58.    Further, until such time as Pinnacle's damages can be quantified, the Court should impose an immediate constructive trust on all of MFC's assets, including but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities under its control, the incentive payments described above, the health clubs' names and customer bases and related membership dues, the equipment in one or more of the health clubs and any and all other assets. business opportunities and proprietary information of MFC whether in possession of the Moyes Trust or in the possession of any of its transferees.

### THIRD CAUSE OF ACTION
**(Breach of Covenant or Good Faith and Fair Dealing
Implied in the Buy-Out Agreement - Against Defendant
The Moyes Trust Only)**

59.    Pinnacle repeats and realleges each and every allegation contained in paragraphs 1 - 40 with the same force and effect as if here set forth in full.

60.    Pinnacle and the Moyes Trust entered into a valid, binding and enforceable Buy-Out agreement when the Moyes Trust agreed to purchase Pinnacle's entire interest in MFC.

61.    The material terms to which the parties agreed in the Buy-Out were clear and definite, and the object of that agreement was lawful.

62.    The email communications detailed above make it clear that there was a meeting of the minds between Pinnacle and the Moyes Trust and that both parties agreed to the material terms of the Buy-Out.

63.    Inherent in the Buy-Out agreement is the implied covenant of good faith and fair dealing, which requires, among other things, that neither party to the contract

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  act in such a manner as to deprive the other contracting party of the intended benefits

2  of that contract.

3      64.    As a 50% member of MFC, the Moyes Trust owed Pinnacle the highest

4  fiduciary duties of loyalty, good faith, honesty and full disclosure.

5      65.    The Moyes Trust breached the implied covenant of good faith and fair

6  dealing by, among other things:  (i) inducing Pinnacle into proceeding with the Buy-

7  Out; (ii) then, after an agreement had been reached, declaring in bad faith that there

8  was no Buy-Out agreement or that any such agreement was now void, and making

9  clear and definitive representations that it was not going to proceed with the Buy-Out;

10  and (iii) then, using the leverage it had acquired from representing there was a deal,

11  to misappropriate the very assets the Moyes Trust had agreed to purchase as part of

12  the Buy-Out.

13      66.    The Moyes Trust intentionally impaired and prevented Pinnacle from

14  receiving the intended benefits and entitlements of the Buy-Out agreement.

15      67.    In addition to its intentional breach of the implied covenant of good faith

16  and fair dealing, the Moyes Trust's conduct with respect to the bond money described

17  in paragraph 17 above has been especially willful, wanton and unjust.  On several

18  occasions, the Moyes Trust expressly promised Pinnacle that it would "send [Pinnacle

19  its] share when we have the money" and that it would "wire ½ of the $660,154.28

20  ($330,077.14) per the instructions you sent", only to later renege on those express

21  commitments and wrongfully withhold the funds based on false claims of set-off.

22      68.    Pinnacle has substantially complied with and performed all of its material

23  obligations under the Buy-Out agreement to the extent it reasonably could, given the

24  Moyes Trust's breaches of duties and repudiation of the Buy-Out.

25      69.    The Moyes Trust has (and had) no valid legal ground or excuse to justify

26  its breach of the implied covenant of good faith and fair dealing as alleged above.

27      70.    As a direct and proximate cause of the breach by the Moyes Trust,

28  Pinnacle has incurred damages in amounts to be proven at trial including, but not

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  limited to, the amounts owed to it under the Buy-Out, and any other damages caused

2  by the Moyes Trust's breach, none of which is limited by contract or governing law.

3      71.    Further, until such time as Pinnacle's damages can be quantified, the

4  Court should impose an immediate constructive trust on all of MFC's assets, including

5  but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities

6  under its control, the incentive payments described above, the health clubs' names

7  and customer bases and related membership dues, the equipment in one or more of

8  the gyms and any and all other assets, business opportunities and proprietary

9  information of MFC, whether in possession of the Moyes Trust or in the possession of

10  any of its transferees.

## FOURTH CAUSE OF ACTION
### (Promissory Estoppel – Against Defendant
### The Moyes Trust Only)

14      72.    Pinnacle repeats and realleges each and every allegation contained in

15  paragraphs 1 - 40 with the same force and effect as if here set forth in full.

16      73.    When the Moyes Trust confirmed the Buy-Out, it made an unambiguous

17  promise to Pinnacle that it was buying out Pinnacle's entire 50% interest in MFC.  The

18  Moyes Trust induced Pinnacle to agree to the Buy-Out based, in part, on the

19  representation that Pinnacle could thereafter avoid further funding of Xeptor.

20      74.    Pinnacle reasonably relied on this promise and ceased providing funding

21  for the operation and management of Xeptor, and investing approximately $3.5 million

22  in its partnership/joint venture with the Moyes Trust.

23      75.    Pinnacle's reliance on the Moyes Trust's promises was expected and

24  foreseeable by the Moyes Trust.

25      76.    Pinnacle has relied on the Moyes Trust's promise to its detriment and

26  suffered damages including, but not limited to, exposure to claims by Xeptor against

27  MFC, and resulting damage to Pinnacle's investment in MFC.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

77.    In addition, the Moyes Trust made an additional unambiguous promise to pay Pinnacle its share of the bond monies described in paragraph 17 above.

78.    The Moyes Trust induced Pinnacle to rely on this false promise to pay the bond monies.  Pinnacle's reliance on this promise was expected and foreseeable by the Moyes Trust.  Pinnacle relied on the Moyes Trust's promise to its detriment and suffered damages including, but not limited to, the value of its 50% portion of the bond monies paid by Pinnacle.

79.    Further, until such time as Pinnacle's damages can be quantified, the Court should impose an immediate constructive trust on all of MFC's assets, including but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities under its control, the incentive payments described above, the health clubs' names and customer bases and related membership dues, the equipment in one or more of the gyms and any and all other assets, business opportunities and proprietary information of MFC whether in possession of the Moyes Trust or in the possession of any of its transferees.

**FIFTH CAUSE OF ACTION**
**(Unjust Enrichment – Against Defendants**
**The Moyes Trust And Deer Valley Only)**

80.    Pinnacle repeats and realleges each and every allegation contained in paragraphs 1 - 40 with the same force and effect as if here set forth in full.

81.    The Moyes Trust has been unjustly enriched by keeping and refusing to pay Pinnacle's 50% portion of the bond monies referenced in paragraph 17 above. There is no justification for the Moyes Trust's refusal to pay Pinnacle, particularly in light of the fact that the Moyes Trust explicitly told Pinnacle it would pay Pinnacle its share on several occasions.

82.    The Moyes Trust has also been unjustly enriched by refusing to pay Pinnacle for Pinnacle's approximate $3.5 million investment in MFC.  By seizing the assets of MFC, the Moyes Trust is receiving the benefit of Pinnacle's investment, but

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  wrongfully refuses to either complete the Buy-Out or treat Pinnacle as an equal

2  partner.

3    83.    There is no justification for the Moyes Trust's refusal to pay Pinnacle for

4  its substantial investment in MFC.

5    84.    Deer Valley has also been unjustly enriched by usurping leases, lease

6  rights, health club membership and proprietary information, all of which are assets

7  that belong to MFC, and thus Pinnacle would be entitled to 50% of the value of such

8  assets.

9    85.    As a result of the actions of the Moyes Trust and Deer Valley, said

10  Defendants have been unjustly enriched and Pinnacle has been damaged and has no

11  adequate remedy at law.

12    86.    Further, until such time as Pinnacle's damages can be quantified, the

13  Court should impose an immediate constructive trust on all of MFC's assets, including

14  but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities

15  under its control, the incentive payments described above, the health clubs' names

16  and customer bases and related membership dues, the equipment in one or more of

17  the gyms and any and all other assets, business opportunities and proprietary

18  information of MFC, whether in possession of the Moyes Trust or in the possession of

19  any of its transferees.

20
## SIXTH CAUSE OF ACTION
### (Breach of Contract – Against Defendant
21  The Moyes Trust Only)

22

23    87.    Pinnacle repeats and realleges each and every allegation contained in

24  paragraphs 1 – 40 with the same force and effect as if here set forth in full.

25    88.    The Operating Agreement is a valid and enforceable written contract.

26    89.    The material terms to which the parties agreed to in the Operating

27  Agreement were clear and definite.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

90.    The Moyes Trust breached the Operating Agreement by, among other things, executing the new lease agreements for several of the health clubs on behalf of Deer Valley and not MFC, without Pinnacle's or Ms. Fournier's prior knowledge or consent.  The Moyes Trust has also breached the Operating Agreement by using the health clubs' names, customer bases, proprietary information and related membership dues, and the equipment in one or more of the health clubs, all without Pinnacle's or Ms. Fournier's prior knowledge or consent.

91.    Pinnacle has substantially complied with and performed all of its material obligations under the Operating Agreement, to the extent it reasonably could, given the Moyes Trust's breaches of duties.

92.    The Moyes Trust has (and had) no legal ground or excuse to justify its breach of contract as alleged above.

93.    As a direct and proximate cause of the breach by the Moyes Trust of its contractual obligations under the Operating Agreement, Pinnacle has been damaged in amounts to be proven at trial.

94.    Further, until such time as Pinnacle's damages can be quantified, the Court should impose an immediate constructive trust on all of MFC's assets, including but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities under its control, the incentive payments described above, the health clubs' names and customer bases and related membership dues, the equipment in one or more of the gyms and any and all other assets, business opportunities and proprietary information of MFC, whether in possession of the Moyes Trust or in the possession of any of its transferees.

## SEVENTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing Implied In Operating Agreement - Against Defendant The Moyes Trust Only)

95.    Pinnacle repeats and realleges each and every allegation contained in paragraphs 1 – 40 with the same force and effect as if here set forth in full.

1    96.    The Operating Agreement is a valid and enforceable written contract.

2    97.    The material terms to which the parties agreed in the Operating

3  Agreement were clear and definite.

4    98.    Inherent in the Operating Agreement is an implied covenant of good faith

5  and fair dealing which requires, among other things, that neither party to the contract

6  act in such a manner as to deprive the other contracting party of the intended benefits

7  of that contract.

8    99.    As a 50% member of MFC, the Moyes Trust owed Pinnacle fiduciary

9  duties of loyalty, good faith, honesty and full disclosure.

10    100.    The Moyes Trust's breached the implied covenant of good faith and fair

11  dealing in the Operating Agreement by executing the new lease agreements for

12  several of the health clubs on behalf of Deer Valley and not MFC, without Pinnacle's

13  or Ms. Fournier's prior knowledge or consent.  The Moyes Trust has also breached

14  the Operating Agreement by using the health clubs' names and customer bases and

15  related membership dues, and the equipment in one or more of the gyms, all without

16  Pinnacle's or Ms. Fournier's prior knowledge or consent.

17    101.    The Moyes Trust's breaches of the implied covenants in the Operating

18  Agreement were willful, wanton and done intentionally to harm Pinnacle and benefit

19  the Moyes Trust.

20    102.    Pinnacle has substantially complied with and performed all of its material

21  obligations under the Operating Agreement to the extent it reasonably could, given

22  the Moyes Trust's breaches of duties.

23    103.    The Moyes Trust has (and had) no valid legal justification or excuse to

24  justify its breach of the implied covenant of good faith and fair dealing as alleged

25  above.

26    104.    As a direct and proximate cause of the breach by the Moyes Trust,

27  Pinnacle has incurred damages in amounts to be proven at trial, which are not limited

28  by contract or governing law.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1    105.   Further, until such time as Pinnacle's damages can be quantified, the

2    Court should impose an immediate constructive trust on all of MFC's assets, including

3    but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities

4    under its control, the incentive payments described above, the health clubs' names

5    and customer bases and related membership dues, the equipment in one or more of

6    the gyms and any and all other assets, business opportunities and proprietary

7    information of MFC, whether in possession of the Moyes Trust or in the possession of

8    any of its transferees.

9                              **EIGHTH CAUSE OF ACTION**
                  **(Breach of Fiduciary Duty – Against Defendant**
10                              **The Moyes Trust Only)**

11

12    106.   Pinnacle repeats and realleges each and every allegation contained in

13    paragraphs 1 - 40 with the same force and effect as if here set forth in full.

14    107.   As a 50% member of MFC, the Moyes Trust owed its partner Pinnacle

15    fiduciary duties of loyalty, good faith, honesty and full disclosure.  The Moyes Trust

16    breached its fiduciary duties to Pinnacle by, among other things:  (1) causing its

17    designated MFC manager, Deer Valley, to execute the new lease agreements in

18    direct contravention of the Operating Agreement and Consent; (2) using the health

19    clubs' name and membership bases and related dues and equipment at certain of the

20    health clubs for the benefit of the Defendants or entities under the Moyes Trust's

21    control; (3) usurping for itself the Incentive Payments described in paragraph 24

22    above; (4) diverting MFC assets to the Moyes Trust or entities under its control; (5)

23    causing MFC and Xeptor to incur unnecessary costs far in excess of what was

24    needed under the circumstances; (6) changing the names on the Xeptor fitness

25    centers without disclosure and consent from Pinnacle; (7) negotiating and engaging in

26    other discussions with Kinberg without the knowledge or consent of Pinnacle; and (8)

27    using economic duress to threaten Xeptor and certain of its members with financial

28    ruin.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    108.   As a direct and proximate cause of the Moyes Trust's breach of its

2 fiduciary duties, Pinnacle has been damaged in amounts to be proven at trial.  Among

3 other things, the Moyes Trust's actions have caused Pinnacle to lose the benefits of

4 leases that should have been executed by MFC, the loss of the Incentive Payments

5 when the strip centers are sold as described above and has deprived Pinnacle of the

6 benefit of its substantial investment of approximately $3.5 million in MFC, all of which

7 the Moyes Trust is using for its sole benefit.

8    109.   The breaches of fiduciary duties by the Moyes Trust were willful,

9 malicious and in conscious and intentional disregard of Pinnacle's rights, entitling

10 Pinnacle to an award of punitive damages.

11    110.   Further, until such time as Pinnacle's damages can be quantified, the

12 Court should impose an immediate constructive trust on all of MFC's assets, including

13 but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities

14 under its control, the incentive payments described above, the health clubs' names

15 and customer bases and related membership dues, the equipment in one or more of

16 the gyms and any and all other assets, business opportunities and proprietary

17 information of MFC, whether in possession of the Moyes Trust or in the possession of

18 any of its transferees.

19                    **NINTH CAUSE OF ACTION**
20        **(Breach of Fiduciary Duty – Against Defendant
             Deer Valley Only)**

21

22    111.   Pinnacle repeats and realleges each and every allegation contained in

23 paragraphs 1 - 40 with the same force and effect as if here set forth in full.

24    112.   As the Moyes Trust's designated manager of MFC, Deer Valley owed

25 Pinnacle fiduciary duties of loyalty, good faith, honesty and full disclosure.

26    113.   Deer Valley breached its fiduciary duties to Pinnacle by, among other

27 things, executing the new lease agreements itself in direct contravention of the

28 Operating Agreement and Consent, and diverting MFC assets to itself, the Moyes

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\535644.1                                        -25-                                        COMPLAINT

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Trust, or entities under Defendants' control.  Deer Valley has been unjustly enriched

2  at Pinnacle's expense as a result of its wrongful holding of the leases.

3      114.  As a direct and proximate cause of the breach by Deer Valley of its

4  fiduciary duties, Pinnacle has been damaged in amounts to be proven at trial.  Among

5  other things, Deer Valley's actions have diminished the value of MFC's assets and

6  therefore diminished the value of Pinnacle's interest in MFC.

7      115.  The breaches of fiduciary duties by Deer Valley were willful, malicious

8  and in conscious and intentional disregard of Pinnacle's rights, entitling Pinnacle to an

9  award of punitive damages.

10      116.  Further, until such time as Pinnacle's damages can be quantified, the

11  Court should impose an immediate constructive trust on all of MFC's assets, including

12  but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities

13  under its control, the incentive payments described above, the health clubs' names

14  and customer bases and related membership dues, the equipment in one or more of

15  the gyms and any and all other assets, business opportunities and proprietary

16  information of MFC, whether in possession of the Moyes Trust or in the possession of

17  any of its transferees.

## TENTH CAUSE OF ACTION
**(Civil Conspiracy To Breach Fiduciary Duties – Against All Defendants)**

20      117.  Pinnacle repeats and realleges each and every allegation contained in

21  paragraphs 1 – 40, and 107-115, with the same force and effect as if here set forth in

22  full.

23      118.  Defendants the Moyes Trust, Deer Valley and Carefree, and possibly

24  others, conspired and agreed between and among them that: (i) the Moyes Trust and

25  Deer Valley would breach their fiduciary duties to Pinnacle and (ii) Deer Valley, with

26  the consent of the Moyes Trust and Carefree's financial backing, would tortiously

27  interfere with MFC's prospective business advantage by executing the new lease

28  agreements.

119.    Defendants jointly and severally, with willful, wrongful and conscious disregard for Pinnacle's rights, and with an intent to harm Pinnacle by acting in a manner which has diminished the value of MFC's assets and therefore the value of Pinnacle's interest in MFC, did knowingly facilitate and approve Deer Valley's execution of the new lease agreements in contravention of the Operating Agreement and the wrongful misappropriation of MFC's assets, rights, business opportunities and prospective business advantage.

120.    The agreement between and among the Moyes Trust, Deer Valley and Carefree is an agreement either to accomplish an unlawful purpose or an agreement to accomplish a lawful purpose by unlawful means, and constitutes a civil conspiracy.

121.    As a direct and proximate cause of the civil conspiracy to breach fiduciary duties between and among Defendants the Moyes Trust, Deer Valley and Carefree as alleged above, Pinnacle has incurred substantial damages in amounts to be proven at trial.  Among other things, Deer Valley's actions have diminished the value of MFC's assets and therefore the value of Pinnacle's interest in MFC.

122.    Pinnacle is also entitled to punitive damages as a result of the actions and conspiracy of the Defendants as alleged above.

123.    Further, until such time as Pinnacle's damages can be quantified, the Court should impose an immediate constructive trust on all of MFC's assets, including but not limited to, the leases executed by Deer Valley, the Moyes Trust or entities under its control, the incentive payments described above, the health clubs' names and customer bases and related membership dues, the equipment in one or more of the gyms and any and all other assets, business opportunities and proprietary information of MFC, whether in possession of the Moyes Trust or in the possession of any of its transferees.

## PRAYER FOR RELIEF

Plaintiff Pinnacle respectfully requests that the Court enter judgment in its favor and against Defendants, and each of them, as follows:

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    First Cause of Action

2    a)    Declaring there is an actual, substantial and immediate controversy

3    between the parties relating to the ownership of MFC;

4    b)    Declaring and adjudging that the Moyes Trust agreed to the Buy-Out and

5    therefore a valid and enforceable contract exists between Pinnacle and the Moyes

6    Trust pursuant to which the Moyes Trust agreed to purchase Pinnacle's 50% interest

7    in MFC; and

8    c)    Declaring and adjudging that the Moyes Trust is, upon payment of the

9    promised consideration under the Buy-Out, the sole, 100% owner of MFC;

10    Second Cause of Action

11    a)    Enforcing the Buy-Out agreement entered into by and between Pinnacle

12    and the Moyes Trust as set forth in Pinnacle's April 7, 2008 emails and the Parties'

13    related emails;

14    b)    Awarding Pinnacle all damages, plus costs, interest, expenses, and fees

15    (including attorneys' fees as provided for in the Operating Agreement) it has incurred

16    as a result of the Moyes Trust's breaches of the Buy-Out Agreement; and

17    c)    Ordering immediate payment to Pinnacle of all of the consideration due

18    Pinnacle under the Buy-Out;

19    Third Cause of Action

20    a)    Enforcing the Buy-Out agreement entered into by and between Pinnacle

21    and the Moyes Trust;

22    b)    Awarding Pinnacle all actual and consequential damages;

23    c)    Ordering immediate payment to Pinnacle of all of the consideration due

24    Pinnacle under the Buy-Out; and

25    d)    Awarding Pinnacle all punitive damages permitted by law;

26    Fourth Cause of Action

27    a)    Awarding Pinnacle all relief provided by law for its claim for promissory

28    estoppel, including all actual and consequential damages caused as a result of

1 Pinnacle's reliance on the Moyes Trust's promise to Buy-Out Pinnacle's interest in

2 MFC and the Moyes Trust's additional promise with respect to paying the bond

3 monies;

4    Fifth Cause of Action

5    (a)    Awarding Pinnacle all relief provided by law for its claims for unjust

6 enrichment, including all actual and consequential damages caused as a result of the

7 Moyes Trust's unjust enrichment with respect to the bond money and Pinnacle's

8 investment in MFC;

9    Sixth Cause of Action

10    a)    Awarding Pinnacle all actual and consequential damages;

11    Seventh Cause of Action

12    a)    Awarding Pinnacle all actual and consequential damages; and

13    b)    Awarding Pinnacle all punitive damages permitted by law;

14    Eighth Cause of Action

15    a)    Awarding Pinnacle all actual and consequential damages; and

16    b)    Awarding Pinnacle all punitive damages permitted by law;

17    Ninth Cause of Action

18    a)    Awarding Pinnacle all actual and consequential damages; and

19    b)    Awarding Pinnacle all punitive damages permitted by law;

20    Tenth Cause of Action

21    a)    Awarding Pinnacle all actual and consequential damages; and

22    b)    Awarding Pinnacle all punitive damages permitted by law;

23    On All Causes of Action

24    a)    Ordering that all of MFC's assets, including but not limited to, the leases

25 executed by Deer Valley, the Moyes Trust or entities under its control, the incentive

26 payments described above, the health clubs' name and customer bases and related

27 membership dues, the equipment in one or more of the gyms and any and all other

28 assets, business opportunities and proprietary information of MFC, whether in the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  possession of the Moyes Trust or in the possession of are held in constructive trust

2  for Pinnacle's benefit;

3        b)      For prejudgment interest on all of Pinnacle's damages;

4        c)      For attorneys' fees as provided for in the Operating Agreement;

5        d)      For Pinnacle's costs incurred herein; and

6        e)      Such other and further relief as this Court deems just and proper.

7

8  DATED: July 29, 2008                    KIRBY NOONAN LANCE & HOGE, LLP

9

10                                 By:    _____
                                          Michael L. Kirby

11                                        Ryan S Kirby

12                                        Joseph L. Fogel (*pro hac vice pending*)
                                          Suzanne M. Rose (*pro hac vice pending*)

13                                        FREEBORN & PETERS, LLP

14                                        Attorneys for Plaintiff PINNACLE FITNESS

15                                        AND RECREATION MANAGEMENT, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\535644.1                      -30-                              COMPLAINT

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

## JURY DEMAND

Plaintiff hereby demands a jury on all issues in this action which may be tried by a jury.

DATED: July 29, 2008

KIRBY NOONAN LANCE & HOGE LLP

By: _____
Michael L. Kirby
Ryan S Kirby

Joseph L. Fogel (*pro hac vice pending*)
Suzanne M. Rose (*pro hac vice pending*)
FREEBORN & PETERS, LLP

Attorneys for Plaintiff PINNACLE FITNESS AND RECREATION MANAGEMENT, LLC

**EXHIBIT 1**

# OPERATING AGREEMENT
# OF
# MFC INVESTMENTS, LLC,
### A Nevada Limited Liability Company

This Operating Agreement (the "Agreement") is entered into and dated effective as of the 6th day of August 2007 by and between **THE JERRY AND VICKIE MOYES FAMILY TRUST ("Moyes")** and **PINNACLE FITNESS AND RECREATION MANAGEMENT, LLC.**, a Delaware limited liability company ("**Pinnacle**") (each a "Member" and collectively, the "**Members**"). The Members have formed a Limited Liability Company (the "Company") pursuant to Chapter 86 of the Nevada Revised Statutes, as amended ("Chapter 86"), to be governed according to the terms and conditions as hereinafter set forth.

## ARTICLE 1.
## FORMATION, NAME

1.1    Formation. Pursuant to the Nevada Limited Liability Company Act (the "Act"), the Members have formed a Nevada limited liability company effective upon the filing of the Articles of Organization of the Company with the Nevada Secretary of State. The Company or its designees shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business. The Company shall immediately, and from time to time hereafter, as may be required by law, execute all amendments of the Articles of Organization, and do all filing, recording and other acts as may be appropriate to comply with the operation of the Company under the Act. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than would be the case in the absence of such provision, the Agreement shall control to the extent permitted by law.

1.2    Intent. It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes. It also is the intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the federal Bankruptcy Code. No Member shall take any action inconsistent with the express intent of the parties hereto.

1.3    Name. The Company's name shall be: "MFC INVESTMENTS, LLC." The business of the Company shall be conducted under such name, or such other name or names as may from time to time be designated by the Managers.

1.4    Members. The names of the initial Members of the Company, and their addresses and Percentage Interests are reflected on **Exhibit A.** If any additional Persons are admitted as Members after formation of the Company pursuant to this Agreement, then all actions, approvals, consents and determinations to be made by the Members under the terms of this Agreement shall require the concurrence of a Majority-in-Interest. Any new Members admitted, with their addresses and Initial Capital Contributions, together with revised Percentage Interests for each Member, shall be added to **Exhibit A** as revised by the Company from time to time.

## ARTICLE 2.
## DEFINITIONS

Section 2.1    Definitions. Capitalized words and phrases used in this Agreement shall have the meanings specified in this Article 2:

"*Act*" means Chapter 86 of the Nevada Revised Statutes, as amended from time to time.

"*Additional Member*" means any Person who is admitted to the Company as an Additional Member pursuant to Article 15 of this Operating Agreement.

"*Affiliate*" means, any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term "control" as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

"*Agreement*" or "*Operating Agreement*" means this Operating Agreement of MFC INVESTMENTS, LLC, as amended from time to time. Words such as "herein", "hereinafter", "hereof" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"*Approved Budget*" has the meaning given that term in Section 6.13 hereof.

"*Approved Expenses*" has the meaning given that term in Section 6.13 hereof.

"*Articles of Organization*" or "*Articles*" means the Articles of Organization of MFC INVESTMENTS, LLC, as amended from time to time.

"*Board of Managers*" shall mean collectively all of the Managers of the Company.

"*Budget*" has the meaning given that term in Section 6.14 hereof.

"*Capital Account*" means the account established and maintained for each Member in accordance with this Agreement and capital accounting rules of applicable Treasury Regulations.

2

"*Capital Contribution*" shall mean, with respect to any Member, the amount of money and the net fair market value of any property (including promissory notes or other obligations to contribute cash or property) contributed to the Company by such Member pursuant to any provision of this Agreement whenever made. "*Initial Capital Contribution*" shall mean the initial contribution to the capital of this Company made pursuant to Section 10.1 of this Agreement. "*Additional Capital Contributions*" shall mean any contributions made under Section 10.3 of this Agreement.

"*Core Activities*" has the meaning given that term in Section 4.1 hereof.

"*Chapter 86*" shall mean Chapter 86 of Nevada Revised Statutes, or any corresponding provisions of succeeding law.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"*Company*" shall mean the limited liability company formed pursuant to this Agreement. The name of the Company is MFC INVESTMENTS, LLC.

"*Fiscal Year*" means the Company's fiscal year, which shall be the calendar year.

"*Interest*" shall mean the respective right of a Member or Interest Holder to an allocative share of the economic benefits of the Company, including net profits, net losses and distributions.

"*Interest Holder*" means any Person who holds an Interest in the Company whether as a member or an unadmitted assignee of a Member.

"*Losses*" shall mean, for each Fiscal Year, the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year under the cash method of accounting and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any expenditures described in Section 705(a)(2)(B) of the Code.

"*Majority*" shall mean one or more Members who own (individually or collectively) or have the legal right to vote fifty-one percent (51%) or more of the voting interests. "*Majority-in-Interest*" means one or more Members owning a simple majority of the Interests.

"*Manager*" or "*Managers*" means the Person(s), Member, Members, or Non-member(s) who becomes Manager(s) pursuant to this Agreement or any new Manager(s) selected by the Members in accordance with this Agreement. Except as otherwise provided in this Agreement, the Managers shall have all of the powers and authority exercisable by a Manager under the Act.

3

"*Member*" means each Person who executes an initial counterpart of this Agreement as a Member until such time as an Withdrawal Event has occurred with respect to such Member and such Person becomes a Withdrawn Member, and any Person who subsequently is admitted as a member of the Company until such time as an Event of Withdrawal has occurred with respect to such Member.

"*Membership Rights*" means all of the rights of a Member in the Company, including a member's (i) Interest; (ii) right to inspect the Company's books and records; and (iii) right to participate in the management of and vote on matters coming before the Company.

"*Moyes Counsel*" shall have the meaning set forth in <u>Section 20.1(a)</u>.

"*Moyes Managers Group*" shall mean collectively, the Manager(s) appointed by Moyes pursuant to <u>Section 6.2(a)</u>.

"*Percentage Interest*" means, with respect to each Member, the percentage identified on <u>Exhibit A</u> as that Member's "Percentage Interest" in the Company, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage Interest of the Member whose Interest has been acquired.

"*Person*" shall mean any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"*Pinnacle Counsel*" shall have the meaning set forth in <u>Section 20.1(b)</u>.

"*Pinnacle Managers Group*" shall mean, collectively, the Manager(s) appointed by Pinnacle pursuant to <u>Section 6.2(a)</u>.

"*Profits*" shall mean, for each Fiscal Year, the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year under the cash method of accounting and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any income described in Section 705(a)(1)(B) of the Code.

"*Regulations*" or "*Treasury Regulations*" shall mean the regulations issued by the U.S. Treasury Department under the Code.

"*Reserves*" means, with respect to any fiscal period, funds set aside or amounts allocated during such period in the sole and absolute discretion of the Managers to reserves which shall be maintained in amounts deemed sufficient by the Managers in their sole discretion for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"*Transfer*" means, when used as a noun, any voluntary or involuntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means voluntarily or

4

involuntarily to sell, hypothecate, pledge, assign, or otherwise transfer. For purposes of this Agreement, a Transfer of a majority or controlling interest in a Member or Interest Holder shall be deemed to be a Transfer of such Member's or Interest Holder's Interest.

"*Withdrawal Event*" means with respect to a specified Person, the death, retirement, resignation, expulsion, bankruptcy or dissolution of such Person.

"*Withdrawn Member*" means a Member following the occurrence of a Withdrawal Event with respect to such Member.

## ARTICLE 3.
## PRINCIPAL OFFICE/REGISTERED OFFICE

Section 3.1    Principal Office.  The principal office of the Company shall be located at 2710 E. Old Tower Road, Phoenix, Arizona 85034 or such other place as the Managers shall determine.  The Company may have such other offices, either within or outside of the State of Nevada, as the Managers may designate or as the business of the Company may from time to time require.

Section 3.2    Registered Office; Agent.  The address of the initial registered office in the State of Nevada of the Company is 4625 West Nevso Drive, Suites 2&3, Las Vegas, Nevada, 89103, and the agent in charge thereof at such address is CHRISTOPHER R. GROBL, ESQ. The registered office and agent may be changed from time to time by action of the Managers and by filing the prescribed form with the Nevada Secretary of State.

## ARTICLE 4.
## PURPOSE AND POWERS

Section 4.1    Purpose.  The Company is organized for any lawful purpose, except insurance, and for such other lawful purposes as the Members may from time to time authorize as permitted under the Act.  The Company shall not engage in any business other than the following, without the written consent of a Majority-in-Interest of the Members.

(a)  acquire a management agreement/relationship with Xeptor, LLC and its affiliates and members for the management of Xeptor's business and the business of its affiliates (the "Xeptor Business") including certain athletic and fitness club facilities (the "Xeptor Clubs") in the Phoenix, Arizona area;

(b)  loan and advance funds to and for the benefit of Xeptor for the operation of the Xeptor Business and Clubs and for pursuit of litigation Claims of Xeptor;

(c)  acquire rights of Xeptor in and to the litigation claims of Xeptor, its Members and/or affiliates and pursue, and fund pursuit of litigation of such claims, including without limitation, any and all claims and potential claims of the which (i) have been made in the pending litigation in Arizona; or (ii) relate to or arise from the facts

5

underlying the such litigation. Claims shall specifically include, but not be limited to, any right or cause of action based on breach of contract that the Plaintiffs have or may have (the "Claims");

(d) conduct investigation regarding possible acquisition of the assets of Xeptor and/or its affiliates, the Xeptor Business, the Xeptor Clubs, and/or interests in Xeptor and/or its affiliates;

(e) engage in the business of management, ownership, operation and investment in membership athletic and fitness clubs and facilities (the "Project");

(f) borrow money and in connection therewith, mortgage, encumber, pledge, hypothecate, or subject to a deed of trust all or any part of the Project;

(g) sell, exchange, transfer, assign or otherwise dispose of the Project or portions thereof; and

(h) perform such other activities directly related to the foregoing Core Activities as may be necessary, advisable or appropriate, as determined by the Managers to further the foregoing business. The Company shall exist only for the purposes specified in this Section 4.1 (the "Core Activities"), unless approved by a Majority-in-Interest of the Members. No Member or Manager shall have any authority to hold itself out as a general agent of any other Member in any other business or activity.

Section 4.2    Powers.    The Company shall have all the powers granted to a limited liability company under the laws of the State of Nevada.

Section 4.3    Title to Assets.    All assets of the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member shall have an ownership interest in such assets solely by reason of being a Member, other than as provided in this Agreement. Title to all assets of the Company shall be held in the name of the Company or its designated nominee, and each of the Members shall execute, acknowledge, record and file any and all instruments as may be necessary or appropriate to evidence the ownership of such assets by the Company.

## ARTICLE 5.
## TERM

Section 5.1.    Duration.    The Company shall commence its existence on the date its Articles of Organization are endorsed by the Nevada Secretary of State and shall continue perpetually thereafter, unless earlier dissolved as provided in this Agreement, the Articles of Organization, or by statute.

# ARTICLE 6.
## MANAGEMENT

Section 6.1    Management.  Subject to the rights of the Members under the Act or the provisions of this Agreement, management of the Company shall be vested in a Board of Managers.  The authorized number of Managers of this Company shall not be less than ONE (1) nor more than TWO (2) until changed, within the limits specified above, by a resolution amending such exact number duly adopted by the Members as provided in Section 6.8 hereof.

Effective upon execution of this Agreement by the Members, the Board of Managers shall be comprised of Two (2) Managers and the Managers shall be as identified on Exhibit B attached and by reference incorporated herein.  Immediately upon execution of this Agreement, the Board of Managers will cause the execution of any and all amendments of the Articles of Organization, and do all filings and/or recordings necessary or required under the laws of the state of Nevada and any other states or jurisdictions in which the Company engages in business. The Board of Managers shall make all decisions in accordance with the procedures set forth in Section 6.10.  Unless a Manager resigns or is removed, each Manager shall hold office until a successor shall have been appointed.  A Manager need not be a Member of the Company.  Except as provided herein, the Managers shall have the exclusive right and authority to direct, manage and control the business of the Company and shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things that the Managers shall deem to be reasonably required to accomplish the business and objectives of the Company.

Section 6.2    Managers.

(a)    Appointment of Managers.  Deer Valley Capital, LLC was the initial Manager of the Company.  Effective upon execution of this Agreement, Moyes has selected one (1) Manager and Pinnacle has selected one (1) Manager and there will be two (2) Managers.  The Managers appointed by each Member (and each Manager's designated representative) are as identified on Exhibit B attached hereto and incorporated herein by reference.

(b)    Resignation.  Any Manager may resign at any time by giving written notice to the Members.  The resignation of a Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice, which shall be no later than seven (7) days following receipt of the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The resignation of a Manager shall not, if applicable, affect the Manager's rights as a Member and shall not constitute a withdrawal of the Manager as a Member.  In such event, a replacement Manager may be appointed in the manner set forth in Section 6.2.

(c)    Vacancies.  So long as there are only two Members of the Company and those Members have equal Percentage Interests, each shall be entitled to select one (1) Manager (or an equal number of Managers).  In the event that there are more than two Members or the two

7

Members have other than equal Percentage Interests, Managers shall be selected by a Majority in Interest of the Members.

(d) <u>Compensation</u>. Except as otherwise agreed by the Members, the Board of Managers shall serve without compensation from the Company.

Section 6.3    <u>General Obligations</u>. The Managers shall execute and cause to be filed original or amended documents and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the state of Nevada and any other states or jurisdictions in which the Company engages in business and, if required by law, shall execute and cause to be recorded appropriate original or amended documents in each county in each such other state in which the Company conducts business.

Section 6.4    <u>General Authority</u>. Subject to the provisions of <u>Section 6.8</u> hereof, the Managers shall have complete and exclusive right and authority to direct and manage the business and affairs of the Company. If there is more than one Manager, the rights and powers of the Managers shall be exercised among them as they may, in writing, agree among themselves, but in the absence of such written agreement or in the event of deadlock or other lack of decision pursuant to such other agreement, they shall be bound by the Majority vote (determined in accordance with Section 6.10(b)) of the Managers then in office. Except as provided in <u>Section 6.8</u> hereof, the Members (other than a Member who is also a Manager) shall have no right to participate in the management or control of the business and affairs of the Company, and shall have only the voting rights specifically set forth in this Agreement or as otherwise required and not subject to waiver under Chapter 86. In addition to this general management authority, the Board of Managers shall have the following specific rights, subject to compliance with the other provisions of this Agreement:

(a)    To contract to sell, sell, lease, exchange, grant any option on, or otherwise transfer or dispose of any Company real property or personal property or any portion thereof or any interest therein;

(b)    To operate, manage, and collect income from any real property or personal property owned by the Company in accordance with this Agreement;

(c)    To make any reasonable expenditures for the organization, operation and conduct of the business and affairs of the Company and to negotiate, execute, acknowledge, file, record, deliver and perform any agreements and instruments considered necessary or appropriate by the Manager for the conduct of the Company business and affairs in accordance with this Agreement or for the implementation of the powers granted under this Agreement;

(d)    To borrow money from banks, other third party lenders or the Members on terms and conditions which the Manager deems reasonable, and to pledge, mortgage and grant security interests or deeds of trust in or on any property owned by the Company as security for the payment of indebtedness authorized by this Agreement;

8

(e)    To mortgage, pledge, hypothecate or authorize or grant any security interest or lien in or on Company property, other than to secure repayment of indebtedness authorized by this Agreement;

(f)    To prepay, modify, amend, renew, or extend any authorized Company indebtedness.

(g)    If such Manager or Managers serve as the tax matters partner for the Company as appointed under Section 6.8 hereof, to make any and all elections for federal, state and local tax purposes including any election, if permitted by applicable law to adjust the basis of property pursuant to Sections 754, 734(b) and 743(b) of the Code, or comparable provisions of state or local law, in connection with transfers of any Interest or Membership Rights in the Company and Company distributions;

(h)    To procure and maintain insurance for the benefit of the Company;

(i)    To invest Company funds in commercial paper, government securities, certificates of deposit, time deposits, banker's acceptances, money market funds, or similar investments having a maturity generally considered to be short term;

(j)    To employ or engage and compensate persons in addition to the Manager to manage or operate Company property and to perform Company administrative services, accounting services, independent auditing services, accounting services, legal services, and other services for the benefit of the Company and to compensate them from funds of the Company;

(k)    To amend the Articles of Organization to correct an administrative error or to reflect a transfer of Interest to an entity or trust controlled by a Member or to reflect a transfer of an Interest resulting from the death or disability of a Member;

(l)    To prepare and revise annual budgets for the Company;

(m)    To improve any real property owned by the Company as determined by the Manager in his sole and absolute discretion;

(n)    To settle all claims and other demands or liabilities incurred as a result of operation of any property, whether real or personal, owned or operated by the Company;

(o)    To execute on behalf of the Company and in its name all instruments and documents, including without limitation, checks, drafts, notes and other negotiable instruments, mortgages and deeds of trust, security agreements, financing statements, and other instruments or documents necessary for the acquisition, operation, financing and maintenance of property owned by the Company;

9

(p)     To designate a Member to act as tax matters partner pursuant to Section 6221 of the Code;

(q)     To employ accountants, legal counsel, and other professional advisors and experts to perform services for the Company and to compensate them from funds of the Company;

(r)     To obtain and maintain, on behalf and for the benefit of the Company all necessary licenses, permits or other municipal or state documentation or allowances of any kind, type or nature relating to the business or operation of the Company; and

(s)     To do and perform all other acts as may be necessary or appropriate to further the purpose of the Company and this Agreement.

Section 6.5     Scope of Duties.     The Manager(s) shall not be required to devote his/her/its full time to the business or affairs of the Company, but shall devote the time reasonably necessary to perform the duties of the Manager under this Agreement and to prudently manage and operate the Company's business and properties.

Section 6.6     Limitation of Liability and Indemnification of Manager.

(a)     The Manager(s) shall not be liable for the return of any contribution of capital of any Member or for any profits thereon, and any return of capital and profits shall be made, if at all, solely from the assets and business of the Company;

(b)     Except as otherwise provided herein, the Manager shall not be liable to the Company or the Members or other Interest Holders for any act or omission in connection with the business or affairs of the Company so long as the Manager against whom liability is asserted acted in good faith on behalf of the Company and in a manner reasonably believed by the Manager to be within the scope of authority under this Agreement and in the best interests of the Company, unless such act or omission constitutes gross negligence, intentional misconduct, fraud or a knowing violation of law;

(c)     The Company or its successor, trustee or receiver shall indemnify, defend and hold harmless the Manager(s) against all claims, demands, actions, losses, liabilities, damages, costs and expenses, which after the date of this Agreement arise out of the Company or its business or affairs, including reasonable attorneys' fees incurred in defending all such matters. However, this indemnification shall apply only if the Manager against whom a claim, action or demand is asserted has acted in good faith on behalf of the Company and in a manner reasonably believed by the Manager to be within the scope of authority under this Agreement and in the best interests of the Company, and only if the act or omission underlying the claim, action or demand did not constitute gross negligence, intentional misconduct, fraud or a knowing violation of law; and

10

3096947v2(59007.1)

(d)    The satisfaction of the indemnification obligations of the Company under this Section 6.6 shall be from and limited to the assets of the Company, and no Member or other Interest Holder shall have any personal liability for satisfaction of any such indemnity obligations. In the event that a final determination by a court of competent jurisdiction is made that the Company is not obligated in respect of any amount previously paid by it to or on behalf of any Manager, the Manager shall refund that amount within thirty (30) days of the final determination.

Section 6.7    Binding Authority. Whether or not there is more than one Manager, the signature of any one Manager under this Agreement shall be sufficient to bind the Company to any agreement or on any document or instrument. Each Member and other Interest Holder agrees not to assert any claims to the effect that execution or performance of any such instrument or document breached this Agreement or the duties of the Manager(s), against any person dealing with the Manager(s) in good faith and without actual notice of the asserted claim at the time of the delivery of the instrument or document, provided that this Section 6.7 shall not be construed to limit any recourse by any Member against the Manager or the Company for any breach of this Agreement or the duties of the Manager. Any person dealing with the Company may rely upon a certificate signed by any Manager as to (a) the identity of any Member, (b) any fact relevant to the Company, and (c) the due authority of persons purporting to act on behalf of the Company.

Section 6.8    Majority Vote Restrictions on Manager(s) Authority. Without the vote or written consent of at least a Majority-in-Interest of the Members, no Manager shall directly or indirectly:

(a)    Do any act in contravention of this Agreement, as amended from time to time;

(b)    Do any act which would make it impossible to carry on the ordinary business of the Company, provided that actions of the Manager in accordance with the purposes of the Company or rights and powers granted under this Agreement shall not be considered to breach this clause;

(c)    Knowingly perform any act that would subject any Member to liability as a general partner of a partnership in any jurisdiction;

(d)    Commingle funds of the Company with funds of any other person;

(e)    Guarantee the indebtedness of any person or cause, suffer or permit any Company property to secure or become collateral for any indebtedness of any person other than the Company;

(f)    Unless such Manager or Managers have been appointed as the tax matters partner for the company as provided below, extend the statute of limitations for assessment of tax deficiencies against the Company and its Members with respect to adjustments to the Company's federal, state or local tax returns;

11

(g)    Unless such Manager or Managers have been appointed as the tax matters partner for the Company as provided below, represent the Company, the Members and Interest Holders before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company, the Members and any Interest Holders in their capacities as such, and to execute any agreements or other documents relating to or affecting tax matters, including agreements or other documents that bind the Members and Interest Holders with respect to tax matters or otherwise affect the rights of the Company, Members and Interest Holders;

(h)    To name a new or an additional Manager of the Company;

(I)    To terminate, dissolve, or wind up the Company as set forth in Section 17.3 hereof;

(j)    Appoint one of the Managers as the tax matters partner for the Company; or

(k)    Cause or permit any new issuances, sales or transfers, in any one or more related or unrelated transactions, to persons who, as of the date of this Agreement, are not Members.

Section 6.9    Insurance. At all times during which the Company owns real or personal property, the Manager through its President shall cause the Company to obtain, maintain, renew and pay for fire and other casualty, rental income or interruption, general liability, worker's compensation, automobile, and other insurance in amounts, on other terms, and from insures customarily required by or acceptable to commercial lenders loaning money secured by similar property.

Section 6.10    Meetings of Managers.

(a)    Meetings. Meetings shall be held once each month or otherwise in accordance with a schedule established by the Board of Managers. In addition, meetings of the Managers may be called by any Manager or by the president, vice-president or the secretary, if any. All meetings shall be held upon four (4) days notice by mail or courier service or forty-eight (48) hours notice delivered personally or by telephone, telegraph, electronic mail or facsimile. Each notice of meeting must include an agenda setting forth the items of business for such meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting. A majority of the Managers present, whether or not a quorum is present, may adjourn any meeting to another time and place. If the meeting is adjourned for more than forty-eight(48) hours, notice of any adjournment shall be given prior to the time of the adjourned meeting to the Managers who are not present at the time of the adjournment. Meetings of the Managers may be held at any place within or without the State of Arizona which has been designated in the notice of the meeting or at such place as

12

maybe approved by the Managers. Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers participating in such meeting can hear one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. A majority of the Managers, present in person or through their duly authorized attorneys-in-fact, shall constitute a quorum at any meeting of the Board of Managers. Business may be conducted once a quorum is present.

(b)    Decision of Managers. Any act required to be taken by the Board of Managers under this Agreement and any decision or determination required to be made by the Board of Managers under this Agreement shall require the unanimous approval of the Moyes Managers Group and the Pinnacle Managers Group during such time as Moyes and Pinnacle are the sole Members and have equal Percentage Interests. Each of the Moyes Managers Group and the Pinnacle Managers Group shall have votes equal to the Percentage Interest of Moyes and Pinnacle, respectively, on any such required action, decision or determination requiring the approval of the Managers. The Managers of each of the Moyes Managers Group and the Pinnacle Managers Group shall be solely entitled to determine how any vote of such group shall be cast on any matter. In the event there are only two Members of the Company and those two Members have other than equal Percentage Interests, actions and decisions by the Board of Managers shall require a Majority vote based on the Percentage Interests of the respective Member that appointed the Manager.

(c)    Written Consent. Any action required or permitted to be taken by the Managers may be taken by the Managers without a meeting, but upon consent in writing to such action by the unanimous approval of the Managers.

Section 6.11    Transactions Between the Company and the Managers. Notwithstanding that it may constitute a conflict of interest, the Managers may, and may cause any Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as, after full disclosure of the terms and conditions of such transaction to the Company by such interested Manager or Affiliate all of the disinterested Managers determine that the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them, and in similar transactions between parties operating at arm's length.

Section 6.12    Officers.

(a)    Appointment of Officers. The Managers may appoint officers at any time and do appoint the initial officers set forth on Exhibit C. The officers of the Company may include a president, vice president(s), secretary, a chief financial officer or treasurer and such other officers as determined by the Managers. The officers shall serve at the pleasure of the Managers, subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. No officer need be a resident of the State of Nevada. The officers shall exercise such powers and perform such duties as specified in this Agreement

13

3096947v2(59007.1)

and as shall be determined from time to time by the Managers. The initial officers of the Company are as identified on <u>Exhibit C</u> attached and by reference incorporated herein.

(b)    <u>Removal, Resignation and Filling of Vacancy of Officers</u>. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Managers at any time. Any officer may resign at any time by giving written notice to the Managers. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice, which shall be no later than seven (7) days following receipt of the notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party. A vacancy in any office may be filled by the Managers.

(c)    <u>Salaries of Officers</u>. The salaries, if any, of all officers and agents of the Company shall be fixed by a resolution of the Managers.

(d)    <u>Duties and Powers of the President</u>. The President, shall be the chief operating officer of the Company, and shall hold and exercise such authority as delegated by the Managers, have general and active management of the business of the Company, shall have control of the day to day operations of the Company and the Project, shall have the right, power and authority to implement all Approved Budgets adopted by the Managers in accordance with the terms of this Agreement and shall see that all orders and resolutions of the Managers are carried into effect. Consistent with the above, he or she shall have the general powers and duties of management usually vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed by the Managers or this Agreement.

With the consent of the Managers, the President shall have the full power to execute, for and on behalf of the Company, any and all documents and instruments which may be necessary to carry on the business of the Company, including, without limitation, any and all deeds, contracts, leases, mortgages, deeds of trust, bonds, promissory notes, security agreements, financing statements and other contracts or instruments pertaining to the Company's assets or obligations, and other contracts requiring a seal, under the seal of the Company, except where required or permitted by law to be otherwise signed and executed or with terms of over one (1) year, and except where the signing and execution thereof shall be expressly delegated by the Managers to some other officer or agent of the Company.

(e)    <u>Duties and Powers of Vice-President</u>. The vice-president, if one is appointed, or if there shall be more than one, the vice-presidents in the order determined by a resolution of the Managers, shall, in the absence or disability of the president, perform the duties and exercise the powers of the president and shall perform such other duties and have such other powers as the Managers by resolution may from time to time prescribe; <u>provided</u>, however, the vice-president shall have no authority to sign any contract, incur any obligation or enter into any agreement on behalf of the Company without the Managers written authorization or ratification.

14

(f)    Duties and Powers of Secretary.

(i)    The secretary, if one is appointed, shall record all the proceedings of any meetings of the Managers and the Members and shall give, or cause to be given, notice of all meetings of the Managers and the Members and shall perform such other duties as may be prescribed by the Managers. The secretary shall have custody of the seal, if any, and the secretary shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature. The Managers may give general authority to any other officer to affix the seal of the Company, if any, and to attest the affixing by his or her signature.

(ii)    The secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Company's transfer agent or registrar, as determined by resolution of the Managers, a register, or a duplicate register, showing the names of all Members and their addresses, their Percentage Interests, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation. The secretary shall also keep all documents as may be required under the Act. The secretary shall have the general duties, powers and responsibilities of a secretary of a corporation.

(g)    Duties and Powers of Chief Financial Officer. The chief financial officer, if one is appointed, shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital and Interests. The chief financial officer shall disburse the funds of the Company as may be ordered by the Managers, and shall render to the President and the Managers, or at a meeting of the Members an account of the financial condition of the Company. The chief financial officer shall perform such other duties and shall have such other responsibility and authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The officer shall have the general duties, powers and responsibility of a chief financial officer of a corporation and may also be designated as the treasurer.

(h)    Signing Authority of Officers. Upon the prior approval of the Managers, an officer, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. The President is hereby authorized to and may execute checks or drafts issued by the Company on behalf of the Company. Subject to the limits of authority enacted by the Managers, the President shall be authorized to sign contracts and obligations on behalf of the Company, unless the Managers expressly authorize or ratify, in writing, such action by another officer of the Company.

Section 6.13    Budgets. The Managers shall within ten (10) days of execution of this Agreement approve an operating budget for 2007 (the "Initial Approved Budget"). Prior to December 1, 2007, the Managers shall approve an operating budget for 2008 for the Company

15

(the "Approved Budget"). For each subsequent fiscal year, the CFO, in conjunction with the President, shall prepare and present for the approval of the Managers in accordance with Section 6.14 a separate annual operating budget (the "Budget") for the Company, setting forth in detail all anticipated Company expenses. The CFO shall present the annual operating budget for approval by the Managers not later than November 1 of the year preceding the year covered by the proposed budget, and the Managers shall approve the annual operating budget by December 1 of each year in accordance with the provisions of Section 6.14. Budgets shall include a reasonable contingency reserve for unanticipated costs associated with the matters covered thereby. The CFO, in consultation with the President, may from time to time submit revisions or modifications to Budgets to the Managers for approval; provided that no revisions or modifications shall be implemented unless approved in accordance with Section 6.14 hereof. The Initial Approved Budget and each other Budget, including any revisions thereto, which is approved in accordance with Section 6.14 hereof, shall be termed an "Approved Budget." Specific expenditures to operate the Project may be made only pursuant to an Approved Budget; provided that the President, shall have discretion to use contingency reserves included in any Approved Budget in any reasonable manner and shall be permitted to make reasonable adjustments between line items reflected on an Approved Budget if the expenses intended to be paid pursuant to the line item from which funds are transferred are in fact incurred and paid (at a total cost less than budgeted) and the items on which the transferred funds are expended were included among the items set forth in the Approved Budget (and were incurred at a cost greater than budgeted). Notwithstanding the foregoing, any increase in any individual line item in an Approved Budget that exceeds the lesser of $10,000 or 10% of the line item shall require the approval of the Managers or if it cannot agree, the approval of a Majority in Interest of the Members. All expense items identified in the Company's Approved Budget from time to time shall constitute "Approved Expenses" of the Company.

Section 6.14 <u>Mechanism for Obtaining Consents</u>. The CFO or President may propose approval of Budgets, operating plans and amendments thereto by the Managers by giving notice thereof to each Manager (which notice may include alternative recommendations or proposals by the Managers). The Managers shall cooperate in good faith to reach mutual agreement on all matters submitted for the approval of the Managers (including, without limitation, any Budgets, operating plans, schedules, and modifications thereto proposed by the CFO or President and any other matters proposed by the President within ten (10) days of their submission to the Managers.

## ARTICLE 7.
## COMPENSATION AND EXPENSES OF MANAGER

Section 7.1 <u>Compensation</u>. No Manager or Member shall receive any compensation for services rendered to or on behalf of the Company, except as otherwise provided herein, or except as set forth in a written document, including a budget, that is approved by all of the Members of the Company.

Section 7.2 <u>Reimbursable Expenditures</u>. The Manager shall be entitled to payment of, or reimbursement for, all reasonable bona fide business expenses incurred in connection with the

16

Company business, upon presentation of satisfactory documentation as to time, place, amount, and nature and business purpose of such business expense.

Section 7.3  Expenses.  Upon formation of the Company, each of the Members shall be reimbursed their costs and expenses, including reasonable attorneys' fees, incurred in the preparation and negotiation of this Agreement.

## ARTICLE 8.
## RIGHTS, RESTRICTIONS AND OBLIGATIONS OF MEMBERS

Section 8.1  Limitation of Liability.  Each Member's liability for the debts and obligations of the Company shall be limited as set forth in the Act and other applicable law.

Section 8.2  List of Members.  Upon written request of any Member, the Manager shall provide a list showing the names, last known addressees and interests of all Members of the Company.

Section 8.3  Priority and Return of Capital.  No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Profits, Losses or distributions; provided that this Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

Section 8.4  Restrictions on Members.  No Member, in the capacity as such, without the consent of the Majority-in-Interest, shall do any of the following:

(a)  Borrow or lend money on behalf of the Company;

(b)  Purport to or sell, mortgage, lease, or otherwise dispose of or encumber property of the Company;

(c)  Sell, assign, pledge, or mortgage a Member's Interest in the Company, except as otherwise provided in Article 15;

(d)  Purchase any real estate or equipment on behalf of the Company;

(e)  Exercise or represent to any third party that such Member has the right to exercise any of the powers of the Managers described in this Agreement.

Section 8.5  Other Business Activities; Disclosure; Waiver.  The Members hereby agree that the creation of the Company and the assumption by each of the Members of their duties hereunder shall be without prejudice to their rights to have other business interests and activities and to receive and enjoy profits or compensation therefrom, and each Member waives any rights it might otherwise have to share or participate in such other interests or activities of the other Members or its affiliates. Each Member may engage in or possess any interest in any other business venture of any nature or description independently or with others, and neither the

17

Company nor the other Members shall have any right by virtue of this Agreement in and to such venture or the income or profits derived therefrom.

The Members expressly agree, however, that no Member shall engage in the operation or ownership of membership fitness or membership athletic clubs. This prohibition shall not limit any, or be deemed to limit any, business in which any Member is engaged on the date of this Agreement, or limit or create any limitation on ownership or operation of any business by a Member in any professional sports teams or clubs or related activities.

Section 8.6    Admission of New Members. No additional Persons shall be admitted as a Member in the Company as a result of the issuance of additional Interests or Membership Rights without the consent of the Majority-in-Interest of the existing Members. All new Members and all existing Members shall execute amended Articles of Organization, if required to be filed with the Secretary of State, and amended Operating Agreement before any new Member becomes a Member of the Company.

## ARTICLE 9.
## MEETINGS OF MEMBERS

Section 9.1    Annual Meetings of Members. The annual meeting of the Members shall be held at such time as shall be determined by the Managers, commencing with the year 2007, for the purpose of the transaction of such business as may come before the meeting. Should the date of the annual meeting fall upon a legal holiday, then the annual meeting shall be held at the same time and place on the next day which is not a legal holiday.

Section 9.2    Special Meetings. Special meetings of the Members may be called at any time by the Manager of the Company or by Member(s) holding a Majority of the outstanding Percentage Interests by delivering written notice of such meeting to the Manager.

Section 9.3    Voting Rights. Each Member shall be entitled to one (1) vote for each Percentage Interest in the Company afforded to such Member under Section 10.1 hereunder, for the purpose of approving or taking action required or permitted to be taken or approved by the Members under this Agreement, except as otherwise provided herein or required by Chapter 86. No withdrawn member shall be entitled to vote nor shall such Member's Interest be considered outstanding for any purpose pertaining to meetings or voting.

Section 9.4    Notice. The Manager of the Company shall cause written notice of the annual meeting, and any special meeting, to be given to each Member entitled to vote at the meeting, either in person, by facsimile transmission or by first class mail, postage prepaid, not less than ten (10) days nor more than sixty (60) days prior to such meeting. The notice shall specify the place, the day, and the hour of such meeting. In addition, the notice of any special meeting shall specify the purpose or purposes for which the meeting is called. Notice shall be deemed delivered by first class mail if mailed to the address of each Member as such Member's address appears on the Company's records. If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the

18

3096947 v2(59007.1)

Member at his or her address as it appears on the books of the Company, with postage thereon prepaid. If transmitted by way of facsimile, such notice shall be deemed to be delivered on the date of such facsimile transmission to the fax number, if any, for the respective Member which has been supplied by such Member to the Company and identified as such Member's facsimile number.

Section 9.5    Waiver of Notice.  Any meeting of the Members, however called and noticed or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present, and if, either before or after the meeting, each of the Members not present signs a written waiver of notice or a consent to holding such meeting or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the records or made a part of the minutes of the meeting.

Section 9.6    Action by the Members Meeting; Quorum; Majority.  The Members may only vote upon matters as to which the Members are authorized to take action pursuant to this Agreement or by applicable law and not subject to modification or waiver. Except as specifically otherwise provided herein, Members may vote, approve a matter or take any action by the vote of Members at a meeting, in person or by proxy or without a meeting by written consent. A Majority-in-Interest of the Members, represented in person or by proxy, shall constitute a quorum at any meeting of Members (or if required by Chapter 86, Members owning at least fifty-one percent (51%) of the total Interests entitled to vote at the time of the action taken). If any Interest has been transferred under this Agreement to persons who are Interest Holders but who have not been admitted as Members, the voting rights associated with such Interests shall not be considered outstanding for purposes of any vote by Members under this Agreement unless by the terms of the transfer the assigning Member retains such voting rights and the Company received actual written notice of the foregoing. The voting power or rights of the Members for all purposes of this Agreement shall be determined as of the date of giving notice of the meeting or as of the date of the notice for proposed action by written consent without a meeting.

Section 9.7    Adjourned Meetings.  In the absence of a quorum at any such meeting, the Manager (or in its absence, a Majority-in-Interest of the Members present) may adjourn the meeting from time to time to another time and place, without notice other than announcement at the meeting until a quorum shall be present. However, when any Members' meeting, either annual or special, is adjourned for thirty (30) days or more, notice of the adjourned meeting shall be given as in the case of an original meeting.

Section 9.8    Action by Written Consent.  Any action may be taken by the Members without a meeting if authorized by the written consent of Members holding at least fifty-one percent (51%) of the Interests (or if required by Chapter 86 Members holding more than fifty-one percent (51%) of the Interests), or such higher percentage as required under Chapter 86 or this Agreement. In no instance where action is authorized by written consent need a meeting of Members be called or noticed.

Section 9.9    Place of Meeting of Members.  The Manager may designate any place, either within or outside the State of Nevada, as the place of meetings of the Members. The first

19

meeting of the Members shall be held at the principal office of the Company set forth in this Agreement, and thereafter as provided in the notice of any meeting of the Members.

Section 9.10   Record Date.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

Section 9.11   Proxies.  At all meetings of Members a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  Such proxy shall be filed with the Managers of the Company before or at the time of its exercise.  No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

## ARTICLE 10.
## CAPITAL CONTRIBUTIONS AND MEMBERS INTERESTS

Section 10.1   Capital Contributions.  Each Member is deemed admitted as a Member of the Company upon execution and delivery of this Agreement.  The initial capital contributions of the Members shall consist of the cash, property or services as set forth in Exhibit A attached hereto, which shall be updated by the Company as appropriate to reflect additional changes in membership and capital contributions.  The total capital of Members in the Company from time to time shall be referred to as the Members "Capital."

Moyes has made capital contributions to the Company as set forth on Schedule 1 to this Agreement.  Pinnacle also made capital contributions to the Company as set forth on Schedule 1.  Further, Pinnacle has made certain loans directly to Xeptor, LLC, as set forth on Schedule 2 attached hereto (the "Pinnacle Loans"), which loans are not capital contributions to the Company.  The Members agree that all rights of Pinnacle and/or Marsha Forsythe-Fournier to acquire membership interests in Xeptor are contributed to and shall be assets of the Company.  In the event that the membership interests in Xeptor held by M.H. Holdings (Arthur Kinberg) (the "MH Interest") are available, the amount of $100,000.00, or portion thereof, loaned by Pinnacle or Fournier to Xeptor and reflected on Schedule 2 may, at the option of the Company, be used to acquire the MH Interest as an asset of the Company and, if so, such amount utilized will be credited as a capital contribution to the Company by Pinnacle and an equal amount will be contributed as a capital contribution to the Company by Moyes.

The parties agree that the aggregate value of the Initial Capital Contribution that has been made by each Member to the Company as of the date of execution of this Agreement and pursuant to this Section 10.1 is set forth in Schedule 1 attached hereto and incorporated herein by reference.  The Members agree that to the extent the actual amount contributed as of the date of

20

execution of this Agreement is less than equal, the Member having contributed the lesser amount as of that date will immediately contribute such amount so as to equalize the Capital Contributions. The Members each agree that certain further Initial Capital Contributions may need to be made to the Company and each Member specifically agrees to make such Capital Contributions up to a total initial capital contribution of $2,200,000.00 each. Such additional amounts shall be contributed equally by each Member, so that the Members have contributed equal amounts, upon written request from the President (or the Managers) and shall be made within ten (10) days after receipt of notice from the President to make such Capital Contributions to the Company.

Should the Managers determine that additional funds above $4.4 million ($2.2 million each) are necessary to complete the investigation of the Xeptor Business and possible acquisition of the Xeptor Business, assets or interests or other Core Activities, then the Managers may request such additional funds as Additional Capital Contributions ("Additional Capital Contributions") to the Company.

Section 10.2    Interests. The Initial Member's Percentage Interests shall be:

| | | |
|---|---|---|
| THE JERRY AND VICKIE MOYES FAMILY TRUST | 50% | 500 UNITS |
| PINNACLE | 50% | 500 UNITS |

Section 10.3    Additional Capital Contributions. Each Member hereby agrees, within ten (10) days after receipt of a notice of capital call from the Managers, to make Additional Capital Contributions to the Company on an "as needed" basis in a pro rata amount based on the Members' Interests. The Managers may make capital calls at any time for any funds which the Managers determine are needed to further the purposes of the Company, including without limitation normal business operations, reserves for working capital, and to pay debt service or other costs or expenses incident to the ownership of any property owned by the Company. Each notice of a capital call must specify the purpose for which the call is made. The portion of each capital call assessed against each Member shall be in proportion to the Member's Interest then held by said Member.

Section 10.4    Failure to Make Additional Capital Contributions. The obligation to make Additional Capital Contributions shall be a personal obligation of the Members and shall be enforceable by the Company and each of its Member. In the event any Member (a "Defaulting Member") shall fail to make any Capital Contribution when required pursuant to the provisions of Section 10.1 or Section 10.3, whether by failing to contribute the funds or by borrowing the funds from the other Members, then the other Members (the "Non-Defaulting Members") shall have the right, but not the obligation, to make the Capital Contribution which is not made on a timely basis by the Defaulting Member. Each Non-Defaulting Member which elects to make a Capital Contribution for the Defaulting Member pursuant to this Section 10.4 shall have the right to make that proportion of such Capital Contribution as is equal to the Percentage Interest of such Non-Defaulting Member as compared to the Percentage Interests of all Non-Defaulting Members electing to make such Capital Contribution. Any Capital Contribution made by any Non-Defaulting Member for a Defaulting Member shall be treated as a loan by the Non-

21

Defaulting Member to the Defaulting Member, which loan shall, in the absence of other agreed-upon borrowing terms, accrue interest at the per annum rate equal to two percent (2%) plus the prime rate quoted by the Wall Street Journal from time to time and shall be due and payable by the Defaulting Member to the Non-Defaulting member in cash upon the earlier of (a) seven (7) days from demand for payment by the Non-Defaulting Member, or (b) thirty (30) days from the date the Non-Defaulting Member made such Capital Contribution to the Company.    If the Defaulting Member pays the Non-Defaulting Member the amount equal to the Capital Contribution made to the Company by the Non-Defaulting Member, together with all interest accrued thereon, on or before the maturity date therefor, then the Defaulting Member shall be deemed to have made the Capital Contribution on and as of the date the Non-Defaulting Member initially made such Capital Contribution to the Company for the Defaulting Member.   If the Defaulting Member fails to pay the Non-Defaulting Member the amount equal to the Capital Contribution made to the Company by the Non-Defaulting Member, together with all interest accrued thereon, on or before the maturity date therefor, then the Non-Defaulting Member may elect, by delivery of notice to the Defaulting Member and the Company, to adjust the Capital Accounts of the Defaulting Member and the Non-Defaulting Member to reflect that the Non-Defaulting Member has made such Capital Contribution on its own behalf and not on behalf of the Defaulting Member thereby increasing the Percentage Interest of the Non-Defaulting Member and reducing the Percentage Interest of the Defaulting Member to reflect such adjustment made to the Capital Accounts of the Defaulting Member and the Non-Defaulting Member.  This provision, and the Capital Account and Percentage Interest adjustment remedy set forth above, shall also apply to circumstances where the Non-Defaulting Member extends a loan to the Defaulting Member enabling the Defaulting Member to make its required additional Capital Contribution.  In the event that the Defaulting Member fails to repay any or all of such loan, including interest accrued thereon, on a timely basis, the Non-Defaulting Member may also elect to adjust the Capital Accounts and Percentage Interest of the Defaulting Member and Non-Defaulting Member to reflect that the Non-Defaulting Member has made such Capital Contribution on its own behalf and account.

The failure of a Member to make an Additional Capital Contribution shall constitute a material breach of this Agreement.   If a Member fails to make an Additional Capital Contribution, all amounts distributable by the Company to the Member in any capacity shall be suspended, and the Member's right to receive distributions from the Company shall not be restored until the Member shall have paid in full to the Company (or to the Non-Defaulting Member who made the payment for the Defaulting Member) the delinquent Additional Capital Contribution, plus interest on such amount from the date such Additional Capital Contribution should have been paid to the date it is paid by the Member plus pay to the Company any damages to this Company attributable to the failure to timely pay the Additional Capital Contribution, plus reimbursement of any reasonable costs and expenses incurred by the Company or any Member to enforce the collection of the delinquent Capital Contribution (the sum of such amounts hereinafter referred to as the "Delinquency Amount") or, at the election of a Majority-In-Interest of the Members, such Delinquency Amount shall have been recouped from amounts otherwise distributable to the Members pursuant to the last sentence of this paragraph or upon termination of the Company pursuant to Article 17.

22

Section 10.5  Use of Capital Contributions.  All Capital Contributions shall be expended in furtherance of the business of the Company.  Capital Contributions shall not be commingled with the funds of any other Person or entity, except that the funds may be deposited in an account in the name of the Company with a bank or other financial institution as the Manager shall deem appropriate.

Section 10.6  No Interest on Capital Contributions.  No interest shall accrue on any Capital Contributions made to the Company.

Section 10.7  No Unauthorized Withdrawals of Capital Contributions.  No Member shall have the right to withdraw or to be repaid any of such Member's Capital Contributions so made, except as specifically provided in this Agreement.

Section 10.8  Return of Capital.  Each member shall look solely to the assets of the Company for return of such Member's capital contributions, such Member shall have no recourse against any other Member for that purpose.  No Member may withdraw any part of his or her capital contribution or receive any distribution of his or her capital contribution from the Company, except upon dissolution of the Company or as specifically provided by this Agreement.

## ARTICLE 11.
## CAPITAL ACCOUNTS

Section 11.1  Composition of Capital Account.  Separate capital accounts shall be maintained by the Company for each Member in accordance with applicable provisions of the Code and the Regulations promulgated thereunder, representing the Members' respective capital contributions to the Company.

(a)  The capital account of each Member shall consist of the original contribution to capital by the Member, increased by the following:

(i)  The fair market value of any property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752);

(ii)  Additional contributions by the Member of cash; and

(iii)  The Member's share of the Company's net Profits allocated to the Member pursuant to Article 12, including income and gain as computed for book purposes in accordance with Regulations Section 1.704-1 (b) (2) (iv) (g).

(b)  The capital account of the Member shall be decreased by the following:

(i)  The amount of money distributed to the Member by the Company pursuant to Article 14;

23

30960<sub>47v2(59007.1)</sub>

(ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such property that the Member is considered to assume or take subject to pursuant to Code Section 752); and

(iii)    Allocations to the Member of Company loss and deductions, including loss and deductions computed for book purposes described in Regulations Section 1.704-1(b)(2)(iv)(g).

(c)    In cases where Code Section 704(c) applies to property of the Company, the Members' capital accounts shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(g) for allocations to the Members of depreciation, depletion, amortization, gain, and loss, as computed for book purposes, with respect to such property.

(d)    The capital accounts of the Members may be adjusted to reflect a revaluation of Company property (including intangible assets such as goodwill) on the Company's books, to the extent provided in Regulations Section 1.704-1(b)(2)(iv)(f) or other applicable Regulations.

(e)    The tax matters partner may make all elections for federal income tax purposes, including an election to adjust the basis of the Company property pursuant to Code Sections 734, 743 and 754, in the event of the transfer of an Interest in the Company or the distribution of property by the Company. The Members' capital accounts shall be adjusted to the extent provided in Regulations Section 1.704-1(b)(2)(iv)(m).

(f)    The provisions of this Agreement regarding the maintenance of capital accounts are intended to comply with Code Section 704 (b), as amended, and the Regulations promulgated thereunder. Notwithstanding anything to the contrary contained in this <u>Article 11</u>, a Majority-in-Interest may consent to modify the method in which capital accounts are maintained, provided such changes are consistent with Code Section 704 and Regulations promulgated thereunder.

## ARTICLE 12.
## PROFITS AND LOSSES

Section 12.1    <u>Profits and Losses</u>. After giving effect to the special allocations set forth in <u>Sections 12.2 and 12.3</u>, Profits and Losses shall be allocated and credited to the Members' respective capital accounts in proportion to the respective Member's Percentage Interests.

Section 12.2    <u>Special Allocations</u>.

(a)    <u>Qualified Income Offset</u>. Except as provided in <u>Section 12.2(b)</u> hereof, in the event any Member unexpectedly receives any adjustment, allocations or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to

24

eliminate, to the extent required by such Regulations, the adjusted capital account deficit of such Member as quickly as possible.

(b)    Minimum Gain Chargeback.  Notwithstanding any other provision of this Section 12.2, if there is a net decrease in Company minimum gain for any Company fiscal year, the minimum gain chargeback requirement contained in Regulations Section 1.704-2 shall apply and each Member must be allocated items of Company income and gain for that year equal to that Member's share of the net decrease in Company minimum gain. This chargeback requirement of the Regulations and shall be interpreted consistently therewith.

Section 12.3    Curative Allocations.  The allocations set forth in Section 12.2(a) and 12.2(b) (the "Regulatory Allocations") are intended to comply with certain requirements of Code Section 704 and Regulations promulgated thereunder.  Notwithstanding any other provisions of this Section 12.3 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other profits, losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

## ARTICLE 13.
## INTEREST AND COMPENSATION

Section 13.1    Interest and Compensation.  No Member will be credited with interest on his or her capital account, and unless a Majority-in-Interest of the Members agree, no Member in his or her capacity as a Member shall be entitled to a salary for services rendered on behalf of the Company.

## ARTICLE 14.
## DISTRIBUTIONS TO MEMBERS

Section 14.1    Distributions.  Except as may be otherwise provided in Section 17.3, the Managers shall determine the amount of cash, if any, available for distribution at such times as the Managers of the Company deem advisable. The distribution shall be based upon all relevant factors, including, but not limited to, the operating expenses and debt service of the Company, sums expended by the Company for capital expenditures and a reasonable reserve for working capital.

Section 14.2    Amount of Distributions.  No distribution shall be made if, after the distribution is made, the assets of the Company are less than all liabilities of the Company, except liabilities to Members on account of their contributions.

Section 14.3    Allocation of Distribution.  Distributions shall be made in the proportion set forth in Section 12.1 hereof, as of the date of distribution, unless agreed otherwise by a Majority-in-Interest vote of the Members.

25

3096947v2(59007.1)

Section 14.4   Distributions.  Except as provided in Sections 14.1 and 14.2 above, the Manager may distribute to each Member an amount equal to that Member's allocable share of net Profits multiplied by the highest marginal income tax rate applicable to individuals under the Code, taking into consideration capital gains where applicable.

Section 14.5   Loans to Company.  Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

## ARTICLE 15.
## RESTRICTIONS ON TRANSFER OF MEMBERS RIGHTS OR INTEREST

Section 15.1 — Restrictions on Transfer or Withdrawal.  Except as otherwise expressly provided in Sections 15.2 and 15.4, no Member shall have any right to retire or withdraw voluntarily from the Company or to sell, transfer, encumber, assign, or otherwise dispose of, voluntarily or by operation of law in bankruptcy or to creditors, or judgment creditors, all or any part of any interest or rights in, the Membership Rights owned by the Member and no Interest Holder may Transfer all, or any portion of, or any interest or rights in, any Interest. Any sale or foreclosure of a security interest will itself constitute a prohibited Transfer independent of the grant of security.   Except as provided in Section 15.4, any Transfer is considered an "Unauthorized Withdrawal."  Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members.  The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 15.1 shall be deemed invalid, null and void, and of no force or effect... Any Person to whom Membership Rights or Interests are attempted to be transferred in violation of this Section 15.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive allocations or distributions from the Company, or have any other rights in or with respect to the Membership Rights or Interest.

Section 15.2   Death or Incompetency of a Member.  Subject to Section 17.1, in the event a Member shall die, his executors, administrators or trustees shall have the same rights and obligations that such Member would have had were such Member still living.  In the event that any Member shall be adjudicated incompetent, his guardian or other legal representative shall have the same rights and obligations in respect to the incompetent Member's interest as the executor, administrator or trustee has in connection with the interest of a deceased Member and the guardian or other legal representative of an incompetent Member shall become a substituted Members without the consent of the other Members.

Section 15.3   Rights of Withdrawn Member.  Upon the occurrence of an Unauthorized Withdrawal event with respect to a Member, the Withdrawn Member (or the Withdrawn Member's successor, if applicable) shall cease to participate in management of the Company or to have any rights of a Member except only the right to receive distributions occurring at the times and equal in amounts to those distributions the Withdrawn member would otherwise have received if a Withdrawal Event had not occurred.

26

3096947v2(59007.1)

Section 15.4   <u>Permitted Transfers</u>.  Any Member may, notwithstanding <u>Section 15.1</u>, transfer all or part of the Member's Interest in the Company to the following (a "Permitted Transferee"):

    (a)    To the Company;

    (b)    To any other existing Member;

    (c)    To an Affiliate or subsidiary controlled by such Member; or

    (d)    To a revocable living trust for the benefit of the Member to the extent allowed by local law.  The Trustee shall hold such Interests subject to the provisions of this Agreement.

The Board of Managers is hereby authorized and empowered to amend <u>Exhibit A</u> to this Agreement from time to time as necessary or appropriate to reflect such transfers.

Section 15.5   <u>Rights of Transferee</u>.  In the event a transfer, assignment or encumbrance is a Permitted Transfer or is approved by a Majority of the remaining Members, the Transferee shall be admitted with all the rights and powers of a Member, and is subject to all the restrictions and liabilities of the Transferring Member. The Transferee shall execute amended Articles of Organization as required. However, pursuant to Nevada Revised Statutes Section 86.351, the Transferring Member is not released from liability to the Company.

Section 15.6   <u>Conditions to Transfer</u>.  Notwithstanding the provisions of <u>Sections 15.4</u> above, no Transfer need be recognized by the Company, unless all of the following requirements are satisfied:

    (a)    The Transfer shall not of itself cause the Company to be in default under any indebtedness of the Company;

    (b)    The Transferring Member shall deliver to the Company an opinion in form and substance from legal counsel reasonably acceptable to the Managers stating that such transfer does not violate any federal or state securities law, and the Transferee shall deliver such additional documents respecting the Transferee's investor suitability and other legal or investment matters as the Managers may reasonably require; and provided further that the Company shall have no duty to participate in, cause or pay for any registration or qualification procedures under federal or state securities laws;

    (c)    The Transferring Member shall deliver to the Company a fully executed written agreement of assignment that sets forth the name, address, and taxpayer identification number of the Transferee, and the terms of such transfer, provided such terms shall not conflict with any provision of this agreement; and

3096947v2(59007.1)

(d)     If any Member is a closely held corporation, or is an unincorporated association or partnership, the transfer, assignment or hypothecation of any stock or interest in such corporation, association or partnership in the aggregate in excess of fifty percent (50%) shall be deemed an assignment or transfer within the meaning of this Agreement, except as provided in Section 15.3 hereof.

Section 15.7   Admission of New Members.  Notwithstanding the above provisions, no Transferee shall become a substitute Member unless the following additional conditions are met:

(a)     The Transferee executes, acknowledges and delivers to the Company a written agreement stating that such Transferee agrees to be bound by the provisions of this Agreement and executes such other instruments as the Managers deem necessary or appropriate for admission as a substitute Member;

(b)     Each Transferee reimburses the Company for all reasonable accounting, legal and other expenses incurred by the Company regarding the transfer and such admission.

Section 15.8   Effective Date of Permitted Transfers.  Any permitted transfer of all or any portion of a Member's Interest shall be effective as of the date upon which the requirements of Sections 15.6 and 15.7 have been met.  The Managers shall provide the Members with written notice of such Transfer as promptly as possible after the requirements of Sections 15.6 and 15.7 have been met.  Any transferee of an Interest or portion thereof shall take subject to the restrictions on transfer imposed by this Agreement.

Section 15.9   Expenses.  Expenses of the Company or of any Interest Holder or Manager occasioned by transfers of Interests shall be reimbursed to the Company, Interest Holder, or Manager, as the case may be, by the transferee.

## ARTICLE 16.
## INVESTMENT REPRESENTATIONS AND AGREEMENTS

Section 16.1   Prohibited "Market" Transfers.   Each Member hereby covenants and agrees with the Company for the benefit of the Company and all other Members that: (a) it is not currently making a market in any Interest; (b) it will not transfer any Interest upon an established securities market or a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704 (b) (and any regulations, proposed regulations, revenue rulings or other official pronouncements of the Internal Revenue Service or Treasury Department that may be promulgated or published); and (c) in the event such regulations, revenue rulings, or other pronouncements treat any or all arrangements which facilitate the selling of an Interest which are commonly referred to as "Matching Services" as being a secondary market or substantial equivalent thereof, he will not transfer any Interest through a Matching Service that is not approved in advance by the Company.

Section 16.2   Investment Representation and Agreements.   Each Member hereby represents and warrants to the Manager and to the Company that its acquisition of an Interest in

28

the Company is made for his, her, or its own account for investment purposes only and not with a view to the resale or distribution of such interest, except insofar as the Securities Act of 1933, as amended, and any applicable securities law of any state or other jurisdiction permit such acquisition to be made for the account of others or with a view to the resale or distribution of such interest without requiring that such interest, or the acquisition, resale or distribution thereof, be registered under the Securities Act of 1933, as amended, or any applicable securities law of the United States or any state or other jurisdiction. Each Member agrees that he, she or it will not sell, assign or otherwise transfer his, her or its Interest or Membership Rights in the Company or any portion thereof, to any Person who does not represent and warrant as set forth in this <u>Section 16.2</u> and agree to be bound by the transfer restrictions set forth in this <u>Article 16</u>.

Section 16.3  <u>Restrictive Legend</u>.  Each Member hereby agrees that the following restrictive legend may be placed upon any counterpart of this Agreement, or any other document or instrument evidencing ownership of an Interest or Membership Rights in this Company:

THE SECURITIES REPRESENTED BY THE INTERESTS AND RIGHTS DESCRIBED HEREIN (1) HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER FEDERAL OR STATE SECURITIES LAWS, (2) HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO OR IN CONNECTION WITH THE SALE OR DISTRIBUTION THEREOF, AND (3) MAY NOT BE SOLD OR OTHERWISE DISPOSED OF WITHOUT AN EFFECTIVE FEDERAL REGISTRATION STATEMENT AND STATE QUALIFICATION RELATED THERETO OR AN OPINION OF COUNSEL FURNISHED AT HOLDER'S EXPENSE IN FORM AND SUBSTANCE AND FROM COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES THAT SUCH REGISTRATION AND QUALIFICATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1993, AS AMENDED AND APPLICABLE STATE LAW.  THE INTERESTS ARE SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SET FORTH IN THE ISSUER'S OPERATING AGREEMENT.

## ARTICLE 17.
## DISSOLUTION AND LIQUIDATION

Section 17.1  <u>Events Requiring Dissolution</u>.  The Company shall be dissolved upon the occurrence of any of the following events:

    (a)    The written consent of a Majority-in-Interest of the Members;

    (b)    The entry of a decree of dissolution under applicable law; or

    (c)    The death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event which terminates a Member's continued membership in the Company, unless the remaining Members (or their designated beneficiaries) unanimously consent in writing to continue the business of the Company, provided there is at least one (1) remaining Members (or beneficiary).

29

**Section 17.2   Effect of Filing of Dissolving Statement**     Upon the occurrence of any event requiring dissolution as set forth in Section 17.1, if the business of the Company is not continued by the unanimous consent of the remaining Members, the Manager of the Company shall immediately execute and deliver to the Secretary of State a statement of its intent to dissolve. Upon filing the statement of intent to dissolve, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, and shall wind up its affairs and liquidate.

**Section 17.3   Winding Up, Liquidation and Distribution of Assets.**

(a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b)     If the Company is dissolved and its affairs are to be wound up, the Manager shall (1) sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind), (2) allocate any Profit or Loss resulting from such sales to the Members' Capital Accounts in accordance with Article 12 hereof, (3) discharge all liabilities of the Members (other than liabilities to Members), including all costs relating to the dissolution, winding up, and liquidation and distribution of assets, (4) establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such Reserves shall be deemed to be an expense of the Company), (5) discharge any liabilities of the Company to the Members other than on account of their interests in Company capital or Profits, and (6) distribute the remaining assets in the following order:

(i)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of Article 12 of this Agreement to reflect such deemed sale.

(ii)     The positive balance of each Member's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs, shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members in respect to their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(c)     Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a negative deficit Capital Account balance (after giving effect to all contributions,

30

distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

Section 17.4    Articles of Termination.   When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, Articles of Termination, or other required documentation thereof, shall be executed and filed with the Nevada Secretary of State.

Section 17.5    Return of Contribution Non-Recourse to Other Members.   Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of his or her Capital Contribution.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE 18.
## INDEMNIFICATION

Section 18.1    Indemnification of Member, Officer, Employee or Agent: Proceeding Other than by Company.   The Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, whether civil, criminal, administrative or investigative, except an action by or in the right of the Company, by reason of the fact that he is or was a Member, Manager, officer, employee or agent of this Company, or is or was serving at the request of this Company as a Member, Manager, director, officer, employee or agent of another limited-liability company or corporation, against expenses, including attorneys' fees, judgment, fines and amounts paid in settlement actually and reasonably incurred by him in connection with the action, suit or proceeding if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of this Company, and, with respect to a criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, does not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interest of this Company, and that with respect to any criminal action or proceeding, he had reasonable cause to believe that his conduct was unlawful.

Section 18.2    Indemnification of Member, Officer, Employee or Agent: Proceeding by Company.   The Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of this Company to procure a judgment in its favor by reason of the fact that he is or was a Member, Manager, employee or agent of this Company, or is or was serving at the request of this

31

Company as a Member, Manager, director, officer, employee or agent of another limited-liability company, corporation, partnership, joint venture, trust or other enterprise against expenses, including amounts paid in settlement and attorneys' fees actually and reasonably incurred by him in connection with the defense or settlement of the actions or suit if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of this company. Indemnification may not be made for any claim, issue or matter as to which such a person has been adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable to this Company or for amounts paid in settlement to this Company, unless and only to the extent that the court of competent jurisdiction determines upon application that in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnify for such expenses as the court deems proper.

Section 18.3    Indemnify if Successful.  To the extent that a Member, Manager, officer, employee or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding described in Section 18.1 or 18.2, or in defense of any claim, issue or matter therein, the Company shall indemnify the Member, Manager, officer, employee or agent against expenses, including attorneys' fees, actually and reasonably incurred in connection with the defense.

Section 18.4    Expenses.  Any indemnification under Sections 18.1 and 18.2, unless ordered by a court or advanced by the Company, must be made by this Company only as authorized in the specific case upon a determination that indemnification of the Member, Manager, employee or agent is proper in the circumstances. The determination must be made:

(a)    By a vote of the Manager, or in the event there are more than one manager, by a majority vote of a quorum of Managers who were not parties to the act, suit or proceeding; or

(b)    If a approval of the Manager or a quorum consisting of Manager(s) who were not parties to the act, suit or proceeding cannot be obtained, then by a majority of the Members, disregarding the vote of any Member or Manager who was a party to the act, suit or proceeding.

## ARTICLE 19.
## COMPANY RECORDS, REPORTS, BANKING

Section 19.1    Books and Records.  The Board of Managers shall cause the Company to keep the following:

(a)    Books and records of account in which shall be entered fully and accurately all transactions and other matters relating to the Company. The Company's books and records shall be kept on a cash basis, except as the Managers may otherwise determine to be permitted under the Code;

32

(b)    A current list of the full name and last known business or residence address of each Member set forth in alphabetical order listing the Member's capital contribution to the Company and Interests owned;

(c)    A copy of the Articles of Organization and all amendments thereto and all filings by the Company in Nevada and other states;

(d)    Copies of the Company's federal, state and local income tax returns and reports, if any, for the six (6) most recent years;

(e)    Copies of any then effective written operating agreement, including any amendments thereto, and of any financial statements of the Company for the three (3) most recent years; and

(f)    Unless contained in the Articles of Organization, a writing setting out:

(i)    The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute;

(ii)    The items as to which or events on the happening of which any additional contributions agreed to be made by each Member are to be made;

(iii)    Any right of a Member to receive, or of a Manager to make, distributions to a Member, which include a return of all or any part of the Member's contribution; and

(iv)    Any events upon the happening of which the Company is to be dissolved and its affairs wound up.

All such books and records shall be maintained at the principal executive office of the Company, and as to those designated in subparagraphs (b) through (f) above, inclusive, also at the registered office of the Company.  In each location, such books and records shall, with reasonable advance notice, be available for inspection and copying by, and at the expense of, the Members, or their duly authorized representatives, during reasonable business hours.

Section 19.2    Bank Accounts.  All funds of the Company shall be deposited in the name of the Company in an account or accounts maintained with such bank or banks selected by the Manager.  The funds of the Company shall not be commingled with the funds of any other Person.  Checks shall be drawn upon the Company account or accounts only for the purposes of the Company and shall be signed by authorized Persons on behalf of the Company.

33

# ARTICLE 20.
## MISCELLANEOUS PROVISIONS

Section 20.1    Counsel to Members.

(a)    Moyes Counsel.  Counsel to Moyes ("Moyes Counsel") may also be counsel to one or more of the Managers, any Affiliate of a Manager, any Member, any Affiliate of a Member, or any other person or entity.  Each Member acknowledges that Moyes Counsel does not represent any other Member in the absence of a clear and explicit written agreement to such effect between the Member and Moyes Counsel, and, that in the absence of any such written agreement, Moyes Counsel shall owe no duties directly to any Member. In the event any dispute or controversy arises (i) between Moyes and the Company, (ii) between Moyes and Pinnacle, or (iii) between any Member or the Company, on the one hand, and a Manager or Member (or an Affiliate of a Manager or Member) that Moyes Counsel represents, on the other hand, then each Member agrees that Moyes Counsel may represent such Manager or Member (or his or her Affiliate), or both, in any such dispute or controversy to the extent permitted by the Arizona Rules of Professional Conduct or similar rules in any other jurisdiction, and each Member hereby consents to such representation. Each Member further acknowledges that Moyes Counsel has not represented the interests of any Member other than Moyes in the preparation and negotiation of this Agreement, Moyes Counsel shall, subject to compliance with applicable Rules of Professional Conduct, be permitted to participate in the day-to-day legal counsel provided to the Company, without being required to relinquish the right to continue to represent Moyes with respect to Moyes' interests under the Agreement.

(b)    Pinnacle Counsel.  Counsel to Pinnacle ("Pinnacle Counsel") may also be counsel to one or more of the Managers, any Affiliate of a Manager, any Member, any Affiliate of a Member, or any other person or entity.  Each Member acknowledges that Pinnacle Counsel does not represent any other Member in the absence of a clear and explicit written agreement to such effect between the Member and Pinnacle Counsel, and that in the absence of any such written agreement, Pinnacle Counsel shall owe no duties directly to any Member.  In the event any dispute or controversy arises (i) between Pinnacle and the Company, (ii) between Pinnacle and Moyes, or (iii) between any Member or the Company, on the one hand, and a Manager or Member (or an Affiliate of a Manager or Member) that Pinnacle Counsel represents, on the other hand, then each Member agrees that Pinnacle Counsel may represent such Manager or Member (or his or her Affiliate), or both, in any such dispute or controversy to the extent permitted by the Illinois Rules of Professional Conduct or similar rules in any other jurisdiction, and each Member hereby consents to such representation.  Each Member further acknowledges that Pinnacle Counsel has not represented the interests of any Member other than Pinnacle in the preparation and negotiation of this Agreement, Pinnacle Counsel shall, subject to compliance with applicable Rules of Professional Conduct, be permitted to participate in the day-to-day legal counsel provided to the Company, without being required to relinquish the right to continue to represent Pinnacle with respect to Pinnacle's interests under the Agreement.

34

Section 20.2    Agreement to Perform Necessary Acts. Each Member agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

Section 20.3    Amendments. The provisions of this Agreement may not be waived, altered, amended, or repealed, in whole or in part, except with the written consent of a Majority of the Members.

Section 20.4    Successors and Assigns. This Agreement shall be binding on, and shall inure to the benefit of, the Members and their respective heirs, legal representatives, successors, and assigns.

Section 20.5    Validity of Agreement. It is intended that each Section of this Agreement shall be viewed as separate and divisible, and in the event that any Section shall be held to be invalid, the remaining Sections shall continue to be in full force and effect.

Section 20.6    Notices. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or within seventy-two (72) hours after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, and properly addressed to the party at his address set forth in Exhibit A, or any other address that any party may designate by written notice to the others.

Section 20.7    Governing Law. THIS AGREEMENT, AND ALL QUESTIONS RELATING TO ITS VALIDITY, INTERPRETATION, PERFORMANCE AND ENFORCEMENT (INCLUDING, WITHOUT LIMITATION, PROVISIONS CONCERNING LIMITATIONS OF ACTION), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA.

Section 20.8    Construction. This Agreement is the result of negotiations between the parties, none of whom has acted under any duress or compulsion, whether legal, economic or otherwise and joint draftsmanship. Accordingly, the terms and provisions of this Agreement shall be construed in accordance with their usual and customary meanings. The parties hereby waive the application of any rule of law that otherwise would be applicable in connection with the construction of this Agreement that ambiguous or conflicting terms or provisions should be construed against the party who (or whose attorney) prepared the executed Agreement or any earlier draft of the same. Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular and the singular the plural. The words "hereof", "herein", "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. All references to "Sections" herein shall refer to the sections and paragraphs of this Agreement unless specifically stated otherwise. The section and other headings contained in this Agreement are inserted for convenience of reference only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation of this Agreement.

35

Section 20.9 _Counterparts_. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 20.10 _Gender and Number_. As used in this Agreement, the masculine, feminine, and neuter gender, and the singular or plural number shall be considered to include the others whenever the context so indicates.

Section 20.11 _Attorneys' Fees_. If any party brings an action or proceeding (including any cross-complaint, counterclaims, or third-party claim) against any other party by reason of a default by the other party or otherwise arising out of this Agreement, the non-prevailing party shall pay to the prevailing party in such action or proceeding all of the prevailing party's costs and expenses of suit (including the costs and expenses of enforcing any judgment or settlement), including reasonable attorneys' fees, which shall be payable whether or not such action is prosecuted to judgment. "Prevailing Party" within the meaning of this Section 20.10 includes a party who dismisses an action for recovery hereunder in exchange for payment of the sums allegedly due, performance of covenants allegedly breached, or consideration substantially equal to the relief sought in the action.

Section 20.12 _Waivers_. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 20.13 _Rights and Remedies Cumulative_. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 20.14 _Severability_. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 20.15 _Heirs, Successors and Assigns_. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

Section 20.16 _Creditors_. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

Section 20.17 _Litigation/Arbitration Expenses_. In any controversy, claim or dispute arising out of, or relating to, this Agreement or the method and manner of performance thereof

36

or the breach thereof, the prevailing party shall be entitled to and awarded, in addition to any other relief, a reasonable sum as litigation/arbitration expenses. If neither party wholly prevails, the party that substantially prevails shall be awarded a reasonable sum as litigation/arbitration expenses. In determining what is a reasonable sum for litigation/arbitration expenses, attorneys' fees shall be included and the actual amount of attorneys' fees the party is obligated to pay its attorney or attorneys shall be presumed to be reasonable. For the purposes of this provision, the term "proceeding" shall include arbitration, administrative, bankruptcy and judicial proceedings, including appeals therefrom.

Section 20.18 <u>Choice of Venue</u>. Any initiation of legal proceedings arising out of, related to, or in connection with the interpretation or enforceability of the Agreement or rights or remedies under the Act, shall be brought in a U.S. District Court located in San Diego, California.

Section 20.19 <u>Complete Agreement</u>. This Agreement and the Articles of Organization constitute the complete and exclusive statement among the Members with respect to the subject matter contained therein. This Agreement and the Articles of Organization supersede all prior agreements by and among the Members.

**[SIGNATURES APPEAR ON FOLLOWING PAGES]**

37

IN WITNESS WHEREOF, this Agreement was adopted by a unanimous vote of all the Members of this Company effective the day above written.

**MEMBERS**

**Pinnacle Fitness and Recreation Management, LLC**

By: _____

Its:

Dated: _____

**The Jerry and Vickie Moyes Family Trust**

By: _____
    Jerry Moyes, Trustee

By: _____
    Vickie Moyes, Trustee.

Dated: _10-17-2007_

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

38

3096947v2(59007.1)

IN WITNESS WHEREOF, this Agreement was adopted by a unanimous vote of all the Members of this Company effective the day above written.

**MEMBERS**

**Pinnacle Fitness and Recreation Management, LLC**

By: _____

Its: Manager

Dated: 10-10-07

**The Jerry and Vickie Moyes Family Trust**

By: _____
     Jerry Moyes, Trustee

By: _____
     Vickie Moyes, Trustee

Dated: _____

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

38

3096947v2(59007.1)

**EXHIBIT A**
to Operating Agreement of
MFC INVESTMENTS, LLC

| Members | Units | Percentage Interests | Initial Contribution to be contributed |
|---|---|---|---|
| The Jerry and Vickie Moyes Family Trust<br>2710 E. Old Tower Road<br>Phoenix, AZ 85034 | 500 Units | 50% | $2,200,000 |
| Pinnacle Fitness and Recreation Management, LLC<br>1111 Willis Avenue<br>Wheeling, IL 60090 | 500 Units | 50% | $2,200,000 |

39

3096947v3(59007.1)

**EXHIBIT B**
**to Operating Agreement of**
**MFC INVESTMENTS, LLC**


List of Managers

**Moyes Appointed:**          Deer Valley Capital, LLC, an Alaska limited
                             liability company


**Pinnacle Appointed:**       Pinnacle Fitness and Recreation Management,
                             Representative: Marsha Forsythe-Fournier


40

**EXHIBIT C**
**to Operating Agreement of**
**MFC INVESTMENTS, LLC**

Officers

President:                                    Jeff Shumway

Senior Vice President of              Julie Chambers
   Administration

Sr. Vice President & Chief            Steven E. Page
   Financial Officer

Sr. Vice President &General        Alan Waskin
Counsel & Secretary:

41

**SCHEDULE 1**
to Operating Agreement of
**MFC INVESTMENTS, LLC**

**Capital Contributions**
**Made Prior to October 2, 2007**

**PINNACLE:**     $ 20,000.00     (4-20-07)(5% Xeptor interest)
                  $ 20,000.00     (7-27-07)(rent - Scottsdale)

                  $470,722.08     (8/15/07)
                  $100,000.00     (9/06/07)
                  $268,000.00     (9/14/07)

        Total: $878,722.08

**MOYES:**     Total: $1,633,004.26
               (see attached breakdown)

42

3096947v3(39007.1)

## SCHEDULE 2
### to Operating Agreement of
### MFC INVESTMENTS, LLC

Loans by Pinnacle to Xeptor
(Not Capital Contributions)

| | |
|---|---|
| 4/27/07 | $ 75,000 |
| 5/14/07 | $100,000 |
| 5/31/07 | $ 25,000 |
| 6/05/07 | $175,000 |

Total:     $375,000

43

3096947v3(59007.1)

From: Marsha Fournier
Sent: Tuesday, April 08, 2008 12:01 AM
To: Jeff Shumway
Cc: 'Elly Penrod'; 'jmoyes@moyestpi.com'; 'jerry_moyes@swifttrans.com'; Steve Page; Alan Waskin
Subject: RE: Xeptor Notification


Mr. Moyes and Jeff,


I vote "yes" on MFC signing the leases on the condition that Mr. Moyes has agreed in Principle to purchase my 50% interest in MFC on the following terms:


1.   The 375,000 with interest will be paid with profits on a cash basis excluding any related party transactions with audit rights reserved.  Interest will be paid at the rate of Libor +2% and will be adjusted semi-annually.  The 375,000 with interest will be repaid in full prior to any splits on profits with Xeptor.


2.   The 1,352,500.00 will be paid with the earlier of Incentive Payments received or profits on a cash basis excluding any related party transactions with audit rights reserved.  Interest will be paid at the rate of Libor +2% and will be adjusted semi-annually. The 1,352,500 with interest will be repaid in full prior to any splits on profits with Xeptor.


3..  The approximately 1,228,418.72 (with interest at Libor +2%) will be paid in 4 equal semi-annual installments of 307,104.68 plus interest with first payment made 6 months after transfer of my interests in MFC contingent on closing with Xeptor but not contingent with any agreement or settlement with Art. The 1,228,418.72 with interest will be paid in full prior to any splits on profit with Xeptor.


4.   50% of Court Deposit of roughly 504,077.00 will be split 50/50 as soon as received.


5.   Complete indemnity from any 3rd party claims against us arising from or related to any participation in and ownership of MFC and management of Xeptor.


I will advise Alan to work with your attorney of choice to formalize this transaction.  I am confident the Moyes Group will turn the gyms into another one of your successful ventures.


I am going to bed now, so please don't expect any further replies tonight.  Have a good night.


Regards,

Marsha Forsythe-Fournier

President

Indeck Power Equipment Company

1111 Willis Ave.

Wheeling, IL. 60090

(847) 541-8300

(847) 541- 8305 (Fax)

From: Elly Penrod [mailto:EPenrod@MoyesTPI.com]
Sent: Monday, April 07, 2008 9:24 PM
To: Marsha Fournier; Steve Page
Subject: Fw: Xeptor Notification

-----Original Message-----
From: Jeff Shumway
To: 'spage@indeck-power.com' <spage@indeck-power.com>; 'jeff.shumway@phoenixcoyotes.com'
<jeff.shumway@phoenixcoyotes.com>; Elly Penrod; 'jerry_moyes@swifttrans.com'
<jerry_moyes@swifttrans.com>
CC: 'mfournier@indeck-power.com' <mfournier@indeck-power.com>; 'awaskin@indeck-
energy.com' <awaskin@indeck-energy.com>
Sent: Mon Apr 07 18:57:16 2008
Subject: Re: Xeptor Notification

Steve,
as I said jerry is not willing to guarantee marsha funds that he has no guarantee of
receiving. He has offered everything he can to make marsha secure on this point. But I
want to make certain we are all in agreement as to what we are in disagreement over.
Marsha has agreed to be paid back her appx 325k out of profits. We have already agreed to
provide you with financial information. If jerry takes over the gyms he would also be

obligated to provide (eventually) a profit participation and accounting to the xeptor
group. At the present time the gyms need cash support on a monthly basis. Marsha would be
avoiding funding the gyms and would avoid a 10 million corp gaurantee. We are willing to
account for profits and losses on a cash basis (although their really is little
depreciation in this operation). And the only real way to effect the cash accounting is by
related party transactions, which we have agreed to exclude.

Steve, I think your group needs to take over the gyms. Jerry will immediately agree to
your purchase of his interest on the terms he has offered.  As marsha pointed out, we must
sign leases by midnight. I have also stated my belief that the board should vote to sign
the leases. I vote yes.

Elly please forward this message so that I am certain that marsha and her group has
received this.

Thanks jeff shumway.

**EXHIBIT 3**

-----Original Message-----
From: Marsha Fournier <mfournier@indeck-power.com>
To: Jeff Shumway
CC: Elly Penrod; Jerry Moyes; JERRY MOYES (TRANS); Steve Page <spage@indeck-power.com>;
Alan Waskin <awaskin@forsythe-racing.com>
Sent: Mon Apr 07 22:27:23 2008
Subject: RE: Xeptor Notification

Sorry, one more clarification.  Mr. Moyes agreed to a personal guarantee in Item number 3
below.  Forgive me, its late.


Regards,

Marsha Forsythe-Fournier

President

Indeck Power Equipment Company

1111 Willis Ave.

Wheeling, IL. 60090

(847) 541-8300

(847) 541- 8305 (Fax)

_____

From: Marsha Fournier
Sent: Tuesday, April 08, 2008 12:07 AM
To: 'Jeff Shumway'
Cc: 'Elly Penrod'; 'jmoyes@moyestpi.com'; 'jerry_moyes@swifttrans.com'; Steve Page; Alan
Waskin



Subject: RE: Xeptor Notification


To clarify #4 below, 50% interest in the court deposit is 504,077 which is my half.


Regards,

Marsha Forsythe-Fournier

President

Indeck Power Equipment Company

1111 Willis Ave.

Wheeling, IL. 60090

(847) 541-8300

(847) 541- 8305 (Fax)

## Shely, Robert

**From:** Jeff Shumway [JShumway@swiftaviationgroup.com]

**Sent:** Tuesday, April 08, 2008 7:41 AM

**To:** Shely, Robert

Bob,

First thing this morning will you call merritt and tell him that I have reached an agreement for jerry to buy out marsha. This may require a few minor changes to the lease but we will address any issues asap.

Thanks.

5/15/2008

**EXHIBIT 5**

-----Original Message-----
From: Elly Penrod [mailto:EPenrod@MoyesTPI.com]
Sent: Tuesday, April 08, 2008 11:02 AM
To: Marsha Fournier
Subject: FW: Xeptor Notification


Thank You,
Elly Penrod
623-907-7388
602-275-6417 Fax

-----Original Message-----
From: Jeff Shumway
Sent: Tuesday, April 08, 2008 8:05 AM
To: Elly Penrod
Subject: Fw: Xeptor Notification

Please forward this to the group. Thanks

-----Original Message-----
From: Jeff Shumway
To: 'mfournier@indeck-power.com' <mfournier@indeck-power.com>
Sent: Tue Apr 08 08:04:01 2008
Subject: Re: Xeptor Notification

Marsha I will summarize our agreement and make sure we are agreed on all issues. Thanks

**EXHIBIT 6**

-----Original Message-----
From: Jeff Shumway
Sent: Wednesday, April 09, 2008 3:08 PM
To: 'mfournier@indeck-power.com'; Elly Penrod; 'awaskin@indeck-energy.com'; 'spage@indeck-power.com'; 'jmoyes@moyestpi.com'; 'jerry_moyes@swifttrans.com'
Subject: Re: Xeptor Notification

I plan to. But it is my understanding that we have a deal. If alan will draft the agreement I will summarize our email exchanges so that we have a basis to review alans draft.
As far as signing in mfc I have no issue with that. It is greenstreet that would prefer a jerry entity. We will get merritt beyond that.

-----Original Message-----
From: Marsha Fournier <mfournier@indeck-power.com>
To: Elly Penrod; awaskin@indeck-energy.com <awaskin@indeck-energy.com>; Steve Page <spage@indeck-power.com>; Jeff Shumway; Jerry Moyes; JERRY MOYES (TRANS)
Sent: Wed Apr 09 14:33:35 2008
Subject: RE: Xeptor Notification

But your last e-mail below said you were going to summarize again.

Regards,
Marsha Forsythe-Fournier
President
Indeck Power Equipment Company
1111 Willis Ave.
Wheeling, IL. 60090
(847) 541-8300
(847) 541- 8305 (Fax)

-----Original Message-----
From: Elly Penrod [mailto:EPenrod@MoyesTPI.com]
Sent: Wednesday, April 09, 2008 4:19 PM
To: Marsha Fournier; awaskin@indeck-energy.com; Steve Page
Subject: FW: Xeptor Notification

Thank You,
Elly Penrod
623-907-7388
602-275-6417 Fax

-----Original Message-----
From: Jeff Shumway
Sent: Wednesday, April 09, 2008 1:16 PM
To: Elly Penrod
Subject: Fw: Xeptor Notification

Please forward to marsha and her group. My emails are still getting bounced.

-----Original Message-----
From: Jeff Shumway
To: 'mfournier@indeck-power.com' <mfournier@indeck-power.com>
Sent: Wed Apr 09 13:11:47 2008
Subject: Re: Xeptor Notification

That is not a problem. I was expecting to get a draft agreement from alan.

-----Original Message-----
From: Marsha Fournier <mfournier@indeck-power.com>
To: Elly Penrod; Jeff Shumway
CC: JERRY MOYES (TRANS); Jerry Moyes; Alan Waskin <awaskin@forsythe-racing.com>; Steve Page <spage@indeck-power.com>
Sent: Wed Apr 09 12:40:12 2008
Subject: RE: Xeptor Notification

Hi Jeff,

I haven't heard from you.  As I didn't hear from you I called Bob Shely and he said you were trying to modifiying leases and trying to put another entity on the leases vs. MFC. As I understand there is a deadline at 5:00pm today on the leases, it would behoove us to finish our binding agreement now so you could legally change the name on the leases.

Until we have a binding agreement the leases need to stay in MFC's name and in the future, you could assign them to any Moyes entity.

I tried leaving you a message but your voice mail was full.

Regards,
Marsha Forsythe-Fournier
President
Indeck Power Equipment Company
1111 Willis Ave.
Wheeling, IL. 60090
(847) 541-8300
(847) 541- 8305 (Fax)

Bob, please forward the entire amount owed to jerry moyes without a deduction for fees.
Make the check payable to jerry moyes. If you need an address please let me know. Thanks
jeff.

-----Original Message-----
From: Shely, Robert <rwshely@BryanCave.com>
To: Jeff Shumway; Marsha Fournier <mfournier@indeck-power.com>
CC: Hirsch, Steven <sahirsch@BryanCave.com>
Sent: Mon Jun 02 13:05:47 2008
Subject: Cash Disbursement


Jeff and Marsha -- I have been in trial for the last week, and have confirmed today that
the $348,500 sitting in trust is available for distribution.  Our legal bills, going back
from December 1, until April 30, 2008, amount to $117,352.46.  (the last bill, for the
month of April, is coming under separate cover).  I would propose that we be permitted to
withhold that amount as payment of our bills, and then to take the difference, split it
evenly and send the funds to you.  I have the name of the entity  and EIN number for
Marsha's entity (Pinnacle Fitness), but I don't have the similar info from Jeff.  Do you
want the check to be made payable to Jerry Moyes, or Jerry and Vicki?  Just let me know
and we will get the check cut immediately.

If you have any objections to our plan to withhold our fees, please let me know
immediately.  We will continue to hold it in trust for a bit before transferring it to
Bryan Cave's account.

Robert W. Shely, Esq.
Bryan Cave LLP
Two N. Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
602-364-7315
rwshely@bryancave.com


This electronic message is from a law firm. It may contain confidential or privileged
information. If you received this transmission in error, please reply to the sender to
advise of the error and delete this transmission and any attachments.

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we
inform you that any U.S. federal tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or
recommending to another party any transaction or matter addressed herein.

From: Jeff Shumway [mailto:JShumway@swiftaviationgroup.com]
Sent: Wednesday, June 04, 2008 8:52 PM
To: Marsha Fournier
Subject: RE: Cash Disbursement


Marsha, I am having the Hartford send the check for the other bond directly to Jerry.  I
dont want Shely get have another shot at keeping the money.  I will have Elly send you
your share when we have the money.

---

From: Marsha Fournier [mailto:mfournier@indeck-power.com]
Sent: Monday, June 02, 2008 1:52 PM
To: Jeff Shumway; rwshely@BryanCave.com
Cc: awaskin@indeck-energy.com; Steve Page
Subject: RE: Cash Disbursement

Hi Bob, same for me as Jeff outlined below.


Jeff, did you send a letter so Bob can have the 600,000+ disbursed also?


Regards,

Marsha Forsythe-Fournier

President

Indeck Power Equipment Company

1111 Willis Ave.

Wheeling, IL. 60090

(847) 541-8300

(847) 541- 8305 (Fax)


From: Jeff Shumway [mailto:JShumway@swiftaviationgroup.com]
Sent: Monday, June 02, 2008 3:12 PM
To: rwshely@BryanCave.com; Marsha Fournier
Cc: sahirsch@BryanCave.com
Subject: Re: Cash Disbursement

**EXHIBIT 8**

**From:** Elly Penrod [mailto:EPenrod@MoyesTPI.com]
**Sent:** Wednesday, June 18, 2008 3:15 PM
**To:** Steve Page
**Cc:** Jeff Shumway
**Subject:** [ENGATE SPAM]RE: Hartford Bond refund
**Importance:** High


Steve,


I will wire out of MFC ½ of the $660,154.28 ($330,077.14) per the instructions you sent.


Please confirm Pinnacle (Marsha) received the $174,500.00 from Bryan Cave's office for ½ of the other bond.  I will post a journal entry to MFC books reflecting the receipt of the bond and distribution to Marsha and Jerry.




Thank You,

Elly Penrod

623-907-7388
602-275-6417 Fax


**From:** Steve Page [mailto:spage@indeck-power.com]
**Sent:** Tuesday, June 17, 2008 2:27 PM
**To:** Elly Penrod
**Subject:** Hartford Bond refund


Elly,


Good afternoon. Have you received a refund of the $660,000 bond money from Hartford yet?


I don't know if you planned on cutting a check or doing a wire transfer for the return of the Pinnacle ½, so I attached a copy of the wire transfer and ACH instructions for Pinnacle.


Thanks,


Steven Page

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

PINNACLE FITNESS AND RECREATION MANAGEMENT, LLC, a Delaware limited liability company

**DEFENDANTS**  FILED

THE JERRY AND VICKIE MOYES FAMILY TRUST, an Arizona trust, DEBRA MILLER MOYES, an Alaska limited liability company, and CAREFREE CAPITAL INVESTMENTS, LLC, a Nevada limited liability company

2008 JUL 29 PM 3:00

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

**(b)** County of Residence of First Listed Plaintiff  Cook, Illinois
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Maricopa, Arizona
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Kirby Noonan Lance & Hoge, LLP
350 Tenth Avenue
13th Floor
San Diego, CA  92101
(619) 231-8666

Attorneys (If Known)

'08 CV 1368 W POR

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt. Reporting | (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS - Third Party | ☐ 895 Freedom of Information |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | 26 USC 7609 | Act |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - | | ☐ 900 Appeal of Fee |
| | Employment | ☐ 550 Civil Rights | Alien Detainee | | Determination Under |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 465 Other Immigration | | Equal Access to Justice |
| | Other | | Actions | | ☐ 950 Constitutionality of |
| | ☐ 440 Other Civil Rights | | | | State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332

Brief description of cause:
Breach of Contract/Fiduciary Duty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** 0.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  July 29, 2008

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 155475   AMOUNT $350   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

TAC  7/29/08

CSDJS44

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 153475   — TC**

**July 29, 2008
14:59:17**

**Civ Fil Non—Pris**
USAO #.: 08CV1368
Judge..: THOMAS J WHELAN
Amount.:                    $350.00 CK
Check#.: BC81108/BC041827

**Total—> $350.00**

FROM: PINNACLE FITNESS & RECREATION
      VS
      JERRY & VICKIE MOYES FAMILY TR