1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT

10          SOUTHERN DISTRICT OF CALIFORNIA

11

12  PINNACLE FITNESS AND RECREATION          )   Case No.: 08cv1368 AJB (BGS)
    MANAGEMENT, LLC, a Delaware limited      )
13  liability company,                       )
                                             )   ORDER GRANTING IN PART AND
14                      Plaintiff,           )   DENYING IN PART MOTION FOR
    v.                                       )   SUMMARY JUDGMENT; GRANTING
15                                           )   MOTION FOR PARTIAL SUMMARY
    THE JERRY AND VICKIE MOYES               )   JUDGMENT; AND GRANTING MOTION
16  FAMILY TRUST, an Arizona Trust,          )   FOR JUDGMENT ON THE PLEADINGS
                                             )
17                      Defendants.          )   [Doc. Nos. 169, 170 and 171]
    _____ )
18  AND RELATED COUNTER CLAIMS.              )
    _____ )

19          Currently before the Court are three motions: (1) the motion for summary judgment filed by the

20  the Jerry and Vickie Moyes Family Trust (hereinafter the "Trust"); (2) the motion for partial summary

21  judgment filed by Pinnacle Fitness and Recreation Management, LLC (hereinafter the "Pinnacle"); and

22  (3) the motion for judgment on the pleadings filed by Pinnacle.  The hearing for these motions set for

23  January 6, 2012 is hereby vacated as the Court finds these motions appropriate for submission on the

24  papers without oral argument pursuant to Civil Local Rule 7.1.d.1.  For the reasons set forth below, the

25  Court rules as follows on the pending motions: the Trust' Motion for Summary Judgment, [Doc. No

26  169], is GRANTED IN PART and DENIED IN PART; Pinnacle's Partial Motion for Summary

27  Judgment, [Doc. No. 170], and Motion for Judgment on the Pleadings, [Doc. No. 171], are GRANTED

28  as set forth below.

1

***Background***

2 *1. Parties and Non-Parties*

3      The Plaintiff, Pinnacle, is a Delaware LLC with its principal place of business in Illinois.

4 Compl., Doc. No. 149, ¶ 1. Pinnacle's sole member is Marsha Forsythe-Fournier, a citizen of Illinois.

5 *Id*. Defendant, the Trust, is an Arizona trust owned by the Jerry and Vickie Moyes family, citizens of

6 Arizona that own various businesses in the transportation, entertainment, and real estate development

7 industries and this collection of businesses are referred to as the "Moyes Group." *Id*. at ¶ 2.

8      Non-party MFC Investments, LLC (hereinafter "MFC"), is a Nevada LLC jointly formed by

9 Pinnacle and the Trust as a 50-50 joint venture for the purpose of loaning money to, and managing the

10 health club operations of a separate non-party Xeptor, LLC ("Xeptor"), an entity which owned and

11 operated 22 health clubs in Arizona.

12      Non-party Deer Valley Capital, LLC (hereinafter "Deer Valley") is a part of the Moyes

13 Group, and is an Alaska LLC with its principal place of business in Arizona.  Deer Valley is the Trust's

14 designated Manager under the LLC Operating Agreement for non-party, MFC.

15      Non-party Carefree Capital Investments, LLC ("Carefree"), is a Nevada LLC with its principal

16 place of business in Arizona. Carefree's sole member is the Trust.  Compl. ¶ 4.

17      *2. Procedural Background*

18      On July 29, 2008, Pinnacle filed a complaint against the Trust, Deer Valley, and Carefree .[1]

19 [Doc. No. 1.] On April 25, 2011, Pinnacle filed a First Amended Complaint (hereinafter"FAC"), [Doc.

20 No. 149], naming only the Trust.

21      In this action, Pinnacle seeks: (i) a judicial declaration that Pinnacle and the Trust entered into a

22 valid and enforceable Buy-Out Agreement whereby the Trust agreed to purchase Pinnacle's entire 50%

23 interest in MFC; (ii) judicial enforcement of the Buy-Out Agreement; (iii) immediate payment to

24 Pinnacle of all of the consideration due to Pinnacle under the Buy-Out Agreement; and (iv)

25 compensatory and punitive damages for the Trust's alleged fraudulent conduct in connection with MFC

26 and Xeptor.

27

28      [1] On September 8, 2009, the Court issued an order dismissing Deer Valley Capital, LLC and Carefree Capital Investments, LLC for lack of personal jurisdiction. [Doc. No. 17.]

The Trust in turn has asserted five counterclaims[2] against Pinnacle in this case and seeks damages in the amount of approximately $14.7 million.[3]  The Trust's alleged damages are broken into three categories: Operation Damages,[4] Lease Damages,[5] and Lost Incentive Fees. *Id.*

### 3. Factual Background

The following description is taken from the parties' pleadings and is not to be construed as findings of fact by the Court.

During the summer of 2007, Pinnacle and the Trust organized MFC for the purpose of providing capital to Xeptor, which owned Arizona fitness and health clubs in financial trouble.[6]  Compl., Doc. No. 169, ¶ 13. In October 2007, Pinnacle and the Trust executed MFC's Operating Agreement ("Operating

---

[2] The five counterclaims asserted by the Trust are as follows: (1) Breach of Contract; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Breach of Fiduciary Duty; (4) Tortious Interference with Contract; and (5) Tortious Interference with Prospective Business Advantage.  *See* Amended Answer and Counterclaim, [Doc. No. 50].

[3] On February 16, 2011, the Trust submitted the expert report of Dwight J. Duncan, who opines that as a result of actions by Pinnacle, the Trust has suffered damages in the amount of $14,650,000. Doc. No. 170-4, attached as Ex. L to Fabian Decl., Expert Report of Dwight J. Duncan at 3. Mr. Duncan breaks the Trust's alleged damages into three categories: Operation Damages, Lease Damages, and Lost Incentive Fees. *Id.*

[4] The Operation Damages are made up of three components: (a) "but-for-profits" in an amount of $5,290,000; (b) "actual losses" based on capital contributed to MFC in the amount of $3,240,000; and (c) "actual losses" based on capital contributed to CAC Holdings in the amount of $2,450,000. *Id.* Mr. Duncan assumes for purposes of his "actual losses" categories that it was the Trust that contributed all amounts to MFC and CAC. *Id.* at 4. The total Lease Damages are $2,287,648, which Mr. Duncan calculates as the present value of two judgments entered against Deer Valley and Carefree (the "Judgments"). *Id.* at Ex. G.

[5] The Lease Damages identified in Mr. Duncan's report total $2,286,504.00 and are attributable to two stipulated judgments entered against Deer Valley and Carefree for unpaid rent under the lease agreements with Greenstreet affiliates for the gyms. *See* Doc. No. 170-4,  Ex. L, at Appendix G.  The present value of these damages is $2,287,648. *Id.*

[6] At the time MFC was formed, Xeptor was in extreme financial distress, owing creditors millions of dollars, defaulting with numerous vendors, and suffering approximately $500,000 in losses each month.  [Trust's MSJ, Ex 3 at 165:7-169:23; Ex. 5 at 95:22-98:6; Ex. 6 at 96:7-97:25; Ex 7 at 100:8-110:7, 122:10-25.]  Xeptor was also involved in litigation as a result of disputes with its primary equipment lessor, MH Holdings, and its landlord, Greenstreet Properties, LLC ("Greenstreet"). Greenstreet held judgments to force eviction.  [*Id.*, Ex 12 at 95:7-99:17; Ex 1 at 52:18-53:4, 111:13-18.] Absent a settlement, Xeptor was facing eviction and would be unable to operate the gyms.  [*Id.*, Ex 12 at 97:1-98:18; Ex 1 at 51:18-52:5; 75:1-3.]
MFC entered into a Management and Standstill Agreement ("Management Agreement") with Xeptor, pursuant to which MFC extended loans to fund the gyms' operations,  manage the business, including the litigation, while MFC (or its nominee) decided whether or not to acquire Xeptor's "assets."  [*Id.*, Ex 16, §§ 1.3, 3.1, 5.3(A).]

08cv1368

Agreement"), which was made effective August 6, 2007. *Id.* ¶ 14. The Operating Agreement provides that Pinnacle and the Trust own MFC 50/50 and are jointly responsible for managing Xeptor's business affairs. *Id.* The Operating Agreement also contains a forum selection clause ("FSC"), which states:

> Any initiation of legal proceedings arising out of, related to, or in connection with the interpretation of enforceability of the [Operating] Agreement or rights or remedies under the Act shall be brought in a U.S. District Court located in San Diego, California. (Operating Agreement. § 20.18.)

In October 2007, MFC and Xeptor also entered into a Second Amended and Restated Management, Loan and Standstill Agreement (the "MSA") effective as of August 6, 2007, pursuant to which MFC agreed to, among other things, manage the business of Xeptor and advance funds to Xeptor to run the fitness clubs through January 10, 2008, with the potential for MFC to acquire the assets of Xeptor. Thereafter, Xeptor and its members executed promissory notes with MFC, in the amount of $5.5 million, which Xeptor and its members promised to repay.

Sometime after the Operating Agreement was executed, the relationship between Pinnacle and the Trust began to deteriorate. Compl., Doc. No. 149, ¶ 18–22. By late February 2008, MFC had invested millions of dollars into the operation of the gyms, yet the gyms continued to lose money. MFC's members had not successfully negotiated a resolution to any of the pending litigation. Pinnacle was negotiating with MH Holdings, the equipment lessor, and was attempting to resolve that litigation by selling MFC's interest to MH Holdings. [Trust's MSJ, Doc. No. 169, Ex 21, 22, 24.] The Trust was negotiating with Greenstreet regarding Xeptor's leases for the gyms. Greenstreet offered forgiveness of past due rent with the requirement that Xeptor vacate the premises or MFC sign new leases within 30 days. Adding to the mounting pressure was Greenstreet's deadline to accept the settlement by March 3, 2008. [*Id.*, Ex 26; Ex. 2 at 87:12-88:19.]

The Trust contends that Pinnacle hoped to avoid settling with Greenstreet and delayed its consent in the hopes that MH Holdings would buy MFC's interest. [Trust's MSJ, Exs. 21, 22, 23, 24, 25, 27, 27A.] The Trust alleges that Pinnacle presented the Trust with a Consent Resolution two hours before the deadline to sign the Greenstreet settlement agreement, establishing a new management structure and directing MFC to sign new leases. [*Id.*, Ex. 28.] To avoid the loss of the gyms altogether, the Trust "yielded" and agreed to the Consent Resolution. [*Id.*, Ex. 29, 30 and 2 at 56:5-57:3.] That

4

same day, Xeptor and Greenstreet entered into the settlement agreement. [*Id.*, Ex. 31 and 33.]

Greenstreet accepted the settlement agreement on March 6, 2008, and the deadline to sign new leases

fell on April 6, 2008, a Sunday.  [*Id.*, Ex. 33.]  The parties treated the deadline to sign new leases as

Monday, April 7, 2008.  [*Id.*, Ex. 11 at 87:21-90:6; Ex. 49 at P10453-54; Ex. 46.]

The Trust contends that despite the Consent Resolution containing Pinnacle's commitment to

sign new leases, along with a guaranty, Pinnacle continued to threaten liquidation of MFC in an effort to

gain leverage in ongoing buyout negotiations between Pinnacle and the Trust. [Trust's MSJ, Ex. 2 at

15:19-16:18; 37:1-38:12; 66:1-15; Ex. 1 at 307:16-309:3, 362:14-363:2; Ex. 42.]  On March 24, 2008,

Mr. Shumway, the Trust's designated representative, offered to sell the Trust's interest in MFC to

Pinnacle, or, in the alternative, for Pinnacle to sell its interest to the Trust.  [*Id.*, Ex. 41.]  Pinnacle

pursued a sale of its interest in MFC to the Trust and negotiations followed.  [*Id.*, Ex. 1 at 327:7-328:8;

Ex. 42; Ex. 9 at 179:16-180:8; Ex. 45.]

The Trust contends that by April 7, 2008, the last day MFC could sign new leases,[7] the parties

"hit a brick wall" in their negotiations.  [Ex. 49 at P0010452.]  Pinnacle had not yet executed the leases

and without the leases there would be nothing to buy out as Xeptor would be forced to vacate and shut

down the gyms.  [Ex. 1 at 75:1-3, 362:14-363:2; Ex. 11 at 89:22-90:6.]  The Buy-Out negotiations

continued into the evening of April 7, 2008.  [Ex. 49 at P0010449-50.]  With no word from Ms. Fournier

for three hours, Mr. Shumway went to bed assuming that the negotiations had failed and that MFC had

lost the opportunity to sign new leases.  [*Id.*; Ex. 2 at 111:14-19, 113:18-114:3.]  Pinnacle disputes this

citing other email sent by Shumway afterward.

The next day, on April 8, Mr. Shumway discovered that Ms. Fournier had sent an email at 12:01

a.m. on April 8 (10:01 p.m. on April 7 in Arizona), stating: "I vote 'yes' on MFC signing the leases on

the condition that Mr. Moyes has agreed in principle to purchase my 50% interest in MFC on the

---

[7] The Trust claims Pinnacle caused MFC to violate the April 7, 2008 deadline to sign the leases with Greenstreet. However, Pinnacle claims that the April 7, 2008 deadline was not a firm deadline in any of the parties' minds.  The Settlement Agreement, signed on March 6, 2008, gave MFC the right to sign leases with Greenstreet within 30 days, which would have been April 5, 2008.  Greenstreet's counsel did not send proposed leases until 4:09 p.m. on April 7th and specifically stated that the leases were "not intended for execution." [Trust's MSJ, Ex. 37.]  Further, MFC's counsel, Bob Shely, advised Greenstreet's counsel that he was in a mediation all day and may not have time to review the leases in any event. [*Id.*, Ex. 38.] Pinnacle contends that the "deadline" to execute the leases was extended to April 9th. [*Id.*, Ex. 13 at 002281.]

following terms." [*Id.*, Ex. 1 at 363:3-15; Ex. 49 at P0010448.] The "I vote yes" email listed five terms, including a personal guaranty from Mr. Moyes and according to the Trust, at least one material alteration to Mr. Shumway's stated terms,[8] and Pinnacle's conditional vote to sign the Greenstreet leases. [Ex. 1 at 363:3-365:14; Ex. 49 at P0010448.] After reviewing the "I vote yes" email on the morning of April 8, Mr. Shumway emailed Ms. Fournier: "Marsha I will summarize our agreement and make sure we are agreed on all issues." [*Id.*, Ex. 1 at 369:21-371:13; Ex. 49 at P0010446-47.]

The Trust alleges that Ms. Fournier's conditional vote to sign leases was "too little, too late," because on April 10, 2008, counsel for Greenstreet declared that "MFC no longer has any right, and my clients have no obligation, to enter into the 2008 Leases or the related agreements." [*Id.*, Ex. 11 at 88:20-90:6, 90:9-92:5; Ex. 52.] Greenstreet sent a letter to MFC's counsel, Bob Shely, on April 10, 2008 claiming the deadline had passed for MFC to sign the leases. Pinnacle contends that Greenstreet had already extended the deadline to April 9th, and had agreed to sign leases with Deer Valley and incentive agreements with Moyes on April 8, 2008. Pinnacle contends that Greenstreet's April 10 letter was simply an act aimed at protecting itself from liability from MFC.

Alternatively, the Trust contends that Greenstreet ended its relationship with MFC, because it no longer wished to do business with Pinnacle or Ms. Fourner. [*Id.*, Ex 11 at 84:21-86:14, 88:7-92:5; 94:14-95:1; Ex. 12 at 80:13-81:4; Ex. 18.] However, Greenstreet did offer to execute the leases with Deer Valley, an entity affiliated with the Trust, which the Trust had designated as Manager of MFC. [*Id.*, Ex 11 at 92:23-97:24.] When Ms. Fournier learned that Greenstreet was contemplating leases with an entity other than MFC, she emailed Mr. Shumway to protest: "Until we have a binding agreement the leases need to stay in MFC's name …." [*Id.*, Ex 50 at JM0000847.]

Nevertheless, Mr. Shumway executed leases with Greenstreet in the name of MFC's Manager, Deer Valley Capital, LLC. on April 10, 2008, which the Trust contends was consistent with the Consent Resolution and the parties' prior expressed intent to have an affiliate enter into the leases to operate the

---

[8] Specifically, Pinnacle limited the repayment of its capital contributions to MFC (the third term in the "I vote yes" email) as being "contingent on closing with Xeptor," whereas Mr. Shumway had stated that the entire buyout (all terms) would be contingent upon closing with Xeptor. [*Id.*, Ex. 46, 49 at P0010448.]

08cv1368

gyms.[9] [Ex 30 at 2; Ex 2 at 141:3-25; Ex 1 at 239:12-242:5; Ex. 19 at P003447.]  Mr. Shumway advised

Ms. Fournier of Deer Valley's execution of the leases and again offered to buy out Pinnacle's interest on

essentially the same terms originally offered, which would have repaid the entire amount of Pinnacle's

investment out of profits from continued operations, however, Ms. Fournier rejected the Trust's offer

and allegedly in contradiction to Ms. Fournier's previous email, claimed for the first time that the parties

had already entered into a buyout agreement.  [*Id.*, Exs. 53, 54.]

Alternatively, Pinnacle alleges that it engaged in negotiations and reached an agreement with

Shumway and the Trust in a 'summary' email sent by Fournier on April 7, 2008, (the "Buy-Out

Agreement"), that the Trust would purchase Pinnacle's 50% interest in MFC.[10]  *Id.* ¶ 28. Pinnacle

---

[9] The Trust states that the Consent Resolution permitted MFC or an affiliate to enter into leases with Greenstreet. [Trust's MSJ at 3; 5; 13 n.15; and 19.] Pinnacle states that this is false.  Review of the Consent Resolution reveals that it does not say that anyone other than MFC was permitted to enter into the leases.  Nor does the Settlement Agreement say this.  It says a wholly-owned MFC subsidiary could sign leases. [Trust's MSJ, Ex. 31.]  Deer Valley was not a wholly-owed subsidiary of MFC.

[10] In early April, Shumway and Moyes were involved in negotiations with Fournier to purchase Pinnacle's interest in MFC. (See Ex. 1 at Ex. 1-A) Pinnacle contends that these negotiations culminated in an agreement, which was summarized in a Fournier email on April 7, 2008, pursuant to which the Trust agreed to buy Pinnacle's interest on the following terms:
   1. The $375,000 with interest will be paid with profits on a cash basis excluding any related party transactions with audit right reserved.  Interest will be paid at the rate of Libor +2% and will be adjusted semi-annually.  The $375,000 with interest will be repaid in full prior to any splits on profits with Xeptor.
   2. The $1,352,500 will be paid with the earlier of Incentive Payments received or profits on a cash basis excluding any related party transactions with audit rights reserved.  Interest will be paid at the rate of Libor +2% and will be adjusted semi-annually.  The $1,352,500 with interest will be repaid in full prior to any splits on profits with Xeptor.
   3. The approximately $1,228,418.72 (with interest at Libor +2%) will be paid in 4 equal semi-annual installments of $307,104.68 plus interest with the first payment made 6 months after transfer of [Pinnacle's] interests in MFC contingent on closing with Xeptor but not contingent with any agreement or settlement with Art.  The $1,228,418.72 with interest will be paid in full prior to any splits on profit with Xeptor.
   4. 50% of the Court Deposit of roughly $504,077 will be split 50/50 as soon as received.
   5. Complete indemnity from any 3rd party claims against [Pinnacle] arising from or related to any participation in and ownership of MFC and management of Xeptor. [Ex.14 at JM000848-49.]

1  contends that prior to the time Fournier sent the foregoing emails, Shumway had already agreed to each

2  and every one of the terms.[11] [Trust's MSJ,  Ex. 1 and 1-A.]

3      Pinnacle states that Fournier further clarified in two follow-up emails that the $504,077 was

4  Pinnacle's half of the bond money and that Moyes had agreed to personally guarantee item number 3.

5  [*Id*., Ex.14 at 847-848.] Pinnacle contends that Shumways' communications after the parties' email

6  exchanges regarding the Buy-Out Agreement indicate that Shumway and the Trust believed that a Buy-

7  Out Agreement had been reached, as he stated "it is my understanding that we have a deal." [*Id*., Ex.

8  14.]

9      After the Buy-Out Agreement was allegedly reached, Pinnacle claims that the Trust and entities

10  under its control, including Deer Valley and Carefree, seized control of MFC and its assets in a manner

11  at odds with the fiduciary and contractual duties owed to Pinnacle under the Operating Agreement.  *Id*. ¶

12  7.  Pinnacle also alleges that the Trust unlawfully conspired with Deer Valley and Carefree to commit

13  other unlawful acts.  *Id*. ¶ 8.

14                            ***Discussion***

15      Currently before the Court are three motions: (1) the motion for summary judgment filed by the

16  Trust, [Doc. No. 169]; (2) the motion for partial summary judgment filed by Pinnacle, [Doc. No. 170];

17  and (3) the motion for judgment on the pleadings filed by Pinnacle, [Doc. No. 171].

18  **I. The Trust's Motion for Summary Judgment**

19      The Trust moves for summary judgment on three categories of claims: (1) Pinnacle's Buyout

20  Claims and the Trust's counterclaim for breach of contact; (2) Pinnacle's Non-Buyout Claims; and (3)

21  Pinnacle's Damages Alleged for Non-Buyout Claims.

22      **A. Legal Standard**

23      Summary judgment is appropriate where the record, when read in the light most favorable to the

24  nonmoving party, demonstrates that "there is no genuine issue as to any material fact and . . . the movant

25  is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56(c), the movant

26  bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex*

27

28      [11] In an email sent just before Fournier's summary email, Pinnacle contends that Shumway made a counteroffer as to the only two outstanding terms, related to items 1 and 2, which Fournier then accepted in her summary email. [*Id*., Ex. 14 at JM0000850.]

1   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving

2   party must set forth, by affidavit or as otherwise provided by Rule 56, "specific facts showing that there

3   is a genuine issue for trial." Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors*

4   *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable inferences that can be drawn from the evidence

5   "must be drawn in favor of the non-movant," *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir.

6   2008), but only admissible evidence is considered. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th

7   Cir. 2002).

8                  **1. *Pinnacle's Buy-Out Claims and the Trust's Counterclaim for Breach of Contact***

9           In its first four causes of action, Pinnacle seeks to recoup its entire $3.5 million investment in

10   the failed gyms by enforcement of a Buy-Out Agreement Pinnacle argues was reached solely through

11   email correspondence in April 2008. The Trust contends that the parties did not reach an enforceable

12   Buy-Out Agreement . The Trust argues that each of Pinnacle's Buy Out claims fail because: (1)

13   Pinnacle's claim for breach of contract of the Buy-Out Agreement is void under the Statute of Frauds;

14   (2) the parties did not form a contract by their preliminary negotiations; (3) Pinnacle cannot enforce the

15   alleged Buy-Out Agreement based upon Promissory Estoppel; and (4) Pinnacle cannot demonstrate a

16   breach or damages related to its Buy-Out claims.

17           The Trust argues that if there was no effective Buy-Out, Pinnacle remained a member of MFC

18   and breached its obligations under the Operating Agreement and the Consent Resolution by failing to

19   fund MFC and sign the Greenstreet leases. As such, the Trust contends it is entitled to summary

20   judgment on Pinnacle's Buy-Out Claims and the Trust's counterclaim for breach of contact.

21           However, as set forth above, the Trust bears the initial burden of demonstrating the absence of a

22   genuine dispute of material fact as to whether or not the parties reached a Buy-Out Agreement.  The

23   Trust has failed to carry this burden.  The Court finds that a genuine dispute exists as to whether a Buy-

24   Out Agreement was reached by the parties based upon the documents and emails cited to support the

25   parties' conflicting positions set forth above.  Based upon the foregoing, the Trust's motion for summary

26   judgment on Pinnacle's Buy-Out claims and the Trust's Counterclaim for breach of contact is hereby

27   DENIED.

28

1

### 2. Pinnacle's Non-Buy-Out Claims

2      The Trust moves for summary judgment on Pinnacle's Non Buy-Out Claims for breach of

3 fiduciary duty, breach of contract, fraud, and unjust enrichment.  Summary judgment is appropriate only

4 where the record, when read in the light most favorable to the nonmoving party, demonstrates that

5 "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter

6 of law." Fed. R. Civ. P. 56(c). The Trust bears the initial burden of demonstrating the absence of a

7 genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the

8 Trust satisfies this burden, Pinnacle must set forth specific facts showing that there is a genuine issue for

9 trial. Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630

10 (9th Cir. 1987). All reasonable inferences that can be drawn from the evidence, must be drawn in favor

11 of the non-movant.[12]

12

### a. Pinnacle's Breach of Fiduciary Duty Claims

13      The Trust argues that unlike Nevada's Partnership Act, which expressly imposes fiduciary duties

14 amongst partners in a partnership, Nevada's LLC Act does not impose fiduciary duties on members of

15 an LLC.  *See* N.R.S. § 87.433.6(1).  The Trust contends that a member of an LLC, particularly a non-

16 controlling, non-managing member, does not owe a co-member a fiduciary duty. The Trust argues that it

17 had no fiduciary duty to Pinnacle because it was never a controlling MFC member.  [Trust's MSJ, p.

18 14]. However, this argument is belied by the Trust's actions in April 2008 in naming Deer Valley

19 Manager of MFC and the manner in which Deer Valley and Carefree, appear to have seized control of

20 MFC in executing the leases with Greenstreet.

21      The Trust argues that Pinnacle's assertion that the Trust owed it a fiduciary duty is founded

22 solely on the Trust's status as a member of MFC.  [*See* Doc. 149, FAC ¶104.] However, the Operating

23 Agreement does not impose any fiduciary duties on the members rather, it provides that MFC would be

24 manager- managed; the appointed managers were granted "exclusive right and authority to direct,

25 manage and control" MFC's business affairs.  [*Id*., Ex. 15, §§ 6.1, 6.4.] The Trust argues it was never an

26 MFC Manager and such, the Trust owed no fiduciary duties to Pinnacle and is entitled to judgment on

27

28      _____

[12] *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

1   Pinnacle's claims for breach of fiduciary duty and constructive fraud.. [*Id.*, §§ 6.1, 6.2(a), Exhibit B.]

2   However, as Pinnacle aptly points out, none of the other cases the Trust cites support summary

3   judgment in its favor on this claim.[13]

4       Alternatively, Pinnacle argues that where neither member is technically controlling, they are

5   more akin to equal partners, who owe each other fiduciary duties.  *Clark v. Lubritz*, 944 P.2d 861, 865

6   (Nev. 1997),  citing  59(A) Am. Jur. 2d Partnership § 425 (1987) ("the requirement of full disclosure

7   among partners in partnership business cannot be escaped….Each partner must …not deceive another

8   partner by concealment of material facts").  Moreover, Pinnacle contends that the MFC Operating

9   Agreement contains no language limiting the duties of one member to the other.  Although there is no

10  case law in Nevada expressly on point, Pinnacle argues that courts of other jurisdictions support this

11  position. Pinnacle cites to *Bay Center*[14] and several other cases[15] to support its contention that a duty is

12  owed. In *Bay Center*, the Delaware Chancellor explained that:

13          [t]he LLC cases have generally, in the absence of provision in the LLC
            agreement explicitly disclaiming the applicability of default principles of
14          fiduciary duty, treated LLC members as owing each other the traditional
            fiduciary duties that directors owe a corporation….Moreover, when
15          addressing an LLC case and lacking authority interpreting the LLC Act,
            this court often looks for help by analogy to the law of limited
16          partnerships.

17      The Trust argues that Pinnacle's reliance on *Bay Center* is misplaced because *Bay Center* really

18  analyzed fiduciary duties of a party with management control, not a non-controlling member such as the

19  _____

20      [13] The Trust cites the following cases in support of its motion for summary judgment on this
    claim. *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 910 (D. Nev. 1993) involved a "claim of tortious
21  breach of implied covenant of good faith and fair dealing . . . ."  And the other two cases cited by the
    Trust are: *Triangle Min. Co. v. Stauffer Chem. Co.*, 753 F.2d 734, 742 (9th Cir. 1985) (Idaho law) and
22  *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997), to
    support its argument that a party cannot assert "an implied covenant claim if it is identical in nature to a
23  claim founded upon an express contract" involve implied contracts, not implied  covenants.  In other
    words, the cases say that a party cannot assert an implied contract claim where there is an express
24  contract.

25      [14] *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658-VCS, 2009 WL
    1124451, at *8 (Del. Ch. Apr. 20, 2009).

26      [15] *See also DirecTV Latin America, LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 438 (S.D.N.Y.
27  2010),  citing  *id.* ("*Absent* provisions in an LLC agreement 'explicitly' disclaiming the applicability of
    a fiduciary duty, LLC members owe each other 'the traditional fiduciary duties that directors owe a
28  corporation.'"); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008) ("Federal and state
    courts have recognized that members of a limited liability company, like partners in a partnership, owe a
    fiduciary duty of loyalty to fellow members").

1   Trust. *See also Kuroda v. SPJS Holdings, LLC*, 2010 WL 925853 (D. Ch.) (criticizing as "entirely

2   baseless" the prospect of imposing fiduciary duties on a non-managing LLC member which had no right

3   to control company assets.)

4          Pinnacle argues that even if the Court does not find that the Trust owed Pinnacle a fiduciary duty

5   as a matter of law, the evidence demonstrates that the circumstances created a fiduciary relationship.

6   Pinnacle relies on *In Executive Management, Ltd. v. Ticor Title Ins. Co.*, 963 P.2d 465, 475 (Nev. 1998),

7   where the court allowed a constructive fraud claim because there was evidence of misrepresentation and

8   concealment.   Pinnacle argues that where one party knows information that another does not, and is

9   also aware that the other party has put its trust in it, that relationship gives rise to a confidential

10  relationship, which, under Nevada law, is akin to a fiduciary one. *See, e.g., Perry v. Jordan*, 900 P.2d

11  335, 337-38 (Nev. 1995) (cause of action for breach of confidential relationship valid); *Allen v. Webb*,

12  485 P.2d 677, 268-69 (Nev. 1971) (one's superior knowledge gave rise to a fiduciary duty to other).

13  Here, Pinnacle argues that the Trust conspired with gym employees to conceal material facts from

14  Pinnacle, and accordingly, even if one did not exist before, Pinnacle argues that a fiduciary relationship

15  was created by the Trust's acts.  Because the Plaintiff has alleged that Deer Valley and Carefree seized

16  control of MFC and the Trust designated Deer Valley the Manager of MFC, the Court finds that the

17  Trust's own actions in unilaterally executing the Greenstreet leases may have placed the Trust in the

18  position of a managing LLC member. The Court finds that a genuine dispute exists as to whether the

19  Trust assumed the role of a managing LLC member.  Based upon the foregoing, the Trust's motion for

20  summary judgment on Pinnacle's fiduciary duty claims is hereby DENIED.

21                              ***b. Pinnacle's Breach of Contract Claims***

22          Pinnacle contends that the Trust breached the Operating Agreement: (1) by executing new leases

23  and incentive agreements with Greenstreet without Pinnacle's permission; and (2) by using the gym's

24  name, customer base, membership dues and equipment following entry into the new leases without

25  Pinnacle's permission.  [Doc. 149, FAC, ¶ 89.] Pinnacle's claim for breach of the implied covenant is

26  based upon this same conduct, as well as the Trust's supposed "scheme" to take over the valueless

27  gyms.  [Doc. 149, FAC, ¶ 98.]

28

1   The Trust argues that its action, and the actions of Deer Valley and CAC, were consistent with

2   the parties' agreement as reflected in the Consent Resolution, because the Consent Resolution directed

3   MFC or its affiliate to sign new leases, which was the predicate to operating the gyms.  The Trust seeks

4   summary judgment that  the conduct alleged did not violate the terms of the Operating Agreement.

5   However, upon review of the Consent Resolution, the Court finds this argument both unsupported and

6   unpersuasive.

7       Furthermore, Pinnacle has alleged numerous breaches of the operating agreement predating the

8   alleged Buy-Out Agreement for which questions of fact preclude summary judgment.[16]  Based upon the

9   aforementioned reasons, the Trust's motion for summary judgment on the breach on contract claims is

10  DENIED.

11                          ***c. Pinnacle's Fraud Claims***

12      Pinnacle contends that the Trust concealed material facts from and made material

13  misrepresentations to Pinnacle throughout the course of MFC's existence, including (i) advising

14  Pinnacle that the Trust would lead the November 2007 settlement negotiation meeting with Greenstreet;

15  (ii) failing to disclose that the Trust "voted" to change the gyms names in November; (iii) failing to

16  inform Pinnacle that Xeptor had signed the Consent & Authorization agreeing to change the names of

17  the gyms; (iv) changing the gyms' names and operating them as the Coyotes Athletic Clubs; (v) that the

18  Trust was working for its own benefit in negotiating a settlement with Greenstreet in order to convince

19  Greenstreet to exclude Pinnacle and MFC from any future leases or incentive agreements; (vi) that the

20  Trust was secretly funding small amounts to the gyms in March 2008, all the while directing the gym

21

22      [16] Pinnacle argues that the Trust breached multiple provisions of the Operating Agreement.  The
    Trust admits that it did not fund MFC in March. Pinnacle contends this is a breach of the Operating
23  Agreement. [Trust's MSJ, Operating. Agreement. §10.3, Ex. 15.]  Moreover, the MFC Operating
    Agreement precluded the Trust from being in the gym business other than through MFC.  [*Id.* § 8.5.]  By
24  appropriating the gym business, including putting the leases and incentive agreements in entities
    affiliated with the Trust, and then incorporating and operating the gyms as CAC, the Trust allegedly
25  breached this provision too.  While a member of MFC, the Trust (using closely affiliated entities) stole
    the very essence of the MFC business, a violation of the very purpose of MFC as set out in § 4.1 of the
26  Operating Agreement. Further, in violation of Section 8.4, the Trust disposed of MFC's assets (the
    incentive agreements, leases, and equipment) by directing Deer Valley to sign the leases and Moyes to
27  sign the incentive agreements.  Pinnacle argues that the Trust's claim that Deer Valley and Moyes were
    perfectly within their rights to sign the leases and incentive agreements because the Consent Resolution
28  the parties signed "directed MFC or its affiliate to sign new leases" is simply false.  Pinnacle argues that
    the Consent Resolution says no such thing.

1   managers to lie to Pinnacle about that funding; and (vii) that the decision to put the Greenstreet leases in

2   Deer Valley's name and the incentive agreements in Moyes' name had been made on April 10th, when in

3   fact that decision had been made on April 8th.

4         The Trust claims that Pinnacle's fraud claims should be dismissed because Pinnacle cannot

5   establish the requirements of fraudulent concealment by "clear and convincing evidence." [Reply, Doc.

6   No. 182, at 7.] Under Nevada law, the elements of fraudulent concealment are: (1) the defendant

7   concealed or suppressed a material fact; (2) that the defendant was under a duty to disclose; (3) the

8   defendant acted with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and

9   would have acted differently if she had known of the concealed or suppressed fact; and (5) as a result of

10   the concealment or suppression of fact, the plaintiff sustained damages.  *Rivera v. Philip Morris, Inc.*,

11   395 F.3d 1142, 1154 (9th Cir. 2005).  Each element of fraud must be proven by clear and convincing

12   evidence.  *See, e.g., Nevada Power Co. v. Monsanto Co.*, 891 F.Supp. 1406, 1414 (D. Nev. 1995).

13         The Trust bears the initial burden of demonstrating the absence of a genuine dispute of material

14   fact with regard to its contention that the alleged frauds were not concealed and that Pinnacle was aware

15   of the alleged frauds. Upon review of the record, the Court finds that the Trust has failed to carry its

16   burden, because as set forth above, genuine disputes of material fact remain as to whether Pinnacle had

17   knowledge of concealed or suppressed facts.  Based upon the foregoing, the Trust's motion for summary

18   judgment on Pinnacle's fraud claims is hereby DENIED.

19                              *d. Unjust Enrichment Claims*

20         The basis of Pinnacle's unjust enrichment claims stem from Pinnacle's contention that by

21   agreeing to the Buy-Out and then reneging on it, the Trust was unjustly enriched by the use of

22   Pinnacle's half of the bond money, which the Trust used for funding in June 2008, after the Buy-Out

23   and after it had misappropriated the leases and incentive agreements. [Opp., Doc. No. 173, at 24.]

24   Pinnacle contends that its unjust enrichment claim is further supported by the fact that the Trust

25   promised to return the bond money to Pinnacle on multiple occasions[17] and Moyes testified that it is his

26   belief Pinnacle is entitled at least to the bond money. [Trust's MSJ, Doc. No. 169-1, Ex. 5, Moyes Dep.

27   at 72.]  Further, Pinnacle argues that the Trust was able to take control of the gyms through its scheme

28

      [17] *See* Trust's MSJ, Doc. No. 169-1, Ex. 43.

and had Pinnacle known of the Trust's plan and misrepresentations, it would not have continued to fund month after month. Based upon the foregoing, Pinnacle argues that the Trust was unjustly enriched by Pinnacle's monthly funding.

The Trust moves for summary judgment of this claim arguing that a claim for unjust enrichment applies only where there is no legal contract, because such claims must fail where an express written contract governs the parties' relations as to the matter in question. [Trust's MSJ at 13.] The Trust argues that the Operating Agreement, Consent Resolution and Nevada's LLC Act govern the parties' relations with respect to these matters. However, Pinnacle's claims stem from the alleged Buy-Out Agreement, which the Trust claim's was never reached. For the reasons set forth above, the Trust's motion for summary judgment on Pinnacle's unjust enrichment claims is DENIED.

### 3. Pinnacle's Damages Alleged for Non-Buyout Claims

The Trust argues that the damages allegedly suffered by Pinnacle as a result of the Trust's conduct including: (1) half of any tenant incentive payments received by the Trust; (2) the value of Xeptor's assets; (3) $2.75 million, the value of Pinnacle's half of the Xeptor promissory notes; and (4) Pinnacle's total investment in MFC; are, as a matter of law, not recoverable. [*Id.,* Ex. 65, pp. 9-10.]

### a. Tenant Incentive Payments

With regard to the tenant incentive payments, the Trust argues that Pinnacle cannot recover damages representing any portion of the tenant incentive payments because it is undisputed that the Trust never received any tenant incentive payments. [*Id.,* Ex 1 at 367:4-15; Ex. 11 75:4-15.] Since Pinnacle does not dispute this fact, the Trust's motion for summary judgment on Pinnacle's damages claim seeking half of any tenant incentive payments received by the Trust is hereby GRANTED. Similarly, Pinnacle concedes that repayment of Fournier's initial $375,000 investment depended upon profits or receipt of incentive payments, which the Trust claims to have not received. Again, since Pinnacle does not dispute the fact that the precondition to repayment of the $375,000 was not met, the Trust's motion for summary judgment on Pinnacle damages claim seeking Fournier's initial $375,000 investment is hereby GRANTED.

### b. Xeptor's Assets

08cv1368

1         With regard to Pinnacle's damages claims involving the value of Xeptor's Assets, the Trust

2   argues that Pinnacle has failed to articulate the "value" of those assets or even make any effort to value

3   those assets. *See* Ex. 1 at 75:1-77:12; Ex. 13 at 257:16-20. The Trust also argues that Pinnacle has failed

4   to make the disclosures required by Fed. R. Civ. P. Rule 26(a)(3) regarding Pinnacle's valuation of these

5   assets. However, despite the Trust's arguments, it is clear from the record that Pinnacle seeks the

6   amount it funded in the Fall of 2007 for the purchase of gym equipment.  Pinnacle and the Trust each

7   funded $250,000 into MFC, which then provided Xeptor with $500,000 to purchase gym equipment.

8   MFC secured a UCC lien in the amount of $500,000 on this gym equipment. Based upon the foregoing,

9   the Trust's motion for summary judgment is DENIED as to Pinnacle's damages claim seeking the

10  $250,000 it funded in the Fall of 2007 for the purchase of this gym equipment.

11                 ***c. Xeptor's Promissory Notes and Pinnacle's Total Investment in MFC***

12        The Trust seeks summary judgment on Pinnacle's damages claim for the value of Pinnacle's half

13  of the Xeptor Promissory Notes in the amount of $2.75 million.  The Trust argues that Pinnacle has the

14  burden to demonstrate damages with reasonable certainty[18] and neither MFC nor its members have ever

15  sought to collect on the promissory notes. [Ex. 13 at 154:14-156:12.] The Trust argues that the notes

16  were and always have been uncollectible, because Xeptor and its members have no money to repay the

17  notes.

18        The Trust also argues that Pinnacle is not entitled to half the proceeds from the refunded

19  appellate bond because the Trust contends that Pinnacle breached its obligations by refusing to continue

20  to fund MFC operations. [*Id.,* Ex. 1 at 350:20-352:1.] The appellate bond refund was received by the

21  Trust in June 2008, and the Trust claims that it credited Pinnacle's MFC account by an amount equal to

22  Pinnacle's half of the appellate bond refund to partially bridge the shortfall caused by Pinnacle's failure

23  to fund.  [Trust's MSJ at 28-9.] The Trust contends that by using the bond refund to credit Pinnacle's

24  account for amounts Pinnacle owed MFC, the Trust properly mitigated the damages it suffered as a

25  result of Pinnacle's breach in failing to fund after Buy-Out negotiations failed.

26

27

28       [18]  *See, e.g., Portland 76 Auto Truck Plaza, Inc. v. Union Oil Co.*, 153 F.3d 938, 947 (9th Cir. 1998).

However, as the movant, the Trust bears the burden of demonstrating that no material dispute exists as to any material fact and the Trust has failed to carry that burden here.  Whether or not Xeptor's Promissory Notes were uncollectible is not dispositive of the value of Xeptor's assests when they were taken over by the Trust. Furthermore, since the Court has already found that there is a material dispute as to whether a Buy-Out Agreement was reached, it is unclear whether Pinnacle had any duty to continue to fund MFC.  Based upon the foregoing, the Trust's motion for summary judgment on these damages claims is DENIED.

## II. Pinnacle's Motion for Partial Summary Judgment

**A.** Pinnacle moves for summary judgment on the following damages asserted by the Trust: (1) damages called "Operation Damages – CAC" in the Duncan Expert Report, which amount to $2,368,117.66,[19] (present value estimated to be $2,452,585);[20] and (2) Lease Damages identified in Mr. Duncan's report that amount to $2,286,504.00, (present value estimated to be $2,287,648).[21]

### B. Relevant Background

From the summer of 2007 until April 2008, Xeptor leased the property in which the gyms operated from affiliates of Greenstreet.  On April 10, 2008, without the consent or approval of Pinnacle, an entity of the Moyes Group, Deer Valley Capital LLC, signed new leases with Greenstreet's affiliates for the properties in which the gyms operated.[22] Additionally, another Moyes-affiliated entity, Carefree Capital Investments, provided a ten-year Guaranty to Greenstreet in the amount of $20 million, guaranteeing Deer Valley's performance under the leases.  *Id*. at 185.

Beginning in July 1, 2008, a new entity called CAC Holdings, Inc., which was owned by and affiliated with Mr. Moyes, began operating the gyms instead of MFC.  As of July 10, 2008, the Trust no longer funded any money into the health club business, rather, Jerry Moyes individually began funding

---

[19] *See* Doc. No. 170-4, Ex. E, at 5-6.

[20] *See* Doc. No. 170-4, Ex. L, at Appendix F.

[21] *See* Doc. No. 170-4, Ex. L, at Appendix G.

[22] *See* Ex. D to Fabian Decl.,  2/8/11 Deposition of Jeff Shumway at 129-133, excerpts attached.

1   CAC Holdings.[23]  In early 2009, Deer Valley stopped paying the rent under its leases with Greenstreet's

2   affiliates and in June 2009, these affiliates filed two lawsuits against Deer Valley and Carefree for

3    unpaid rent.[24]  In October 2010, Deer Valley and Carefree stipulated to judgments against them for the

4   amounts sued upon.[25] These judgments are not against the Trust. *Id.* There are no agreements in place

5   that would require the Trust to pay these judgments entered against Deer Valley or Carefree.[26]

6           *C. Legal Standard*

7           Summary judgment is appropriate where the record, when read in the light most favorable to the

8   nonmoving party, demonstrates that "there is no genuine issue as to any material fact and . . . the movant

9   is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56(c), the movant

10  bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex*

11  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving

12  party must set forth, by affidavit or as otherwise provided by Rule 56, "specific facts showing that there

13  is a genuine issue for trial." Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors*

14  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable inferences that can be drawn from the evidence

15  "must be drawn in favor of the non-movant," *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir.

16  2008), but only admissible evidence is considered. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th

17  Cir. 2002).

18

19

20

21

22

23

24

---

25      [23] *See* Ex. F to Fabian Decl., Deposition of Marsha Forsythe-Fournier at 168-169, excerpts
26  attached; Ex. G to Fabian Decl., 3/15/11 Deposition of Patti Johnson, Volume I, at 58, excerpts attached.

        [24] *See* Ex. H (Group Exhibit) to Fabian Decl., Complaints (without exhibits).

27      [25] Ex. I (Group Exhibit) to Fabian Decl., Stipulated Judgments.

28      [26] *See* Ex. J to Fabian Decl., Deposition of Jerry Moyes at 19-23, excerpts attached.

08cv1368

Under this standard, partial summary judgment "on all or any part of a claim" may be entered as to that portion of the claim.[27]  This reasoning extends to damages claims.[28]

///

### 1. Operation Damages

Pinnacle contends that these damages are losses allegedly sustained not by the Trust, but by non-parties Jerry Moyes or CAC Holdings. Pinnacle argues that the undisputed evidence demonstrates that it was Jerry Moyes individually, and not the Trust, who made the capital contributions after the formation of CAC Holdings.[29]  No evidence in the record shows that the Trust reimbursed Mr. Moyes for these capital infusions or has agreed to do so.  Nor is there any evidence suggesting that the Trust has any legal obligation to reimburse Mr. Moyes for these capital contributions.  Pinnacle argues that as a matter of law, these damages are not recoverable by the Trust at trial under any circumstances, even if the Trust were to prevail on its counterclaims, because the monies were contributed by Mr. Moyes, who is not individually a party to this case.

As set forth above, once the moving party satisfies the burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must demonstrate, by affidavit or as otherwise provided by Rule 56, "specific facts showing that there is a genuine issue for trial" though admissible

---

[27] Fed. R. Civ. P. 56(a); *see also Flintkote Co. v. General Acc. Assur. Co.*, 410 F. Supp. 2d 875, 881 (N.D. Cal. 2006) ("Fed. R. Civ. P. 56(d) allows a court to render partial summary judgment, thereby reducing the number of facts at issue in a trial"), citing *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987); *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1207 (S.D. Cal. 2007) (granting motion for partial summary judgment on breach of contract claim); *Onder v. Allstate Ins. Co.*, No. 02-213-IEG, 2002 U.S. Dist. LEXIS 11344, at *1 (S.D. Cal. Jun. 12, 2002).

[28] *Hansen Bev. Co. v. Vital Pharm., Inc.*, No. 08-CV-1545-IEG, 2010 U.S. Dist. LEXIS 79218, at *29 (S.D. Cal. Aug. 3, 2010) (granting partial motion for summary judgment on Lanham Act damages claim); *Scott v. UNUM Life Ins. Co.*, No. C 09-1841, 2010 U.S. Dist. LEXIS 127799, at *28 (N.D. Cal. Dec. 3, 2010) (granting partial motion for summary judgment on punitive damages claim).

[29] Specifically, the Trust's last payment relating to the gyms occurred on July 3, 2008. *See* Doc. No. 170-4,  Ex. E, at 5-6.  Beginning on July 10, 2008, Mr. Moyes himself began funding CAC Holdings. *Id.*

1    evidence,[30] with all reasonable inferences that can be drawn from the evidence being drawn in favor of

2    the non-movant.[31]

3         The Trust opposes Pinnacle's motion and asserts, by way of an affidavit, that the Trust funded

4    CAC Holdings from July 1, 2008 until the gym's closing, however, this assertion contradicts the Trust's

5    own interrogatory answers.[32]  The sham affidavit rule precludes the Trust from creating a genuine

6    dispute of material fact by contradicting its prior interrogatory answers.[33]  The Trust claims that it

7    "funded CAC and CAC's capital infusions into the gyms from June 2008 through the gyms' closing."

8    *See* Def. Opp., Doc. No. 175, at 6. To support this statement, the Trust submits the affidavit of Elly

9    Penrod that disavows prior, and very specific, interrogatory answers submitted by the Trust.[34] In its

10   answers to Pinnacle's interrogatories, which Penrod says she helped prepare and which were served on

11   Pinnacle on March 25, 2008, the Trust set out a lengthy and specific chart with the headings: "Funding

12   Entity;" "Date;" "Amount;" and "Purpose."[35]  For the entries from August 6, 2007 through July 3, 2008,

13   the Trust listed "JVMFT" (Jerry and Vickie Moyes Family Trust) as the funding entity.  *Id.*  From July

14   10, 2008 through September 9, 2010, the Trust lists "Jerry C. Moyes" and not JVMFT (the Trust) as the

15   funding entity. *Id.*

16

17

18       [30]  Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,
19   630 (9th Cir. 1987); *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008).

         [31] *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008).
20

21       [32] *See* Resp. to Interrog. No. 16.

22       [33] *Schuyler v. United States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party opposing
     summary judgment cannot create a genuine issue of fact by contradicting or repudiating his own sworn
23   deposition testimony"); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D. Cal. 2004).

24       [34]  Specifically, in February 2011, Pinnacle served the following interrogatory on the Trust:
     For each occasion, between August, 2007 through the present, on which the Trust, or any other
25   Moyes-related entity, provided monies to CAC Holdings, MFC, Xeptor, or any entity on behalf of CAC
     Holdings, MFC, or Xeptor, please identify:
26           (a) the date of such funding;
             (b) the person or entity that funded CAC Holdings;
27           (c) the amount of such funding; and
             (d) the purpose of such funding.
     *See* Doc. No. 170-4, Ex. E, at Interrog. No. 16.
28
         [35] *Id.* at Resp. to Interrog. No. 16.

1     The Court notes that this interrogatory response was submitted after Penrod testified that she did

2   not recall whether anyone other than the Trust had funded CAC Holdings.[36]   At no time in the last four

3   months, or even since Pinnacle filed its motion for partial summary judgment, has the Trust amended

4   this interrogatory answer. [Trust's MSJ, Ex. 5 to Resp. at ¶ 4.] Penrod's explanation that the Trust made

5   a mistake in answering the interrogatories is not credible given that it submits no documentary evidence

6   to support its assertion that the Trust funded the "Jerry C. Moyes" amounts, and the prior interrogatory

7   answers are specific and clear about drawing a distinction between which entity or individual "JVMFT"

8   or "Jerry C. Moyes" funded the amounts in question.

9     Based upon the foregoing, Pinnacle's motion for summary judgment that the Trust cannot

10   recover as damages categorized as Operation Damages – CAC in the amount of $2,368,117.66 is hereby

11   GRANTED.

12   ///

13   ///

14                    ***2. Lease Damages***

15     Pinnacle also argues that the Trust cannot recover damages incurred by Deer Valley or Carefree

16   Capital in the amount of $2,286,504.00, which are attributable to two stipulated judgments entered

17   against Deer Valley and Carefree for unpaid rent under their lease agreements with Greenstreet affiliates

18   for the gym properties.[37]   The Trust seeks the present value of these damages in the amount of

19   $2,287,648.  *Id.*  Pinnacle argues that because these judgments were entered solely against Deer Valley

20   and Carefree, not the Trust, that the Trust has no liability or obligation under them.[38]   Pinnacle further

21   argues that this is supported by Mr. Moyes testimony that there are no agreements in place between the

22   Trust and Deer Valley or Carefree that would require the Trust to indemnify or hold Deer Valley or

23   Carefree harmless as to the amount of such judgments.[39]

24

25

26   [36] Compare Ex. 5 to Resp. at ¶ 2 with Penrod Dep. at 15, Tab A to Penrod Affidavit, Resp. Ex. 5.

27   [37] *See* Doc. No. 170-4, Ex. L, at Appendix G.

28   [38] *See* Doc. No. 170-4, Ex. I.

[39] *See* Doc. No. 170-4, Ex. J.

However, the Trust contends that it suffered damages by: (1) funding Deer Valley's payment on the Greenstreet leases either directly (in June 2008) or through CAC (from July 1, 2008 forward);[40] and (2) paying the judgments against Deer Valley and Carefree. The Trust contends that it used separate LLCs as the vehicles to operate and fund the gym operations and that its use of separate LLCs to operate the gyms was contemplated by the parties and absolutely consistent with MFC's plan going forward.[41] Since the damages were incurred as a result of entry into the leases and have been borne by the Trust, the Trust contends that it has standing to assert a direct action against Pinnacle for these losses.[42] The Trust contends that the Consent Resolution between the parties signed in March 2008 permitted "an affiliate" of MFC to enter into leases with Greenstreet. However, as set forth previously, the Court finds this argument both unsupported and unpersuasive.

The Trust argues that it is entitled to pursue its claims and resultant damages irrespective of the vehicle utilized to operate the gyms is reflected in the reality that Pinnacle has sued the Trust for actions undertaken by those very same LLCs.[43] The Trust argues that if it cannot recover for damages it incurred due to its funding of Deer Valley and CAC, then it follows that Pinnacle likewise cannot recover for actions taken by Deer Valley and CAC.[44] *See* Def. Opp., Doc. No. 175, at 1.

Ultimately, however, the Trust does not provide any evidence of a legal obligation to pay the judgments against Deer Valley and Carefree. Because the Lease Damages that the Trust seeks were

[40] *See* Deposition of Elly Penrod, attached as Exhibit 3; The Jerry and Vickie Moyes Family Trust's Responses to Plaintiff's Second Set of Interrogatories, Response No. 16, a copy of which is attached as Exhibit 4; July 14, 2011 Declaration of Elly Penrod ("Penrod Declaration"), ¶¶ 2, 3, attached as Exhibit 5).

[41] *See* Doc. No. 169, Ex. 1 to the Trust's MSJ at 113:8- 114:11; Ex. 15 to the Trust's MSJ, §§ 6.1, 6.4; Ex. 2 to the Trust's MSJ at 123:25-132:9; Ex. 30 to the Trust's MSJ, Fournier Deposition at 232:1, 235:5-241:16, attached as Exhibit 1; November 19, 2007 email from Mr. Waskin to Mr. Shumway, attached as Exhibit 2; Ex. 19 to the Trust's MSJ.]

[42] *See, e.g., Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141-42 (9th Cir. 2010) (standing exists when a plaintiff suffers an injury in fact (either concrete or imminent injury), the injury is traceable to the defendant and the injury will be redressed by a favorable decision).

[43] In its alternative, non-buyout claims, Pinnacle alleges that it incurred damages as a result of Deer Valley entering the Greenstreet leases and/or CAC's continued operation of the gyms. FAC, Doc. No. 149, ¶¶ 82, 89, 98, 104, 110-111, 119-120.

[44] The Trust puts forth no evidence to support this argument and has not affirmatively moved for summary judgment on these grounds and as such, the Trust's argument is not a properly supported motion before this Court.

08cv1368

1    incurred voluntarily and not damages suffered directly by the Trust, the Trust cannot recover them in

2    this lawsuit.[45]  Based upon the foregoing, Pinnacle's motion for summary judgment on the Trust's claim

3    for Lease Damages in the amount of $2,287,648 is GRANTED.

4    ***III. Pinnacle's Motion for Judgment on the Pleadings***

5         At issue in Pinnacle's motion for judgment on the pleadings, [Doc. No. 171], are the Trust's

6    Third Counterclaim (breach of fiduciary duty), Fourth Counterclaim (tortious interference with

7    contract), and Fifth Counterclaim (tortious interference with prospective business advantage). As a

8    preliminary matter, the Trust states in its moving papers that it no longer intends to pursue its Fourth

9    Counterclaim for tortious interference with contract, and as such, Pinnacle's motion for judgment of the

10   pleadings as to the Trust's Fourth Counterclaim is hereby GRANTED. *See* Def. Opp., Doc. No. 174, at

11   FN 1.

12        ***A. Legal Standard***

13             ***1. Motion for Judgment on the Pleading Pursuant to Rule 12(c)***

14        Fed. R. Civ. P. 12(c) provides, in relevant part, that "after the pleadings are closed but within

15   such time as not to delay the trial, any party may move for judgment on the pleadings." And, as courts of

16   this Circuit have recognized, Fed. R. Civ. P. 12(h)(2) "specifically authorizes" a moving party to use a

17   motion for judgment on the pleadings "to raise the defense of failure to state a claim, even after an

18   answer has been filed." *Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir. 1980) (affirming dismissal of

19   action pursuant to Rule 12(c)). This is particularly true where a party has asserted the affirmative

20   defense of failure to state a claim along with its answer, and thus, "the motion[] to dismiss [is] not based

21   on new arguments for which [counter-claimant] could claim to have been unprepared." *Id.* ; *see also*

22   *Martorello v. Sun Life Assur. Co. of Canada*, No. C 09-0912, 2009 U.S. Dist. LEXIS 41465, at *9 (N.D.

23   Cal. May 1, 2009) (considering Rule 12(c) motion as motion for judgment on pleadings where answer

24   raised defense of failure to state claim).

25

26

27

28

---

[45] *Jowdy v. Guerin*, 457 P.2d at 749 (plaintiff must establish that he has suffered damages).

1    In deciding a Rule 12(c) motion, courts apply the same standard of review as with a Fed R. Civ.

2    P. 12(b)(6) motion to dismiss.[46] As a result, a "judgment on the pleadings is proper when there are no

3    issues of material fact, and the moving party is entitled to judgment as a matter of law."[47]

4                              *2. The Operating Agreement's Forum Selection Clause*

5    MFC's Operating Agreement contains a forum selection clause ("FSC"). The Court has already

6    concluded that the FSC contained in the Operating Agreement is valid, enforceable, and applies to all

7    the claims alleged. [*See* Order Dated September 8, 2009, Doc. No. 17, at 12, lines 22-3.]

8    A California Federal District Court sitting in diversity applies California choice-of-law

9    principles to determine which state's law to apply to particular claims.[48] "[A] valid choice-of-law clause,

10   which provides that a specified body of law "governs" the "agreement" between the parties,

11   encompasses all causes of action arising from or related to that agreement, regardless of how they are

12   characterized, including tortious breaches of duties emanating from the agreement or the legal

13   relationships it

14   creates."[49] Pinnacle contends that Nevada law governs this Court's analysis of the breach of contract

15   and breach of fiduciary duty claims.

16   Pinnacle contends that the governmental interests test applies to determine the proper law that

17   applies to the Trust's tortious interference claims.[50]  Here, the Plaintiff argues that Arizona law applies

18   because the events giving rise to these tort claims took place in Arizona, and one party is an Arizona

19

20

21   [46] *Martorello*, 2009 U.S. Dist. LEXIS 41465, at *9, citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988).

22   [47] *Miglin v. Mellon*, No. 2:08-cv-01013, 2009 U.S. Dist. LEXIS 109235, at *6 (D. Nev. Nov. 4,
23   2009), citing *General Conference Corp. of Seventh Day Adventists v. Seventh Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989) (citing Fed. R. Civ. P. 12(c)); *see also Martorello*, 2009 U.S. Dist. LEXIS 41465, at *9.

24
25   [48] *Rasidescu v. Midland Credit Management, Inc.*, 495 F. Supp. 1155, 1158-59 (S.D. Cal. 2007).

26   [49] *Nedloyd Lines B.V. v. Superior Court of San Mateo County*, 834 P.2d 1148, 1155 (Cal. 1992) (applying choice of law provision to breach of fiduciary duty claim).

27   [50] *Consolidated Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 391 n.3 (9th
28   Cir. 1983) ("Other issues in this case, which involve tort law and the law of punitive damages, are not controlled by the contract choice of law provision. California law requires an analysis of the interests of states involved to determine the law that most appropriately applies to each issue.")

1    resident, and because the contracts and prospective business advantages with which Pinnacle is alleged

2    to have interfered were intended to be performed in Arizona or were otherwise directed at Arizona. *Id.*

3         Pinnacle contends that, although Nevada law applies to the Trust's contract and breach of

4    fiduciary duty counterclaims, Arizona law applies to the Trust's tortious interference with contract

5    claim.  Pinnacle is incorrect. Section 20.7 of the Operating Agreement provides that Nevada law will

6    apply to all questions relating to the performance and interpretation of the Operating Agreement.

7    [Trust's MSJ, Ex. 15 to the Trust's MSJ, § 20.8.] Here, the Trust's tortious interference with prospective

8    business advantage claim is based upon Pinnacle's failure to timely and properly fund pursuant to the

9    Operating Agreement and thus, directly relates to how the parties performed the Operating Agreement.

10   [Doc. 50, Amended Answer and Counterclaim, ¶¶ 75, 76.]  Direction can also be found from this

11   Court's prior order that § 20.18 of the Operating Agreement (the forum selection clause) applied to all

12   of Pinnacle's claims against the Trust, including the tort claims. [Doc. 17, Order, p. 7-8.]  In so holding,

13   the Court noted that application of the forum selection clause depended on whether "resolution of the

14   claims relates to interpretation of the contract. [*Id.*, p. 7.] There can be no legitimate debate that

15   resolution of the Trust's tortious interference with prospective business advantage claim relates to the

16   performance and interpretation of the Operating Agreement such that Nevada law applies.

17        **B. Discussion**

18        In the Third Counterclaim, the Trust alleges that "Pinnacle owed a fiduciary duty to MFC" and

19   that "Pinnacle breached its fiduciary duty owed to MFC" in several different ways. [Counterclaim ¶¶

20   64-65, Doc. 50, attached as Ex. D hereto.]  The Trust does not allege in the Counterclaim that Pinnacle

21   owed the Trust a fiduciary duty or breached any such duty to the Trust.[51]

22        In its Fifth Counterclaim for tortious interference with prospective business advantage, the Trust

23   claims Pinnacle interfered with MFC's prospective business advantages, not the Trust's. Specifically,

24   the Trust alleges that Pinnacle interfered with MFC's ability "to increase the client base at the gyms and

25

26   _____

[51] The only mention of the Trust is in paragraphs 66 and 67. *See* Doc. No. 50, p. 21:
     66. MFC and the Trust were significantly damaged as a result of Pinnacle's breaches of

27   fiduciary duty.
     67. The actions of Pinnacle were intentional, aggravated and committed with an evil mind and

28   with the intent to cause injury, or in reckless and/or deliberate disregard of an unjustifiably substantial
     risk of significant harm to MFC and the Trust.

08cv1368

1   to substantially profit from such an increase;" "to manage the gyms;" and to continue to manage the

2   gyms and acquire Xeptor's assets. (Counterclaim ¶¶ 75-77.) A claim for tortious interference with

3   prospective business advantage must belong to the party asserting the claim.[52]

4        Both of these Counterclaims allege only that Pinnacle owed a fiduciary duty to MFC[53] and that

5   Pinnacle interfered with the business advantage of MFC.[54]  The Counterclaims allege wrongdoing by

6   Pinnacle against MFC, not the Trust.[55]  Pinnacle argues that these claims were brought as derivative

7   claims on behalf of MFC and were subsequently dismissed by this Court. The Trust has filed the exact

8   claims in Arizona state court.          Since the only duty owed, or interference alleged, is with regard to

9   duties owed to MFC and not the Trust, Pinnacle's motion for judgment on the pleadings on these claims

10   is hereby GRANTED.

11   ///

12   ///

13                          ***Conclusion***

14        For the reasons set forth above, the Trust' Motion for Summary Judgment, [Doc. No 169], is

15   GRANTED IN PART and DENIED IN PART; Pinnacle's Partial Motion for Summary Judgment, [Doc.

16   No. 170], and Motion for Judgment on the Pleadings, [Doc. No. 171], are hereby GRANTED as set

17   forth herein.

18        IT IS SO ORDERED.

19

20   DATED:  January 4, 2012

21

22      [52] *Dube v. Likins*, 216 Ariz. 406, 412, 167 P.3d 93, 99 (Ariz. App. 2007) (elements of tortious
interference with prospective business advantage claim are "(1) the existence of a valid business

23   expectancy; (2) the interferer's knowledge of the business expectancy; (3) the interferer intentionally
induced or caused termination of the business expectancy; and (4) damage suffered as a result of

24   termination of the business expectancy"); *Karlsson Group, Inc. v. Langley Farms Invs., LLC*, No.
CV-07-0457, 2009 U.S. Dist. LEXIS 82498, at *11 n.5 (D. Ariz. Sept. 1, 2009) (Ariz. law) (first

25   element claim requires "existence of valid…business expectancy on [plaintiff's part").

26      [53] *See* Counterclaim, Doc. No. 50, ¶¶ 64-65.

27      [54] *Id.*, ¶¶ 75-77.

28      [55] The Court's September 8, 2010 ruling dismissed these claims because they were derivative
claims on behalf of MFC. The Trust has subsequently filed the exact claims in Arizona state court.

Hon. Anthony J. Battaglia
U.S. District Judge