1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11   PINNACLE FITNESS AND                )   Case No. 3:08-CV-1368-GPC-BGS
     RECREATION MANAGEMENT,              )
12   LLC, a Delaware limited liability   )   **ORDER:**
     company,                            )
13                                       )   **(1) GRANTING IN PART AND**
                                         )   **DENYING IN PART THE**
14                                       )   **TRUST'S RENEWED MOTION**
                       Plaintiff,        )   **FOR JUDGMENT AS A MATTER**
15   v.                                  )   **OF LAW (ECF NO. 309);**
                                         )
16   THE JERRY AND VICKIE MOYES          )   **(2) DENYING AS MOOT THE**
17   FAMILY TRUST, an Arizona trust,     )   **TRUSTS'S MOTION FOR**
                                         )   **RELIEF PURSUANT TO RULE**
18                                       )   **62(b) (ECF NO. 316); AND**
                       Defendant,        )
19   _____  )   **(3) GRANTING IN PART AND**
                                         )   **DENYING IN PART PINNACLE'S**
20                                       )   **MOTION TO CORRECT**
     AND RELATED COUNTERCLAIMS.          )   **JUDGMENT (ECF NO. 313)**
21                                       )
     _____  )
22                                       )

23                          **INTRODUCTION**

24        Before the Court are three post-trial motions, each of which has been fully

25   briefed: the Trust's Renewed Motion for Judgment as a Matter of Law or,

26   Alternatively, a New Trial ("Renewed JMOL"), (ECF Nos. 309, 332, 338); Pinnacle's

27   Motion to Correct the Judgment ("Motion to Correct the Judgment"), (ECF Nos. 313,

28   334, 336); and the Trust's Motion for Relief Pursuant to Federal Rule of Civil

Procedure 62(b) ("Motion to Stay Execution of the Judgment"), (ECF Nos. 316, 327, 333).  The Court finds each of these motions suitable for disposition without oral argument.  See CivLR 7.1.d.1.  For the reasons that follow, the Court hereby **GRANTS IN PART AND DENIES IN PART** the Trust's Renewed JMOL, **DENIES AS MOOT** the Trust's Motion to Stay Execution of the Judgment, and **GRANTS IN PART AND DENIES IN PART** Pinnacle's Motion to Correct the Judgment.

## BACKGROUND

After a ten-day trial, a jury returned verdicts in favor of Pinnacle on its claims for Breach of Contract (Buy-Out), Breach of Implied Covenant of Good Faith and Fair Dealing (Buy-Out), Promissory Estoppel (Buy-Out), Breach of Contract (Operating Agreement), Breach of Implied Covenant of Good Faith and Fair Dealing (Operating Agreement), Breach of Fiduciary Duty, Fraud (by Intentional Misrepresentation and by Concealment), Constructive Fraud, and Civil Conspiracy to Defraud.

The jury awarded Pinnacle $1,632,495.72 in compensatory damages on its first, second, and/or third claims ("Buy-Out Claims").  The jury awarded Pinnacle zero damages on its fourth and/or fifth claims and $905,242.00 in compensatory damages on its sixth, seventh, eighth, and/or ninth claims ("Non-Buy-Out Claims").  The jury further awarded Pinnacle $1,100,000 in punitive damages based on a finding that the Trust acted with an evil mind.

After considering the parties' proposed judgments, the Court entered judgment on March 21, 2013.

The Trust then filed its Renewed JMOL, asserting substantially the same arguments asserted in its initial JMOL.[1]  The Trust further moves to stay execution of the judgment pending disposition of these post-trial motions.  Pinnacle, on the other hand, moves to correct the language of the judgment to conform with what it asserts are the jury's findings.

---

[1] The Court previously denied in part and submitted in part the Trust's initial JMOL. (See ECF No. 266.)

1

# DISCUSSION

2

## I.    Judgment as a Matter of Law

3

### A.    Legal Standard

4

Under Federal Rules of Civil Procedure, Rule 50(a)(1):

5

6

7

8

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . resolve the issue against the party; and . . . grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

9

"A motion for judgment as a matter of law may be made at any time before the

10

case is submitted to the jury.  The motion must specify the judgment sought and the law

11

and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).

12

"If the court does not grant a motion for judgment as a matter of law made under

13

Rule 50(a), the court is considered to have submitted the action to the jury subject to

14

the court's later deciding the legal questions raised by the motion."  Id. 50(b).

15

16

17

> No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may ... (1) allow judgment on the verdict, if the jury returned a verdict; . . . (2) order a new trial; or . . . (3) direct the entry of judgment as a matter of law.

18

Id.

19

"Judgment as a matter of law is proper if the evidence, construed in the light

20

most favorable to the non-moving party, allows only one reasonable conclusion and

21

that conclusion is contrary to that reached by the jury." Acosta v. City & Cnty. of San

22

Francisco, 83 F.3d 1143, 1145 (9th Cir.1996).  The jury's verdict is reviewed to

23

determine whether it is supported by substantial evidence. Murray v. Laborers Union

24

Local No. 324, 55 F.3d 1445, 1452 (9th Cir.1995).  "Substantial evidence is 'such

25

relevant  evidence  as  reasonable  minds  might  accept  as  adequate  to  support  a

26

conclusion.'"  Mockler v. Multnomah Cnty., 140 F.3d 808, 815 n.8 (9th Cir. 1998)

27

(citing Murray, 55 F.3d at 1452).

28

/ / /

### A.     Analysis

The Trust argues it is entitled to judgment as a matter of law on all of Pinnacle's claims or, in the alternative, a new trial.

#### 1.     Buy-Out Claims

The Trust argues it is entitled to judgment as a matter of law on Pinnacle's Buy-Out Claims because (1) Nevada's statute of frauds bars enforcement of the contract; (2) the parties' preliminary negotiations did not result in contract formation; (3) promissory estoppel is unavailable where the parties' relationship is governed by a contract; and (4) Pinnacle did not introduce any evidence demonstrating it was damaged by the Trust's breach of the Buy-Out Agreement.

#### a.     Statute of Frauds

The Trust argues the Buy-Out Agreement found to exist by the jury is subject Nevada's statute of frauds because Term 3 of the Buy-Out Agreement requires the Trust to pay Pinnacle "4 equal semi-annual installments of [$]307,104.68." The Trust argues this term results in a contract that, "from the terms used," could only be performed over the course of two years. The Trust thus argues that, because there is no writing that contains the substantial parts of the contract, and that is signed by the trustees of the Trust, the statute of frauds has not been satisfied.

In response, Pinnacle asserts the statute of frauds does not apply because the Trust could have made the four payments of $307,104.68 in less than a year. Specifically, Pinnacle notes that the second sentence of Term 3 requires that Pinnacle "be repaid in full prior to any splits on profits with Xeptor." Pinnacle thus argues "if the gyms had been profitable in the first year such that the Trust would be required to pay Xeptor a portion of those profits, the Trust would first be required to pay Pinnacle the entire $1.2 million." Pinnacle asserts that nothing in the Buy-Out Agreement precludes payment of the full amount within a year.

Pinnacle argues that, even if the statute of frauds applies, "the email exchanges between Shumway and Fournier from April 2 through April 7, when considered

together, satisfy the Statute of Fraud writing requirement." Pinnacle argues the statute of fraud is satisfied because those email exchanges included the "names of the parties, the interests affected, and the consideration paid for those interests." Pinnacle further argues that, under Nevada's Electronic Transactions Uniform Act ("ETUA"), Nev. Rev. Stat. § 719 et seq., Shumway's typed name at the bottom of his emails constitutes a valid signature for purposes of the statute of frauds.

In reply, the Trust argues the statute of frauds applies despite the second sentence of Term 3 regarding repayment before any splits on profits with Xeptor. The Trust argues that the "mere possibility" that it could repay Pinnacle in less than a year does not preclude application of the statute of frauds. Assuming the statute of frauds applies, the Trust argues the ETUA does not alter the requirement that the trustees of the Trust sign the agreement—something the trustees did not do.[2] The Trust further argues that, in light of the parties' 23-page draft acquisition agreement, the email exchanges between Shumway and Fournier do not contain all the promises that were to constitute the contract.

Every agreement that, by its terms, is not to be performed within one year from the making thereof is void unless the agreement, or some note or memorandum thereof expressing the consideration, is in writing and subscribed by the person charged therewith. Nev. Rev. Stat. § 111.220.

"Where the manifest intent and understanding of the parties, as gathered from the words used and the circumstances existing at the time, are that the contract shall not be executed within the year, the mere fact that it is possible that the thing may be done in a year, will not prevent the statute [of frauds] from applying." Stanley v. A. Levy & J. Zetner Co., 112 P.2d 1047, 1052-53 (Nev. 1941).

In Center of Hope v. Wells Fargo, the court concluded that an alleged oral loan modification appeared to fall within the statute of frauds because the loan could not be

---

[2] A sub-component of this argument is that Pinnacle knew Shumway did not have the authority to bind the trust.

repaid within one year at the agreed monthly rate; thus, the agreement could not, by its terms, be completed within one year.  781 F. Supp. 2d 1075, 1080 (D. Nev. 2011).  Similarly, in Corchado v. BAC Home Loan Servicing, the court concluded an oral loan modification fell within the statute of frauds because the plaintiff did not "aver" that the five payments she made pursuant to the alleged modification "would have discharged the loan within one year from the time she claim[ed] to have executed the oral modification contract."  2011 WL 4573905, at *2 (D. Nev. Sept. 29, 2011).

On the other hand, in Atwell v. Southwest Securities, the Supreme Court of Nevada concluded that an oral real estate brokerage agreement was not subject to the statute of frauds where there was "nothing to indicate it could not be performed within one year."  107 Nev. 820, 825 (1991).  Similarly, in Girton v. Daniels, the Supreme Court of Nevada held that a two-year lease was not subject to the statute of frauds because "[w]hile the lease by its terms, if fully complied with, may have extended for two years and even longer," it nevertheless "could have been terminated by act of the parties within a year according to its specific provisions and without violation of its terms."  35 Nev. 438 (1913).

The Court concludes that the Buy-Out Agreement is not subject to the statute of frauds.  Unlike Center of Hope and Corchado, nothing in the Buy-Out Agreement precluded the Trust from discharging its obligation to Pinnacle within a year.  Indeed, based on the language of the agreement and the record in this matter, the Court finds the parties did not understand the timing of the four semi-annual payments to be a material term of the agreement because the Trust could have paid the entire $1.2 million within a year, in accordance with the agreement's specific provisions and without violating its terms.  Cf. Harmon v. Tanner Motor Tours of Nevada, Ltd., 79 Nev. 4, 15 (1963) (holding that contract to provide transportation services for ten years fell within statute of frauds because performance of contract would require at least ten years).  The Court thus finds no reason to disturb the jury's verdict on this ground.

/ / /

### b.    Contract Formation

The Trust argues the emails that comprise the Buy-Out Agreement cannot be cobbled together, in piecemeal fashion, to form a contract.  The Trust argues the emails were merely a series of offers and counteroffers.  Specifically, the Trust asserts Shumway "never unequivocally accepted the terms of the 'I vote yes' email," which was a counteroffer because it differed materially from Shumway's previous proposals, in that (1) it made repayment of only the third term contingent on purchase of Xeptor's assets, while Shumway insisted that the entire deal be contingent on that transaction; (2) it granted Pinnacle audit rights, while Shumway agreed only to be provide financial information semi-annually; (3) it failed to mention that Fournier would terminate her right to purchase any interest in Xeptor; and (4) it provided for interest on repayment of monies Fournier loaned Xeptor prior to Moyes' involvement.

The Trust further argues a contract was not formed because the parties did not intend to be bound until a written agreement was executed.  The Trust bases this argument on: (1) the fact that Fournier acknowledged in her emails that the transaction still needed to be finalized; (2) the fact that the parties' draft acquisition agreement states, among other terms, that it "constitutes the legal, valid and binding obligation of the [Trust] enforceable against the [Trust] in accordance with its terms"; (3) the fact that the parties' prior agreements, including the MFC Operating Agreement, were formalized in writing; (4) the fact that the draft agreement contains numerous important details that were not discussed by the parties; (5) the fact that the transaction involves such a large sum of money that one would reasonably expect such a contract to be in writing; and (6) Section 15.6 of the MFC Operating Agreement provides that "[N]o Transfer [of interests in MFC] need by recognized by [MFC], unless all of the following requirements are met . . . (c) the Transferring Member shall deliver to the Company a fully executed written agreement of assignment . . . ."

In response to the Trust's counteroffer argument, Pinnacle argues that, when more closely examined, nothing in Fourniers "I vote yes" email differs from what

1   Shumway had previously agreed to in prior emails.  Pinnacle argues the parties reached

2   agreement on material terms throughout the exchange of emails between Shumway and

3   Fournier and that Fournier's "I vote yes" email was merely a summary of the parties'

4   agreement.

5          As to whether the parties intended to be bound only by a formal written

6   agreement, Pinnacle asserts the Trust did not offer any evidence that a final written

7   agreement was a condition to the formation of a buy-out.  Pinnacle asserts that whether

8   the parties planned to negotiate additional terms is irrelevant to whether they reached

9   a deal on the essential and material terms of the Buy-Out Agreement.

10         Pinnacle further notes that the evidence demonstrated that Shumway understood

11  the parties had an agreement based on Shumway and Fournier's email exchanges.

12  Pinnacle notes that Shumway sent emails to various individuals indicating he had

13  reached an agreement with Pinnacle.  Pinnacle also notes that, following his email

14  exchange with Fournier, Shumway caused the Greenstreet leases to be put in the name

15  of a Trust-owned entity, Deer Valley.

16         An enforceable agreement cannot exist when the parties have not agreed to its

17  essential terms.  May v. Anderson, 119 P.3d 1254, 1258 (Nev. 2005).  Where further

18  negotiation as to important terms are contemplated, there is no contract until agreement

19  is reached on all terms under negotiation.  Tropicana Hotel Corp. v. Speer, 692 P.2d

20  499, 501 (Nev. 1985) ("When important terms remain unresolved, a binding agreement

21  cannot exist.") (citing Loma Linda Univ. v. Eckenweiler, 469 P.2d 54, 56 (Nev. 1970)).

22         Furthermore, if the record shows that during their negotiations the parties

23  contemplated that any agreement would only become effective when reduced to writing

24  and signed by the parties, then no contract is formed without such a signed writing.

25  See Tropicana, 692 P.2d at 502 n.4.  As the Supreme Court of Nevada recognized in

26  Dolge v. Masek, "It should be borne in mind that some measure of agreement is usually

27  manifested as a basis for preparation of a written draft of agreement."  70 Nev. 314,

28  319 (1954).  And "such manifestation of agreement" may be held to constitute binding

1  contractual assent if the evidence in support thereof is "convincing and subject to no

2  other reasonable interpretation." Id.

3      Based on a review of the record, including the above facts, the Court first

4  concludes that reasonable minds could conclude the parties intended the Buy-Out

5  Agreement to become immediately binding, even though it was contemplated that a

6  formal written agreement was to be prepared later.  Thus, the convincing evidence

7  standard set forth in Dolge does not necessarily apply.

8      The Court further concludes reasonable minds could conclude the email

9  exchanges between Shumway and Fournier resulted in an agreement on all material

10  terms–rather than a mere chain of offers and counteroffers, resulting in a counteroffer

11  by Fournier that Shumway did not accept.

12      In sum, the Court concludes that either parties' position with regard to contract

13  formation is supported by substantial evidence.  Accordingly, the Court finds no reason

14  to disturb the jury's verdict on this ground.

15                    **c.    Promissory Estoppel**

16      The Trust argues the jury's verdict on Pinnacle's promissory estoppel claim

17  should be vacated because an express contract–to wit, the MFC Operating

18  Agreement–governs the same subject matter as the promise underlying the promissory

19  estoppel claim.  More specifically, the Trust asserts that both the MFC Operating

20  Agreement and the promise it made to buy Pinnacle's interest in MFC both involve a

21  return of Pinnacle's capital contributions to MFC.

22      Pinnacle argues this case has nothing to do with the return of its capital

23  contributions.  Rather, it has to do with the Trust buying out Pinnacle's interest in MFC

24  at a price that was calculated using the amount of Pinnacle's capital contributions.

25      "The doctrine of promissory estoppel, which embraces the concept of detrimental

26  reliance, is intended as a substitute for consideration, and not as a substitute for an

27  agreement between the parties." Vancheri v. GNLV Corp., 105 Nev. 417, 421 (1989).

28  The Court thus agrees that, where a promise is supported by consideration, promissory

1    estoppel is unavailable.

2           As an initial matter, the Court does not agree that the MFC Operating Agreement

3    governs the Trust's buy-out of Pinnacle's interest in MFC.  While the MFC Operating

4    Agreement contains provisions for the assignment of a member's interest to another

5    person or entity, it does not specifically contain provisions for one member to buy-out

6    another member's interest in the company.  The Court find that the jury could have

7    reasonably concluded that Fournier used the amount of her capital contributions to

8    calculate a buy-out price; this is subtly different than seeking a return of her capital

9    contributions under the MFC Operating Agreement. Moreover, the promise underlying

10   Pinnacle's promissory estoppel claim is the same promise that is the subject of the Buy-

11   Out Agreement.

12          The jury found the Buy-Out Agreement to be a valid and enforceable agreement

13   between the parties.  This implies that the jury found sufficient consideration supported

14   the Trust's promise to pay Pinnacle $1.2 million for its interest in MFC.  Accordingly,

15   the Court agrees the Trust is entitled to judgment as a matter of law on Pinnacle's

16   promissory estoppel claim.

17                                     **d.    Damages**

18          The Trust argues Pinnacle did not demonstrate it was damaged by the Trust's

19   breach of the Buy-Out Agreement.  Specifically, the Trust argues Term 3 of the Buy-

20   Out Agreement made payment of the four semi-annual installments contingent on the

21   Trust's purchase of Xeptor's assets.  The Trust thus argues that because there is no

22   evidence that the Trust entered an agreement to purchase Xeptor's assets, Pinnacle is

23   not entitled to payment of the $1.2 million.  The Trust further argues that, with regard

24   to repayment of the bond monies pursuant to Term 4, Pinnacle cannot recover from the

25   Trust, the legal fees ($124,383.98) retained by Xeptor's attorney.

26          In response, Pinnacle asserts that the Trust, through CAC, did in fact acquire

27   Xeptor's only assets on July 1, 2008, and thus the $1.2 million payment term was

28   triggered.  Pinnacle further argues "the Trust never presented Xeptor with a good-faith

offer to purchase its assets, and ended up taking over all the assets anyway." Regarding the bond monies, Pinnacle contends that, while Xeptor's attorney did retain a portion of the bond monies for legal fees, the Trust is still required to pay half of those fees.

Based on a review of the record, the Court concludes the jury's award of damages is supported by substantial evidence. That is, the Court finds reasonable minds could conclude that the Trust acquired Xeptor's assets in a manner that would trigger payment of the $1.2 million. As to the bond monies, the Court concludes that, regardless of whether Xeptor's attorney withheld legal fees, substantial evidence supports the jury's award of damages in that the Trust and Pinnacle were to share any legal fees incurred by MFC.

### 2.   Non-Buy-Out Claims

The Trust argues the jury's verdict on Pinnacle's tort claims should be vacated because it is not supported by substantial evidence and because Pinnacle did not trust or place confidence in Shumway. The Trust further argues the jury's award of punitive damages should be vacated.

### a.   Substantial Evidence

The Trust argues the jury's verdict on Pinnacle's tort claims should be vacated because it is not supported by substantial evidence. Specifically, the Trust sets forth each fact that supports Pinnacle's fraud claims and then attempts to argue why each is insufficient in itself to support Pinnacle's fraud claims. The evidence cited by the Trust includes: (1) the Trust's attempt to negotiate a 51/49 voting split under the MFC Operating Agreement in August 2007; (2) Shumway's purported failure to fully participate in a November 2, 2007 meeting with Greenstreet; (3) the change of the gyms' names in late January 2008; (4) Shumway's February, 11 2008 email to John Hueston stating that the Trust was working to get out of the parties' partnership; (5) Stacy Rush's testimony that Shumway promised a Moyes entity only would sign leases with Greenstreet; (6) Shumway's March 2008 email exchanges with Darrin Austin,

Patti Johnson, and Elly Penrod; (7) Shumway's communications with Greenstreet during the April 7-10, 2008 time frame; and (8) Deer Valley's signing of the Greenstreet leases on April 10, 2008.

After concluding that items 1, 2, 6, 7, and 8 are not relevant because they occurred after Pinnacle stopped funding MFC, the Trust discusses why items 3, 4, and 5 cannot individually support Pinnacle's fraud claims.

In response, Pinnacle argues the Trust's "attempt to side-step this evidence by breaking it up into individual, isolated actions should be rejected," as "[t]he fraud here was not the name change or the discussion with John Hueston, or the secret agreement with Stacey Rush in isolation." Instead, "[e]ach of these actions and statements was part of a fraudulent scheme to take over the gyms or evidence of the scheme."

As a preliminary matter, the Court does not agree that items 1, 2, 6, 7, and 8 are irrelevant because they occurred after Pinnacle stopped funding MFC. While Pinnacle's damage theory is based on its assertion that it would not have contributed any funds to MFC had it known of the Trust's intention to take over the gyms, the Court agrees with Pinnacle that the jury could have properly considered all of the above items (1 through 8) as evidence of the Trust's scheme to defraud Pinnacle. Thus, the Court agrees with Pinnacle that the Trust's attempt to analyze each item individually does not compel a finding that the jury's verdict was not supported by substantial evidence. The Court concludes that a reasonable person, when viewing all the evidence together, could conclude that the Trust defrauded Pinnacle. Accordingly, the Court finds no reason to disturb the jury's verdict on Pinnacle's fraud claims on this ground.

### b.     Trust or Confidence in Shumway

The Trust argues the jury's verdict on Pinnacle's claims for breach of fiduciary duty, fraud, constructive fraud, and civil conspiracy to defraud must be vacated because Shumway's actions did not bind the trust because Pinnacle did not trust or place confidence in Shumway. The Trust asserts the evidence demonstrates the exact

1    opposite: that Pinnacle did not trust Shumway from the beginning.

2          In response, Pinnacle notes that while it may have not have trusted Shumway,

3    it did place confidence in Shumway to, for example, hire a general manager and an

4    accountant, and to act as president of MFC.  Pinnacle further notes that it funded MFC

5    through Moyes' personal bank account for months without an operating agreement and,

6    once an operating agreement was executed, relied on the Trust's representatives to fund

7    Xeptor.  Pinnacle asserts that, most importantly, it agreed to Shumway's suggestion

8    that he handle negotiations with Greenstreet.  Pinnacle asserts that it was precisely

9    because of Fournier's confidence in Shumway that the Trust was able to defraud

10   Pinnacle.

11         Based on a review of the record, including the facts cited by Pinnacle, the Court

12   finds reasonable minds could conclude that, while Fournier may not have trusted

13   Shumway personally, she did place confidence in Shumway as a business partner.

14   Thus, the Court finds no reason to disturb the jury's verdict on this ground.

15                           **c.    Punitive Damages**

16         The Trust argues the jury's award of punitive damages should be vacated or

17   reduced.  The Trust asserts "there is not clear and convincing evidence in the record to

18   establish any of Pinnacle's underlying torts, let alone the 'something more' required

19   to award punitive damages."  The Trust argues Shumway could not have acted with an

20   "evil mind" because "he repeatedly urged Pinnacle to sign the Greenstreet leases and

21   repeatedly offered for either party to purchase the other's interest in MFC."

22         The Trust further argues "Pinnacle cannot recover punitive damages because

23   . . . it did not suffer any damages as a result of the Trust's supposed scheme."  That is,

24   "there is not clear and convincing evidence that Pinnacle somehow relied to its

25   detriment on any of the Trust's alleged misconduct . . . or that the Trust's alleged

26   misconduct caused Pinnacle any harm."

27         The Trust argues last that the award of punitive damages is excessive because

28   the reprehensibility of the conduct at issue is low to moderate and the compensatory

                                              13

1  damages are substantial.  The Trust asserts punitive damages in this case should not

2  exceed a 1:1 ratio to compensatory damages.

3  In response, Pinnacle argues the following facts constitute clear and convincing

4  evidence in support of the jury's award of punitive damages:

5  •  Shumway authorized the change of the gyms' names without Pinnacle's

6  consent and then lied about it when Fournier asked him about it;

7  •  Acting as 50% owner of MFC, Shumway promised Stacy Rush that no

8  entity that would sign the Greenstreet leases would include Fournier;

9  •  Shumway and Moyes signed the Consent Resolution knowing the Trust

10  had no intention of keeping the promises in that Resolution;

11  •  Shumway conspired with Darrin Austin and Patti Johnson to lie to

12  Pinnacle and withhold information to negotiate a better buy-out deal;

13  •  Shumway worked behind the scenes with Greenstreet to take over the

14  leases and valuable incentive agreements for the sole benefit of the Trust;

15  •  Shumway sought to cover up his fraud by claiming that he advised Shely

16  there was a buy-out only as a negotiation tool with Greenstreet.

17  Pinnacle asserts that any insistence by Shumway for Pinnacle to sign the

18  Greenstreet leases is discounted by the fact that he had already told Fournier the Trust

19  no longer wanted to partner with Pinnacle.  Pinnacle further notes that the jury found

20  the Trust acted with an evil mind by "intending to cause injury to Pinnacle," by being

21  "motivated by spite or ill-will," and by "serving its own interests, having reason to

22  know and consciously disregarding a substantial risk that its conduct might

23  significantly injure Pinnacle's rights."

24  Pinnacle summarizes the evidence as showing that "Shumway lied to Pinnacle,

25  convinced Austin and Johnson to lie to Pinnacle, promised Rush that Fournier would

26  not be involved before signing the Consent Resolution, and negotiated against Pinnacle

27  and MFC's interests in order to obtain the leases and incentive agreements for the

28  Trust's benefit."

The parties agree that Arizona law applies to Pinnacle's claim for punitive damages. Under Arizona law, "punitive damages are those damages awarded in excess of full compensation to the victim in order to punish the wrongdoer and to deter others from emulating his conduct." Linthicum v. Nationwide Life Ins. Co., 150 Ariz. 326, 330 (1986). The inquiry of whether punitive damages should be awarded focuses on the wrongdoer's mental state. Id. "To recover punitive damages something more is required over and above the mere commission of a tort." Id. (internal quotation marks omitted). "The wrongdoer must be consciously aware of the wrongfulness or harmfulness of his conduct and yet continue to act in the same manner in deliberate contravention to the rights of the victim." Id. Only when the wrongdoer has such awareness may "the evil mind required for the imposition of punitive damages . . . be found." Id.

Based on a review of the record, including the facts cited by Pinnacle, the Court finds a reasonable person could have concluded that Shumway acted with an evil mind in his dealings with Pinnacle. As such, the Court finds the jury's award of punitive damages is supported by substantial evidence. Moreover, because the ratio of punitive damages ($1.1 million) to compensatory damages ($905,242) approximates a 1:1 ratio, the Trust's argument that the punitive damages award is excessive is moot.

In sum, the Court finds the Trust is only entitled to judgment as a matter of law on Pinnacle's promissory estoppel claim. In all other respects, the Trust has failed to demonstrate that the jury's verdict should be vacated as a matter of law and/or is not supported by substantial evidence.

### 3.    Motion for New Trial

The Trust argues in the alternative it is entitled to a new trial to correct what it asserts is an inconsistent verdict. The Trust argues the jury's verdict was inconsistent because Pinnacle pled its tort claims in the alternative but the jury found for Pinnacle on all of its claims. In support of its argument, the Trust cites Pinnacle's First Amended Complaint, which states: "Therefore, in the alternative to its declaratory

relief and contract enforcement claims related to the Buy-Out, Pinnacle also seeks equitable and monetary relief for, among other things, the Trust's fraud and breaches of fiduciary duties and contractual duties owed to Pinnacle."  The Trust asserts that "throughout this lawsuit, Pinnacle sought the return of all capital contributions Ms. Fournier made to MFC through two mutually exclusive avenues."  In support of its position, the Trust notes that Fournier testified that she proposed the terms of the Buy-Out Agreement "to get [her] full investment back from what [she] put in."

In response, Pinnacle argues that, although it initially asserted the tort claims in the alternative, Pinnacle made clear that the claims were not alternative.  Pinnacle notes that, in any event, the Joint Pretrial Order removed any assertion that its Non-Buy-Out claims were alternative to the Buy-Out Claims.  Pinnacle also argues the Trust withdrew its request for verdict forms that would require the jury to stop if it found in favor of Pinnacle on its Buy-Out Claims.  Pinnacle further argues that, once the verdict forms were finalized, the Trust did not object on these grounds and, therefore, the Trust waived its right to object and seek a new trial on these grounds.  Pinnacle argues last that, regardless of whether its Non-Buy-Out Claims were alternative to its Buy-Out Claims, there is nothing inconsistent with the jury's verdict.  That is, the Trust could have breached its agreement to buy out Pinnacle's interest in MFC <u>and</u> defrauded Pinnacle before breaching the Buy-Out Agreement.

In reply, the Trust asserts it did not waive this objection.  The Trust specifically notes that, after the jury rendered its verdict, the Trust requested that the jury be instructed to return to deliberations to resolve this inconsistency, but that the Court denied its request.

"The court may, on motion, grant a new trial on all or some of the issues–and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).

When a jury's answers to written questions "are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered;

16

instead the court must direct the jury to further consider its answers and verdict, or must order a new trial." Fed. R. Civ. P. 49(b)(4). "If a jury answers special interrogatories inconsistently and the answers cannot be reconciled, a new trial must be granted." <u>Tanno v. S.S. President Madison Ves</u>, 830 F.2d 991, 992 (9th Cir. 1987).

The Court finds the jury's verdict is not factually inconsistent because, as noted by Pinnacle, the jury could have found separately that the Trust breached the Buy-Out Agreement and that, before the breach of that agreement, the Trust schemed to defraud Pinnacle. The Court simply does not place as much importance as the Trust seems to on the fact that Fournier used the amount of her capital contributions to negotiate the buy-out deal. Moreover, while Pinnacle initially pled its Non-Buy-Out Claims in the alternative, Pinnacle is correct that the Joint Pretrial Order ultimately governed the matters to be tried. <u>See</u> <u>Bristol Locknut Co. v. SPS Techs., Inc.</u>, 677 F.2d 1277, 1279 (9th Cir. 1982) ("A pretrial order governs the subsequent course of the action unless modified to prevent manifest injustice.") And nothing in the Joint Pretrial Order indicates that the Non-Buy-Out Claims were alternative to the Buy-Out Claims. Accordingly, the Court finds no reason to order a new trial.

## II.     Motion to Stay Execution of Judgment

Because the Trust's Motion to Stay Execution of Judgment requests that execution of the judgment be stayed until this Court rules on the post-trial motions under Rules 50 and 59, and because the Court rules on those motions in this Order, the Trust's Motion to Stay Execution of Judgment is moot.

## III.    Motion to Correct Judgment

Pinnacle requests, pursuant to Rule 60(a), that the Court correct the Judgment in the following ways:

- • Add language to Paragraph 3(a) of the Judgment to include language reading: "The Court finds that a valid and enforceable agreement was reached pursuant to which the Trust agreed to buy Pinnacle's membership interest in MFC on the terms set forth on pages one and two of Exhibit 3

to the First Amended Complaint.  The Court finds that as of April 8, 2008, the Trust is the sole owner of the MFC."

•   Add language to Paragraph 11(a)(i) to reflect that the Trust acquired Xeptor's assets on July 1, 2008–the date triggering payment of the $1.2 million to Pinnacle and thus the date triggering accrual of interest on the judgment.

In response, the Trust argues Pinnacle's proposed changes to the Judgment are improper.  As to the proposed changes to Paragraph 3(a), the Trust asserts it would be improper to include the Court's findings in a Judgment rendered pursuant to a jury trial. The Trust asserts the jury did not decide the existence, validity, scope or application of any non-monetary terms.  The Trust asserts Pinnacle's claim was for breach of contract and that it dismissed its declaratory judgment claim.  The Trust argues Pinnacle is attempting to secure indemnification by the Trust and should not be allowed to do so because the non-monetary terms of the agreement were never decided or settled.

As to the proposed changes to Paragraph 11(a)(i), the Trust argues that it never closed the purchase of Xeptor's assets because it did not occur as contractually structured between MFC and Xeptor.  The Trust argues, as it did under its damages argument above, that payment of the $1.2 million was never triggered and thus Pinnacle is not entitled to interest on that amount.  The Trust further argues that the proposed interest structure (four semi-annual payments) further supports a conclusion that the Buy-Out Agreement is subject to the Statute of Frauds.

In reply, Pinnacle asserts its proposed amendment to Paragraph 3(a) should be accepted because "only one buy-out agreement [was] presented to the jury, the one summarized in Ms. Fournier's April 7, 2008 email," and "[t]he jury found that agreement to be 'valid and enforceable.'"  Pinnacle argues it follows "it only follows that as of the date of that Buy-Out, the Trust is the sole owner of MFC."  Pinnacle then "moves for a finding that based on the jury's verdict" along the lines of its proposed

amendments.

As to Paragraph 11(a)(i), Pinnacle asserts "there is no scenario under which the trigger date in [Paragraph 11(a)(i)] will ever be met" because "Xeptor has no assets as of today because the Trust already purchased them or disposed of them in 2008."

Rule 60(a) permits a court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment."

The Court first finds that Pinnacle does not seek to correct a clerical mistake but instead seeks to modify the Judgment by adding additional terms. This is especially true with regard to Paragraph 3(a) where Pinnacle asks the Court to include certain findings. The Court declines to do so because, as noted by the Trust, there is no basis for the Court to interject its own findings into a judgment based on the verdict of a jury.

As to Paragraph 11(a)(i), however, the Court agrees with Pinnacle that the Judgment should be amended to include July 1, 2008, as the date upon which the Trust closed its purchase of Xeptor's assets. As discussed above, the Court found substantial evidence existed to support a finding that the Trust satisfied this condition precedent through CAC when it purchased Xeptor's only assets.

## CONCLUSION

After a careful review of the parties' submissions and the record in this matter, and for the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. The Trust's Renewed Motion is **GRANTED** as to Plaintiff's promissory estoppel claim and **DENIED** in all other respects;

2. The Trust's Motion to Stay Execution of the Judgment is **DENIED AS MOOT**;

3. Pinnacle's Motion to Correct the Judgment is **GRANTED** as to Paragraph 11(a)(i) of the Judgment and **DENIED** as to Paragraph 3(a) of the Judgment;

4. Pinnacle shall lodge a proposed amended judgment that comports with the Court's rulings in this Order, via email (efile_curiel@casd.uscourts.gov),

and provide a copy of the same to the Trust, on or before **May 15, 2013**.

5. The hearing on these motions, currently set for May 10, 2013, is **VACATED**.

DATED:  May 8, 2013

HON. GONZALO P. CURIEL
United States District Judge